## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA

NICHOLAS FORD and
ALONZO HAWKINS,                                CASE NO.: 3:24-cv-00404-MCR-ZCB

       Plaintiffs,                                JURY TRIAL DEMANDED

  v.

SOUTHERN ROAD & BRIDGE, LLC,

       Defendant.

_____/

## AMENDED COMPLAINT

Plaintiffs, NICHOLAS FORD ("Mr. Ford" and/or "Plaintiff Ford") and ALONZO HAWKINS ("Mr. Hawkins" and/or "Plaintiff Hawkins") (collectively, the "Plaintiffs"), by and through their undersigned counsel, hereby complain of Defendant, SOUTHERN ROAD & BRIDGE, LLC ("Defendant"), and in support allege as follows:

## INTRODUCTION

1.    This case involves two Black bridge painters who were subjected to unlawful discrimination and retaliation during their employment and were unlawfully deprived of the wages owed to them by their employer.

2.    Plaintiffs seek monetary relief to redress Defendant's unlawful employment practices in violation of 42 U.S.C. § 1981 *et seq*. ("Section 1981"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"), the Florida Civil Rights Act of 1992, §760.01 ("FCRA"), and the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq*. ("FLSA").

## PARTIES

3.    Plaintiff, NICHOLAS FORD, is an individual male residing in Escambia County, Florida.

4.      Plaintiff, ALONZO HAWKINS, is an individual male residing in Tarrant County, Texas.

5.      Defendant, SOUTHERN ROAD & BRIDGE, LLC, is a Florida Limited Liability Company, with its principal place of business located at 715 Wesley Avenue, Tarpon Springs, Florida, 34689.

6.      Defendant is a licensed General Contractor operating across the United States with the focus of paving roadways and restoring bridges.

7.      At all times material, Defendant employed Plaintiffs to work at various construction sites throughout Florida.

8.      Defendant's exact number of employees is unknown to Plaintiffs, but upon information and belief, there are well more employees than the statutory minimum.

9.      At all times material hereto, Defendant determined and controlled Plaintiff's work schedule and job duties, including the assignment of overtime hours.

10.     At all times material, Defendant was an "employer" within the meaning of 42 U.S.C. § 2000e(b).

11.     At all times material, Plaintiffs were each an "employee" of Defendant within the meaning of 42 U.S.C. § 2000e(f).

12.     Defendant was an "employer" within the meaning of 29 U.S.C. § 203(d).

13.     Plaintiffs were non-exempt hourly employees of Defendant, as the term "employee" is defined by 29 U.S.C. § 203(e).

14.     At all times material, Defendant was an "employer" within the meaning of § 760.02(7), Florida Statutes.

15.     At all times material, Plaintiffs were each a "person" within the meaning of §

760.02(6), Florida Statutes.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367. This action is authorized and instituted pursuant to 42 U.S.C. § 1981, 42 U.S.C. § 2000e, 29 U.S.C. § 201.

17.     Venue is proper in this Court under 28 U.S.C. §1391 because the events giving rise to this action occurred within the jurisdiction of the United States District Court for the Northern District of Florida.

## ADMINISTRATIVE PREREQUISITES

18.     Mr. Ford has complied with all statutory prerequisites in order to file this action.

19.     On or about January 10, 2024, Mr. Ford timely filed a Charge of Discrimination (Charge No. 511-2024-01203) against Defendant with the U.S. Equal Employment Opportunity Commission ("EEOC") and the Florida Commission on Human Relations ("FCHR").

20.     Mr. Hawkins has complied with all statutory prerequisites in order to file this action.

21.     On or about January 10, 2024, Mr. Hawkins timely filed a Charge of Discrimination (Charge No. 511-2024-01202) against Defendant with the EEOC and the FCHR.

22.     The EEOC has issued each Plaintiff's Notice of Right to Sue against Defendant.

23.     Plaintiffs are timely commencing this action within ninety (90) days of receipt of the EEOC's Notice of Right to Sue.

24.     Plaintiffs are timely commencing this action more than 180 days since the filing of their charges of discrimination.

## FACTUAL ALLEGATIONS

### FLSA Coverage

25.     At all times material, Defendant regularly employed two or more employees for the relevant time that handled goods or materials that travelled through interstate commerce, or used instrumentalities of interstate commerce, thus making Defendant's business an enterprise covered under the Fair Labor Standards Act.

26.     At all times material, Defendant was an enterprise engaged in interstate commerce in the course of their marketing, locations, services, and sale products that have moved through interstate commerce.

27.     At all times material, Defendant regularly and recurrently obtained, solicited, exchanged, and sent funds to and from outside of the State of Florida, used telephonic transmissions going outside of the State of Florida to conduct business, and transmitted electronic information through computers, the internet, via email, and otherwise outside of the State of Florida.

28.     At all times material, Defendant has had gross revenues in excess of $500,000.00 per year.

29.     At all times material, Defendant was an "enterprise engaged in commerce or the production of goods for commerce," within the meaning of 29 § U.S.C. 206(a).

30.     At all times material, the Defendant had two or more "employees handling, selling or otherwise working on goods or material that have been moved in or produced for commerce by any person," within the meaning of 29 § U.S.C. 203(s)(1)(A).

31.     At all times material, Defendant had an annual gross volume of sale made or business done of not less than $500,000 (exclusive of excise taxes at the retail level that are separately stated), within the meaning of 29 § U.S.C. 203(s)(1)(A).

**Defendant Unlawfully Violated the FLSA from the Onset of Plaintiffs' Employment**

32.     On or about February 26, 2023, Defendant hired Mr. Ford as a Laborer.

33.     Several weeks later, in or around March of 2023, Mr. Ford complained to Human Resources because Defendant paid him $22.00 per hour for the first three (3) weeks of employment despite his agreement stating Defendant would pay Mr. Ford $24.00 per hour.

34.     Mr. Ford complained after his first incorrect paycheck but this was not corrected until several weeks later. Mr. Ford contacted Eloi [Last Name Unknown], a non-Black individual hired by Defendant alongside Mr. Ford, to ask if he received lower wages. Eloi did not experience the same issue as Defendant paid him the correct amount despite underpaying Mr. Ford.

35.     Defendant discovered that Mr. Ford was correct in claiming he was being underpaid, and it addressed this issue.

36.     On or around April 11, 2023, Defendant hired Mr. Hawkins as a Laborer.

37.     Plaintiffs were dedicated employees and worked at various jobsites spanning hundreds of miles for Defendant.

38.     In or around June of 2023, Mr. Ford texted Ryan Witt ("Witt"), an individual white male employed by Defendant as Field Supervisor, regarding a wage and hour dispute where Defendant paid Mr. Ford for 26.00 hours despite working 40.00 hours that week.

39.     At all times material, Witt maintained the ability to modify Plaintiffs' employment, including but not limited to changing Plaintiffs' hours, work assignments, work schedule, and work location, as well as the ability to hire and/or fire Plaintiffs.

40.     Around the same time, Mr. Hawkins brought forth similar complaints regarding wage and hour disputes. More specifically, Mr. Hawkins reported that Defendant was not paying him for his hours worked, including regular and overtime hours.

41.     Defendant brushed aside Plaintiffs' complaints, urging them to continue working to get paid.

42.     Defendant continued to underpay Plaintiffs, so Plaintiffs asked for pictures of the timesheets that were being submitted on their behalf.

43.     This timesheet was to be filled out and signed daily by each employee to confirm the hours they worked on any given day, then handed to a supervisor for filing.

44.     Upon receipt of the timesheets from Witt, Plaintiffs discovered that Defendant was fraudulently signing Plaintiffs' names and inputting the incorrect hours onto these timesheets.

45.     Not only was the signature of each employee identical on every timesheet provided, but Mr. Hawkins' name was spelled incorrectly on every timesheet, confirming Plaintiffs' suspicions that the documents were forged.

46.     Defendant implemented such practices to unlawfully lower Plaintiffs' hours and avoid paying Plaintiffs for hundreds of hours of owed work and overtime.

47.     Mr. Ford reported the timesheet errors to Witt on or around October 23, 2023, and again on or around November 5, 2023, stating that he was missing payment for regular and overtime hours and entire paychecks.

48.     Mr. Hawkins also continued to complain about missing hours from his paychecks throughout this time.

49.     As a result of Plaintiffs' continued complaints to Defendant regarding their fraudulent timesheets and failure to pay owed wages, on or around November 6,  2023, George

Pappas ("Pappas"), an individual white male employed by Defendant as a Human Resources and Project Manager, texted Mr. Hawkins asking for a correction to his hours, knowing there was an issue.

50.     At all times material, Pappas maintained the ability to modify Plaintiffs' employment, including but not limited to changing Plaintiffs' hours, work assignments, work schedule, and work location, as well as the ability to hire and/or fire Plaintiffs.

51.     Defendant employed Mr. Ford for approximately ten (10) months, and Mr. Hawkins for approximately nine (9) months. Yet, Mr. Ford had only signed one timesheet, and Mr. Hawkins had never signed a timesheet, despite Defendant's policy which required each Laborer to sign their timesheets on a daily basis.

52.     As a result, Plaintiffs were each owed hundreds of hours of regular and overtime wages, which Defendant refused to pay.

53.     In or around November of 2023, shortly after Plaintiffs' complaints and reports of Defendant's egregious wage and hour violations, Defendant terminated Plaintiffs.

<u>**Defendant Unlawfully Discriminated Against Plaintiffs**</u>
<u>**on the Basis of their Race and Color**</u>

54.     At all times material hereto, Defendant employed Isaac Ruiz (hereinafter "Ruiz"), an individual Hispanic male, as the Crew Lead for Defendant.

55.     At all times material, Ruiz maintained the ability to modify Plaintiffs' employment, including but not limited to changing Plaintiffs' hours, work assignments, work schedule, and work location, as well as the ability to hire and/or fire Plaintiffs.

56.     In or around April of 2023, Ruiz told Mr. Hawkins that he was close with the Human Resources team, and that the last Black guy who snitched on Ruiz was fired. Mr. Hawkins

was confused as to why Ruiz mentioned his race or skin color, or felt the need to warn Mr. Hawkins about "snitching." Nevertheless, Plaintiffs continued to work to the best of their abilities.

57.     On or around May 23, 2023, Mr. Hawkins asked Witt for a day off to spend time with his mother, who was dying of cancer. Witt denied Mr. Hawkins' request, saying that Mr. Hawkins would be able to see her during a lunch break. Meanwhile, Witt approved a non-Black employee's request, to take four (4) days off for Halloween, immediately upon request.

58.     In or around June of 2023, Plaintiffs' mother passed due to cancer, and they attended her funeral.

59.     Witt told Plaintiffs that they would have paid leave while attending the funeral.

60.     Defendant, per Witt's instruction, had previously paid non-Black employees for days off regarding familial matters, yet Defendant never paid Plaintiffs for this time off.

61.     While Plaintiffs were at the funeral, Witt called Mr. Hawkins and shouted over the phone demanding Plaintiffs return to a worksite a few hundred miles away.

62.     Witt demanded Plaintiffs return to work immediately despite knowing they were attending their mother's funeral. Not only did Defendant fail to pay Plaintiffs for time off to attend their mother's funeral, but Defendant also demanded Plaintiffs use their own money to travel to the job site that same night

63.     On or around June 24, 2023, Ruiz specifically told Plaintiffs that they could not stop for food on the way to the job site. Subsequent to these instructions, Ruiz reprimanded Plaintiffs for purchasing food on the way to a jobsite, however, Ruiz allowed non-Black coworkers to get food without any reprimand, warning, or discipline. Plaintiffs realized that Ruiz would look the other way whenever a non-Black employee stopped for food on the way to the sites, but Ruiz reprimanded Black employees for the exact same action.

64. Additionally, on several occasions, Ruiz denied Plaintiffs and other Black employees their lunch breaks while allowing non-Black employees to break for lunch. Ruiz allowed Hispanic employees to drive the company trucks to pick up lunch regardless of whether they had a driver's license. Yet, Ruiz did not allow Plaintiffs to drive the company trucks to get lunch even though they had their driver's licenses.

65. Further, Ruiz limited Plaintiffs' ability to drive any company truck as he explained that Black people always get pulled over. Ruiz told Plaintiffs and additional colleagues that Black people should not be allowed to drive company trucks.

66. Each Plaintiff carried his driver's license and was certified to drive for Defendant. In fact, driving the trucks was an opportunity for Plaintiffs to clock-in and get paid, but Ruiz repeatedly denied them such opportunity.

67. Ruiz also refused Plaintiffs the right to use the company port-a-potty on various occasions, requiring them to relieve themselves on the side of the highway. Again, Ruiz did not refuse non-Black employees access to the company port-a-potty while at the worksite.

68. Plaintiffs' workplace was further riddled with racism as Ruiz normalized calling Plaintiffs and other Black employees "*nigger*." Ruiz used racial slurs against Plaintiffs in person and via text.

69. Another aspect of Plaintiffs' job with Defendant was to perform work while being in a tunnel or underground, and during the Summer of 2023, Plaintiffs worked in extreme heat with Ruiz. Ruiz would sweat profusely and complain to Plaintiffs that he was "sweating like a *nigger* trying to read." Plaintiffs were disgusted and appalled by these comments.

70. Witt also contributed to Defendant's racist workplace.

71.     On or around September 13, 2023, Witt told Plaintiffs that Black men have huge genitals. This made Plaintiffs extremely uncomfortable. Plaintiffs told Witt that they did not want to continue the conversation. However, Witt continued this conversation, explaining that Black men have huge penises. Plaintiffs did not respond in the hope of moving past this subject.

72.     Shortly thereafter, while at work, Witt told Plaintiffs that he let a gay guy grab his penis for $50.

73.     Plaintiffs were disturbed by these comments and wanted to work without being subjected to racially discriminatory or sexually harassing comments.

74.     Throughout the duration of Plaintiffs' employment, Witt repeatedly sexualized Black men by making comments about their penises.

75.     On or around October 8, 2023, at approximately 10:29 A.M., Plaintiffs and their coworkers were in hotel rooms near a job site, and they heard music coming from the site. Ruiz texted the group chat, "[t]his *nigga* playing [g]ay as[s] music". Ruiz continued to complain about the music, stating, "I think it's the mf Alfredo whooped and the *niggas* across hall ta[l]king laughing loud and they have a bitch that works with them[.]"

76.     Defendant, by and through Ruiz, encouraged and utilized racist language and behavior in its workplace.

77.     In or around October of 2023, Mr. Ford reported Ruiz's and Witt's unlawful conduct directly to Witt hoping this would change the culture of the work environment. In response, Witt told Mr. Ford that they would have a further meeting to fix any workplace-related issues regarding discrimination.

78.     In or around late October of 2023, Witt asked Mr. Hawkins if he believed that Witt was racist and discriminatory towards Plaintiffs. Mr. Hawkins confirmed that Witt and Ruiz treated

non-Black employees more favorably and that both Witt and Ruiz had said many racist comments to Plaintiffs.

79.     Witt did not take any meaningful corrective action, never held a subsequent meeting to address the complaints of racism, and as a result, the unlawful discrimination and sexual harassment persisted.

80.     In or around early November of 2023, Defendant terminated Mr. Ford despite his successful job performance. This termination came less than a few weeks after he reported Witt and Ruiz for unlawful activity.

81.     Defendant did not issue a write-up to Mr. Ford or place Mr. Ford on a performance improvement plan, yet Defendant cited performance issues as the basis for termination. Although Defendant contends that Mr. Ford voluntarily resigned, Ruiz texted Mr. Hawkins and several other employees the following: "Just to let everyone know we got rid of [N]ick for lack of performance[.]"

82.     Ruiz texted Mr. Hawkins, "we all know snitching is hoe shit and u better than us know that [Nick,] [yo]ur own brother trying to throw us under the bus…" Ruiz directly characterized Mr. Ford's complaints and reports as "snitching" before threatening additional retaliatory action against Mr. Hawkins.

83.     On or around November 3, 2023, Mr. Hawkins sent Witt a detailed text message complaining about safety violations, wage and hour violations, and harassment.

84.     A few days later, Witt retaliated against Mr. Hawkins. Witt was supposed to pick up Mr. Hawkins and take him to a job site. Witt failed to pick Mr. Hawkins up and proceeded to terminate Mr. Hawkins for a "no call no show." Mr. Hawkins explained that he was intentionally

left behind, and provided screenshots to support his claim, but Defendant proceeded to ignore and terminate him.

85.    Defendant's termination of Mr. Hawkins came following his reports of racism, harassment, and wage and hour violations.

86.    Neither Plaintiff was written up, disciplined, or placed on a performance improvement plan prior to their terminations.

87.    As a result of Plaintiffs' numerous complaints and reports of extensive unlawful activity, Defendant, by and through its agents, terminated both Plaintiffs in or around early November of 2023.

88.    Defendant unlawfully and wrongfully terminated Plaintiffs because of their race and color, and in retaliation for their repeated complaints of unlawful conduct.

89.    The above-described conduct represents just some examples of the unlawful discrimination, harassment, and retaliation to which Defendant subjected Plaintiffs.

90.    Defendant unlawfully discriminated against Plaintiffs on the basis of their race and color.

91.    Defendant is either directly or vicariously responsible for the unlawful acts and conduct complained of herein.

92.    As a result of Defendant's actions, Plaintiffs felt extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

93.    At all times material, Defendant's employees acted as agents of Defendant in their discriminatory and unlawful treatment of Plaintiffs.

94.    At all times material, Defendant acted with deliberate indifference to the discriminatory treatment and hostile work environment complained of herein.

95.     As a result of the acts and conduct complained herein, Plaintiffs have suffered and will continue to suffer the loss of income, the loss of salary, bonuses, benefits, and other compensation which such employment entails, and Plaintiffs have also suffered future pecuniary losses, emotional pain, humiliation, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Plaintiffs have further experienced severe emotional and physical distress.

96.     Defendant's conduct was malicious, willful, extreme, and outrageous, and conducted with full knowledge of the law so as to justify an award of punitive damages against Defendant.

## COUNT I
### 42 U.S.C. § 1981
### RACE AND COLOR DISCRIMINATION
### (Plaintiff Hawkins as Against Defendant)

97.     Mr. Hawkins reincorporates the factual allegations in Paragraphs 25 through 96.

98.     Section 1981 provides in relevant part, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a).

99.     Section 1981 further provides that the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. § 1981(b).

100.     Mr. Hawkins is a Black individual, and he is therefore a protected class member.

101.     The elements of a prima facie case of disparate treatment are flexible and are tailored on a case-by-case basis to differing factual circumstances.

102.    Defendant subjected Mr. Hawkins to discriminatory treatment on the basis of his race and skin color.

103.    Defendant's discriminatory treatment included, but was not limited to, denying Mr. Hawkins the same employment privileges afforded to his non-Black co-workers; refusing to approve Mr. Hawkins' requested days off; denying Mr. Hawkins leave to mourn for his mother; denying Black employees the ability to stop for food on the way to the worksite; denying Black employees the ability to take lunch breaks; denying Black employees access to operate the company vehicles; denying Black employees access to company restrooms; denying Black employees similar work opportunities to non-Black employees; disciplining Black employees for performing the same actions as non-Black employees; reducing Mr. Hawkins' hours worked; forging Mr. Hawkins' signature on the daily timesheet; subjecting Black employees to racial slurs such as "nigger"; and unlawfully terminating Mr. Hawkins.

104.    Defendant targeted Mr. Hawkins because he is Black. No similarly situated employee outside his protected class endured the discriminatory conduct that Mr. Hawkins was forced to endure.

105.    The discriminatory actions of Defendant against Mr. Hawkins, as described and set forth above, constitute an adverse employment action for purposes of Section 1981. In subjecting Mr. Hawkins to adverse employment actions, Defendant intentionally discriminated against Mr. Hawkins with respect to the compensation, terms, conditions, or privileges of his employment.

106.    As a direct and proximate result of Defendant's intentional discriminatory conduct in violation of Section 1981, Mr. Hawkins has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits. Mr. Hawkins

has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages.

107. Mr. Hawkins accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

108. Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of Mr. Hawkins' rights under Section 1981, warranting the imposition of punitive damages in addition to compensatory damages.

109. Defendant's conduct deprived Mr. Hawkins of his statutory rights guaranteed under Section 1981.

110. Mr. Hawkins further requests that his attorney's fees and costs be awarded as permitted by law.

**COUNT II**
**42 U.S.C. § 1981**
**HOSTILE WORK ENVIRONMENT**
**(Plaintiff Hawkins as Against Defendant)**

111. Mr. Hawkins reincorporates the factual allegations in Paragraphs 25 through 96.

112. Section 1981 provides in relevant part, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a).

113. Section 1981 further provides that the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. § 1981(b).

15

114.    Mr. Hawkins is a Black individual, and he is therefore a protected class member.

115.    The Defendant's discriminatory conduct was severe or pervasive enough to make any reasonable person of the same legally protected class believe that the conditions of employment were altered, and that the working environment was intimidating, hostile, or abusive.

116.    Defendant's severe and pervasive conduct included, but was not limited to, repeatedly subjecting Mr. Hawkins to the use of racial slurs including "*nigger*" both in person and via text message; denying Black employees the right to operate Defendant's vehicles because "Black people always get pulled over"; and sexualizing Black men, stating that "Black men have huge genitals."

117.    Defendant targeted Mr. Hawkins because he is Black. No similarly situated employee outside his protected classes endured the discriminatory conduct that Mr. Hawkins was forced to endure.

118.    Defendant's discriminatory conduct toward Mr. Hawkins negatively impacted both his professional life and his personal life. Defendant's conduct made Mr. Hawkins feel isolated, humiliated, embarrassed, and ashamed.

119.    As a direct and proximate result of Defendant's intentional discriminatory conduct in violation of Section 1981, Mr. Hawkins has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.

120.    Mr. Hawkins has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages.

121.    Mr. Hawkins accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

122.    Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of Mr. Hawkins' rights under Section 1981, warranting the imposition of punitive damages in addition to compensatory damages.

123.    Defendant's conduct deprived Mr. Hawkins of his statutory rights guaranteed under Section 1981.

124.    Mr. Hawkins further requests that his attorney's fees and costs be awarded as permitted by law.

**COUNT III**
**42 U.S.C. § 1981**
**RETALIATION**
**(Plaintiff Hawkins as Against Defendant)**

125.    Mr. Hawkins reincorporates the factual allegations in Paragraphs 25 through 96.

126.    Section 1981 provides in relevant part, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a).

127.    Section 1981 further provides that the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. § 1981(b).

128.    The elements of a prima facie case of retaliation are flexible and are tailored on a case-by-case basis to differing factual circumstances.

129.    Defendant retaliated against Mr. Hawkins for reporting discrimination on the basis of his race and skin color in violation of Section 1981.

130.    Mr. Hawkins engaged in protected activity by making several complaints to Defendant and opposing Defendant's unlawful actions.

131.    Mr. Hawkins was subjected to materially adverse actions at the time or within a relatively short time after the protected conduct took place.

132.    Defendant's actions were "materially adverse" because they were serious enough to discourage a reasonable worker from engaging in similar protected activity.

133.    Mr. Hawkins engaged in protected activity by reporting Witt's and Ruiz's discriminatory behavior and comments repeatedly throughout his employment.

134.    Mr. Hawkins further engaged in protected activity by frequently reporting Defendant's wage and hour violations to Witt, Ruiz, and Pappas, stating that his hours timesheets were wrong.

135.    After Defendant wrongfully terminated Mr. Hawkins' brother, Mr. Ford, for similar complaints, Ruiz threatened that "snitching" would result in termination.

136.    Within a few days of Mr. Hawkins' latest reports of discrimination, harassment, and wage violations, Defendant terminated Mr. Hawkins under the guise of attendance issues. However, Defendant never issued Mr. Hawkins a written warning prior to terminating him.

137.    There is a causal connection between Mr. Hawkins' reports of unlawful behavior and Defendant terminating Mr. Hawkins' employment.

138.    In response to Mr. Hawkins opposing the discriminatory conduct and asserting his right to enjoy the same employment benefits as every other employee, Defendant retaliated against Mr. Hawkins.

139.    Defendant retaliated against Mr. Hawkins by engaging in conduct, including but not limited to, failing to transport Mr. Hawkins to a job site then claim Mr. Hawkins failed to

appear for work; forcing Mr. Hawkins to continue working with racist and discriminatory individuals; and unlawfully terminating Mr. Hawkins.

140.   Defendant took the above-mentioned materially adverse actions, among others, against Mr. Hawkins because of his protected activities.

141.   Any reasonable employee in Mr. Hawkins' position would be dissuaded from reporting unlawful conduct if he knew that he would be subjected to the kind of treatment that Mr. Hawkins was forced to endure.

142.   Defendant's alleged bases for its adverse employment actions against Mr. Hawkins are pretextual and have been asserted only to cover up the retaliatory nature of Defendant's conduct.

143.   As a direct and proximate result of Defendant's intentional discriminatory conduct in violation of Section 1981, Mr. Hawkins has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits. Mr. Hawkins has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages.

144.   Mr. Hawkins accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

145.   Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of Mr. Hawkins' rights under Section 1981, warranting the imposition of punitive damages in addition to compensatory damages.

146.   Defendant's conduct deprived Mr. Hawkins of his statutory rights guaranteed under Section 1981.

147.    Mr. Hawkins further requests that his attorney's fees and costs be awarded as permitted by law.

**COUNT IV**
**42 U.S.C. § 2000e-2**
**RACE and COLOR DISCRIMINATION**
**(Plaintiff Hawkins as Against Defendant)**

148.    Mr. Hawkins reincorporates the factual allegations in Paragraphs 25 through 96.

149.    Title VII provides, in relevant part, that "it shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of his race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

150.    Title VII further provides that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m).

151.    Mr. Hawkins is a Black individual, and he is therefore a protected class member.

152.    The elements of a prima facie case of disparate treatment are flexible and are tailored on a case-by-case basis to differing factual circumstances.

153.    Defendant subjected Mr. Hawkins to discriminatory treatment on the basis of his race and skin color.

154.    Defendant's discriminatory treatment included, but was not limited to, denying Mr. Hawkins the same employment privileges afforded to his non-Black co-workers; refusing to approve Mr. Hawkins' requested days off; denying Mr. Hawkins leave to mourn for his mother; denying Black employees the ability to stop for food on the way to the worksite; denying Black employees the ability to take lunch breaks; denying Black employees access to operate the

company vehicles; denying Black employees access to company restrooms; denying Black employees similar work opportunities to non-Black employees; disciplining Black employees for performing the same actions as non-Black employees; reducing Mr. Hawkins' hours worked; forging Mr. Hawkins' signature on the daily timesheet; subjecting Black employees to racial slurs such as "nigger"; and unlawfully terminating Mr. Hawkins.

155.   Defendant targeted Mr. Hawkins because he is Black. No similarly situated employee outside his protected class endured the discriminatory conduct that Mr. Hawkins was forced to endure.

156.   The discriminatory actions of Defendant against Mr. Hawkins, as described and set forth above, constitute an adverse employment action for purposes of Title VII. In subjecting Mr. Hawkins to adverse employment actions, Defendant intentionally discriminated against Mr. Hawkins with respect to the compensation, terms, conditions, or privileges of his employment.

157.   As a direct and proximate result of Defendant's intentional discriminatory conduct in violation of Title VII, Mr. Hawkins has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits. Mr. Hawkins has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages.

158.   Mr. Hawkins accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

159.   Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of Mr. Hawkins' rights under Title VII, warranting the imposition of punitive damages in addition to compensatory damages.

160.    Defendant's conduct deprived Mr. Hawkins of his statutory rights guaranteed under Title VII.

161.    Mr. Hawkins further requests that his attorney's fees and costs be awarded as permitted by law.

**COUNT V**
**42 U.S.C. § 2000e-2**
**HOSTILE WORK ENVIRONMENT**
**(Plaintiff Hawkins as Against Defendant)**

162.    Mr. Hawkins reincorporates the factual allegations in Paragraphs 25 through 96.

163.    Title VII provides, in relevant part, that "it shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of his race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

164.    Title VII further provides that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m).

165.    Mr. Hawkins is a Black individual, and he is therefore a protected class member.

166.    The Defendant's discriminatory conduct was severe or pervasive enough to make any reasonable person of the same legally protected class believe that the conditions of employment were altered, and that the working environment was intimidating, hostile, or abusive.

167.    Defendant's severe and pervasive conduct included, but was not limited to, repeatedly subjecting Mr. Hawkins to the use of racial slurs including "*nigger*" both in person and via text message; denying Black employees the right to operate Defendant's vehicles because

"Black people always get pulled over"; sexualizing Black men, stating that "Black men have huge genitals"; and telling Mr. Hawkins about homosexual activity while at work.

168.    Defendant targeted Mr. Hawkins because he is Black. No similarly situated employee outside his protected classes endured the discriminatory conduct that Mr. Hawkins was forced to endure.

169.    Defendant's discriminatory conduct toward Mr. Hawkins negatively impacted both his professional life and his personal life. Defendant's conduct made Mr. Hawkins feel isolated, humiliated, embarrassed, and ashamed.

170.    As a direct and proximate result of Defendant's intentional discriminatory conduct in violation of Title VII, Mr. Hawkins has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.

171.    Mr. Hawkins has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages.

172.    Mr. Hawkins accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

173.    Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of Mr. Hawkins' rights under Title VII, warranting the imposition of punitive damages in addition to compensatory damages.

174.    Defendant's conduct deprived Mr. Hawkins of his statutory rights guaranteed under Title VII.

175.    Mr. Hawkins further requests that his attorney's fees and costs be awarded as permitted by law.

**COUNT VI**
**42 U.S.C. § 2000e-3**
**RETALIATION**
**(Plaintiff Hawkins as Against Defendant)**

176.     Mr. Hawkins reincorporates the factual allegations in Paragraphs 25 through 96.

177.     Title VII prohibits retaliation in any manner against a person who has opposed a discriminatory practice, or who has participated in any investigation, proceeding or hearing related to an unlawful discriminatory practice. 42 U.S.C. § 2000e-3(a).

178.     The elements of a prima facie case of retaliation are flexible and are tailored on a case-by-case basis to differing factual circumstances.

179.     Defendant retaliated against Mr. Hawkins for reporting discrimination on the basis of his race and skin color in violation of Title VII.

180.     Mr. Hawkins engaged in protected activity by making several complaints to Defendant and opposing Defendant's unlawful actions.

181.     Mr. Hawkins was subjected to materially adverse actions at the time or within a relatively short time after the protected conduct took place.

182.     Defendant's actions were "materially adverse" because they were serious enough to discourage a reasonable worker from engaging in similar protected activity.

183.     Mr. Hawkins engaged in protected activity by reporting Witt's and Ruiz's discriminatory behavior and comments repeatedly throughout his employment.

184.     Mr. Hawkins further engaged in protected activity by frequently reporting Defendant's wage and hour violations to Witt, Ruiz, and Pappas, stating that his hours timesheets were wrong.

185.     After Defendant wrongfully terminated Mr. Hawkins' brother, Mr. Ford, for similar complaints, Ruiz threatened that "snitching" would result in termination.

24

186.    Within a few days of Mr. Hawkins' latest reports of discrimination, harassment, and wage violations, Defendant terminated Mr. Hawkins under the guise of attendance issues. However, Defendant never issued Mr. Hawkins a written warning prior to terminating him.

187.    There is a causal connection between Mr. Hawkins' reports of unlawful behavior and Defendant terminating Mr. Hawkins' employment.

188.    In response to Mr. Hawkins opposing the discriminatory conduct and asserting his right to enjoy the same employment benefits as every other employee, Defendant retaliated against Mr. Hawkins.

189.    Defendant retaliated against Mr. Hawkins by engaging in conduct, including but not limited to, failing to transport Mr. Hawkins to a job site then claim Mr. Hawkins failed to appear for work; forcing Mr. Hawkins to continue working with racist and discriminatory individuals; and unlawfully terminating Mr. Hawkins.

190.    Defendant took the above-mentioned materially adverse actions, among others, against Mr. Hawkins because of his protected activities.

191.    Any reasonable employee in Mr. Hawkins' position would be dissuaded from reporting racism if he knew that he would be subjected to the kind of treatment that Mr. Hawkins was forced to endure.

192.    Defendant's alleged bases for its adverse employment actions against Mr. Hawkins are pretextual and have been asserted only to cover up the retaliatory nature of Defendant's conduct.

193.    As a direct and proximate result of Defendant's intentional discriminatory conduct in violation of Title VII, Mr. Hawkins has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits. Mr. Hawkins

has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages.

194.    Mr. Hawkins accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

195.    Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of Mr. Hawkins' rights under Title VII, warranting the imposition of punitive damages in addition to compensatory damages.

196.    Defendant's conduct deprived Mr. Hawkins of his statutory rights guaranteed under Title VII.

197.    Mr. Hawkins further requests that his attorney's fees and costs be awarded as permitted by law.

**COUNT VII**
**§ 760.10(1), Fla. Stat.**
**RACE and COLOR DISCRIMINATION**
**(Plaintiff Hawkins as Against Defendant)**

198.    Mr. Hawkins reincorporates the factual allegations in Paragraphs 25 through 96.

199.    The FCRA prohibits employment discrimination in an individual's terms, conditions, and privileges of employment because of the individual's race and color. § 760.10(1)(a), Fla. Stat.

200.    Mr. Hawkins is a Black individual, and he is therefore a protected class member.

201.    The elements of a prima facie case of disparate treatment are flexible and are tailored on a case-by-case basis to differing factual circumstances.

202.    Defendant subjected Mr. Hawkins to discriminatory treatment on the basis of his race and skin color.

203.    Defendant's discriminatory treatment included, but was not limited to, denying Mr. Hawkins the same employment privileges afforded to his non-Black co-workers; refusing to approve Mr. Hawkins' requested days off; denying Mr. Hawkins leave to mourn for his mother; denying Black employees the ability to stop for food on the way to the worksite; denying Black employees the ability to take lunch breaks; denying Black employees access to operate the company vehicles; denying Black employees access to company restrooms; denying Black employees similar work opportunities to non-Black employees; disciplining Black employees for performing the same actions as non-Black employees; reducing Mr. Hawkins' hours worked; forging Mr. Hawkins' signature on the daily timesheet; subjecting Black employees to racial slurs such as "nigger"; and unlawfully terminating Mr. Hawkins.

204.    Defendant targeted Mr. Hawkins because he is Black. No similarly situated employee outside his protected class endured the discriminatory conduct that Mr. Hawkins was forced to endure.

205.    The discriminatory actions of Defendant against Mr. Hawkins, as described and set forth above, constitute an adverse employment action for purposes of the FCRA.  In subjecting Mr. Hawkins to adverse employment actions, Defendant intentionally discriminated against Mr. Hawkins with respect to the compensation, terms, conditions, or privileges of his employment.

206.    As a direct and proximate result of Defendant's intentional discriminatory conduct in violation of the FCRA, Mr. Hawkins has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.  Mr. Hawkins has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages Mr. Hawkins accordingly demands lost economic damages, lost

wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

207.    Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of Mr. Hawkins' rights under the FCRA, warranting the imposition of punitive damages in addition to compensatory damages.

208.    The conduct of Defendant deprived Mr. Hawkins of his statutory rights guaranteed under the FCRA.

209.    Mr. Hawkins further requests that his attorney's fees and costs be awarded as permitted by law.

**COUNT VIII**
**§ 760.10(1), Fla. Stat.**
**HOSTILE WORK ENVIRONMENT**
**(Plaintiff Hawkins as Against Defendant)**

210.    Mr. Hawkins reincorporates the factual allegations in Paragraphs 25 through 96.

211.    The FCRA prohibits employment discrimination in an individual's terms, conditions, and privileges of employment because of the individual's race and skin color. § 760.10(1), Fla. Stat.

212.    Mr. Hawkins is a Black individual, and he is therefore a protected class member.

213.    The Defendant's discriminatory conduct was severe or pervasive enough to make any reasonable person of the same legally protected class believe that the conditions of employment were altered, and that the working environment was intimidating, hostile, or abusive.

214.    Defendant's severe and pervasive conduct included, but was not limited to, repeatedly subjecting Mr. Hawkins to the use of racial slurs including "*nigger*" both in person and via text message; denying Black employees the right to operate Defendant's vehicles because

"Black people always get pulled over"; sexualizing Black men, stating that "Black men have huge genitals"; and telling Mr. Hawkins about homosexual activity while at work.

215.    Defendant targeted Mr. Hawkins because he is Black. No similarly situated employee outside his protected classes endured the discriminatory conduct that Mr. Hawkins was forced to endure.

216.    Defendant's discriminatory conduct toward Mr. Hawkins negatively impacted both his professional life and his personal life. Defendant's conduct made Mr. Hawkins feel isolated, humiliated, embarrassed, and ashamed.

217.    As a direct and proximate result of Defendant's intentional discriminatory conduct in violation of the FCRA, Mr. Hawkins has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.  Mr. Hawkins has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages Mr. Hawkins accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

218.    Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of the Mr. Hawkins' rights under the FCRA, warranting the imposition of punitive damages in addition to compensatory damages.

219.    The conduct of Defendant deprived Mr. Hawkins of his statutory rights guaranteed under the FCRA.

220.    Mr. Hawkins further requests that his attorney's fees and costs be awarded as permitted by law.

## COUNT IX
## § 760.10(7), Fla. Stat.
## RETALIATION
## (Plaintiff Hawkins as Against Defendant)

221.    Mr. Hawkins reincorporates the factual allegations in Paragraphs 25 through 96.

222.    The FCRA prohibits retaliation in any manner against a person who has opposed a discriminatory practice, or who has participated in any investigation, proceeding or hearing related to an unlawful discriminatory practice. § 760.10(7), Fla. Stat.

223.    The elements of a prima facie case of retaliation are flexible and are tailored on a case-by-case basis to differing factual circumstances.

224.    Mr. Hawkins engaged in a protected activity when he opposed Defendant's unlawful discriminatory conduct on the basis of his race and color.

225.    Mr. Hawkins engaged in protected activity by making several complaints to Defendant and opposing Defendant's unlawful actions.

226.    Mr. Hawkins was subjected to materially adverse actions at the time or within a relatively short time after the protected conduct took place.

227.    Defendant's actions were "materially adverse" because he were serious enough to discourage a reasonable worker from engaging in similar protected activity.

228.    Mr. Hawkins engaged in protected activity by reporting Witt's and Ruiz's discriminatory behavior and comments repeatedly throughout his employment.

229.    Mr. Hawkins further engaged in protected activity by frequently reporting Defendant's wage and hour violations to Witt, Ruiz, and Pappas, stating that his hours timesheets were wrong.

230.    After Defendant wrongfully terminated Mr. Hawkins' brother, Mr. Ford, for similar complaints, Ruiz threatened that "snitching" would result in termination.

231.    Within a few days of Mr. Hawkins' latest reports of discrimination, harassment, and wage violations, Defendant terminated Mr. Hawkins under the guise of attendance issues. However, Defendant never issued Mr. Hawkins a written warning prior to terminating him.

232.    There is a causal connection between Mr. Hawkins' reports of unlawful behavior and Defendant terminating Mr. Hawkins' employment.

233.    In response to Mr. Hawkins opposing the discriminatory conduct and asserting his right to enjoy the same employment benefits as every other employee, Defendant retaliated against Mr. Hawkins.

234.    Defendant retaliated against Mr. Hawkins by engaging in conduct, including but not limited to, failing to transport Mr. Hawkins to a job site then claim Mr. Hawkins failed to appear for work; forcing Mr. Hawkins to continue working with racist and discriminatory individuals; and unlawfully terminating Mr. Hawkins.

235.    Defendant took the above-mentioned materially adverse actions, among others, against Mr. Hawkins because of his protected activities.

236.    Any reasonable employee in Mr. Hawkins' position would be dissuaded from reporting racism if he knew that he would be subjected to the kind of treatment that Mr. Hawkins was forced to endure.

237.    Defendant's alleged bases for its adverse employment actions against Mr. Hawkins are pretextual and have been asserted only to cover up the retaliatory nature of Defendant's conduct.

238.    As a direct and proximate result of Defendant's retaliatory conduct in violation of the FCRA, Mr. Hawkins has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.  Mr. Hawkins has also suffered

and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages Mr. Hawkins accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

239.   Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of the Mr. Hawkins' rights under the FCRA, warranting the imposition of punitive damages in addition to compensatory damages.

240.   The conduct of Defendant deprived Mr. Hawkins of his statutory rights guaranteed under the FCRA.

241.   Mr. Hawkins further requests that his attorney's fees and costs be awarded as permitted by law.

**COUNT X**
**29 U.S.C. § 207(1)**
**VIOLATION OF THE FLSA**
**(Plaintiff Hawkins against Defendant)**

242.   Mr. Hawkins reincorporates the factual allegations in Paragraphs 25 through 96.

243.   Defendant was Mr. Hawkins' employer for purposes of the FLSA, as the term "employer" is defined by 29 U.S.C. § 203(d).

244.   Under 29 U.S.C. § 207, "no employer shall employ any of his employees… for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1).

245.   At all times material, Defendant did not adequately compensate Mr. Hawkins for all hours worked above 40 each week.

246.    At all times material, Defendant failed to adequately compensate Mr. Hawkins at the rate of one and one-half times his regular rate for all hours worked over 40, in violation of the FLSA.

247.    Under 29 U.S.C. § 211(c), "[e]very employer subject to any provision of this chapter… shall make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him…" 29 U.S.C. § 211(c).

248.    At all times material, Defendant failed to keep adequate records of Mr. Hawkins' hours worked each day, total hours worked each workweek, and total overtime earnings for the workweek, in violation of the FLSA's collection of data provision.

249.    As a direct and proximate result of Defendant's failure to adequately compensate Mr. Hawkins' overtime hours, and Defendant's failure to collect and maintain data, Defendant violated the FLSA.

250.    Pursuant to 29 U.S.C. § 216(b), Mr. Hawkins is entitled to payment of overtime wages that Defendant was required to pay to Mr. Hawkins and that Defendant improperly withheld, and an additional equal amount in the form of liquidated damages.

251.    Defendant willfully and intentionally refused to pay Plaintiff overtime wages earned during the relevant time.

252.    Defendant either knew from prior reports, or recklessly failed to investigate whether its failure to pay Mr. Hawkins for any earned overtime wages violated the FLSA, and then it failed to timely correct its violation(s).

253.    The employment records for Mr. Hawkins from which the Defendant's liability can be ascertained are within the exclusive custody and control of the Defendant.

254.    At this time, the total amounts are unknown and are to be determined upon further investigation.

255.    Mr. Hawkins further requests that his attorney's fees and costs be awarded as permitted by law.

**COUNT XI**
**29 U.S.C. § 215(a)(3)**
**FLSA RETALIATION**
**(Plaintiff Hawkins against Defendant)**

256.    Mr. Hawkins reincorporates the factual allegations in Paragraphs 25 through 96.

257.    Defendant was Mr. Hawkins's employer for purposes of the FLSA, as the term "employer" is defined by 29 U.S.C. § 203(d).

258.    Under 29 U.S.C. § 215(a)(3), it is unlawful to "discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceed under of related to this Act, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee."

259.    Mr. Hawkins engaged in a protected activity when he opposed Defendant's unlawful wage and hour violations, complained about Defendant's unlawful wage and hour violations, and when he participated in an investigation into Defendant's unlawful conduct.

260.    In response to Mr. Hawkins asserting his right to enjoy the same employment benefits as every other employee, Defendant retaliated against Mr. Hawkins.

261.    Defendant retaliated against Mr. Hawkins by engaging in conduct, including but not limited to, warning Mr. Hawkins about "snitching", refusing to correct Mr. Hawkins incorrect timesheets, and unlawfully terminating Mr. Hawkins' employment.

262.    Defendant took the above-mentioned materially adverse actions, among others, against Mr. Hawkins because of his protected activities.

263.     Defendant's retaliatory actions were causally connected to Mr. Hawkins' protected activities.

264.     Any reasonable employee in Mr. Hawkins' position would be dissuaded from opposing unlawful pay practices if they knew that they would be subjected to the kind of treatment that Mr. Hawkins was forced to endure.

265.     Defendant's alleged basis for its adverse employment actions against Mr. Hawkins are pretextual and have been asserted only to cover up the retaliatory nature of Defendant's conduct.

266.     As a direct and proximate result of the Defendant's retaliatory conduct in violation of the FLSA, Mr. Hawkins has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.  Mr. Hawkins has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages. Mr. Hawkins accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

267.     Defendant willfully and intentionally retaliated against Mr. Hawkins for his protected activities under the FSLA.

268.     Mr. Hawkins further requests that his attorney's fees and costs be awarded as permitted by law.

### COUNT XII
**42 U.S.C. § 1981**
**RACE AND COLOR DISCRIMINATION**
**(Plaintiff Ford as Against Defendant)**

269.     Mr. Ford reincorporates the factual allegations in Paragraphs 25 through 96.

270.     Section 1981 provides in relevant part, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a).

271.     Section 1981 further provides that the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. § 1981(b).

272.     Mr. Ford is a Black individual, and he is therefore a protected class member.

273.     The elements of a prima facie case of disparate treatment are flexible and are tailored on a case-by-case basis to differing factual circumstances.

274.     Defendant subjected Mr. Ford to discriminatory treatment on the basis of his race and skin color.

275.     Defendant's discriminatory treatment included, but was not limited to, denying Mr. Ford the same employment privileges afforded to his non-Black co-workers; refusing to approve Mr. Ford's requested days off; denying Mr. Ford leave to mourn for his mother; denying Black employees the ability to stop for food on the way to the worksite; denying Black employees the ability to take lunch breaks; denying Black employees access to operate the company vehicles; denying Black employees access to company restrooms; denying Black employees similar work opportunities to non-Black employees; disciplining Black employees for performing the same actions as non-Black employees; reducing Mr. Ford's hours worked; forging Mr. Ford's signature

on daily timesheets; subjecting Black employees to racial slurs such as "nigger"; and unlawfully terminating Mr. Ford.

276.    Defendant targeted Mr. Ford because he is Black. No similarly situated employee outside his protected class endured the discriminatory conduct that Mr. Ford was forced to endure.

277.    The discriminatory actions of Defendant against Mr. Ford, as described and set forth above, constitute an adverse employment action for purposes of Section 1981. In subjecting Mr. Ford to adverse employment actions, Defendant intentionally discriminated against Mr. Ford with respect to the compensation, terms, conditions, or privileges of his employment.

278.    As a direct and proximate result of Defendant's intentional discriminatory conduct in violation of Section 1981, Mr. Ford has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits. Mr. Ford has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages.

279.    Mr. Ford accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

280.    Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of Mr. Ford's rights under Section 1981, warranting the imposition of punitive damages in addition to compensatory damages.

281.    Defendant's conduct deprived Mr. Ford of his statutory rights guaranteed under Section 1981.

282.    Mr. Ford further requests that his attorney's fees and costs be awarded as permitted by law.

**COUNT XIII**
**42 U.S.C. § 1981**
**HOSTILE WORK ENVIRONMENT**
**(Plaintiff Ford as Against Defendant)**

283.     Mr. Ford reincorporates the factual allegations in Paragraphs 25 through 96.

284.     Section 1981 provides in relevant part, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a).

285.     Section 1981 further provides that the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. § 1981(b).

286.     Mr. Ford is a Black individual, and he is therefore a protected class member.

287.     The Defendant's discriminatory conduct was severe or pervasive enough to make any reasonable person of the same legally protected class believe that the conditions of employment were altered, and that the working environment was intimidating, hostile, or abusive.

288.     Defendant's severe and pervasive conduct included, but was not limited to, repeatedly subjecting Mr. Hawkins to the use of racial slurs including "*nigger*" both in person and via text message; denying Black employees the right to operate Defendant's vehicles because "Black people always get pulled over"; and sexualizing Black men, stating that "Black men have huge genitals."

38

289.    Defendant targeted Mr. Ford because he is Black. No similarly situated employee outside his protected classes endured the discriminatory conduct that Mr. Ford was forced to endure.

290.    Defendant's discriminatory conduct toward Mr. Ford negatively impacted both his professional life and his personal life. Defendant's conduct made Mr. Ford feel isolated, humiliated, embarrassed, and ashamed.

291.    As a direct and proximate result of Defendant's intentional discriminatory conduct in violation of Section 1981, Mr. Ford has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.

292.    Mr. Ford has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages.

293.    Mr. Ford accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

294.    Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of Mr. Ford's rights under Section 1981, warranting the imposition of punitive damages in addition to compensatory damages.

295.    Defendant's conduct deprived Mr. Ford of his statutory rights guaranteed under Section 1981.

296.    Mr. Ford further requests that his attorney's fees and costs be awarded as permitted by law.

**COUNT XIV**
**42 U.S.C. § 1981**
**RETALIATION**
**(Plaintiff Ford as Against Defendant)**

297.    Mr. Ford reincorporates the factual allegations in Paragraphs 25 through 96.

298.     Section 1981 provides in relevant part, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a).

299.     Section 1981 further provides that the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. § 1981(b).

300.     The elements of a prima facie case of retaliation are flexible and are tailored on a case-by-case basis to differing factual circumstances.

301.     Defendant retaliated against Mr. Ford for reporting discrimination on the basis of his race and skin color in violation of Section 1981.

302.     Mr. Ford engaged in protected activity by making several complaints to Defendant and opposing Defendant's unlawful actions.

303.     Mr. Ford was subjected to materially adverse actions at the time or within a relatively short time after the protected conduct took place.

304.     Defendant's actions were "materially adverse" because they were serious enough to discourage a reasonable worker from engaging in similar protected activity.

305.     Mr. Ford engaged in protected activity by reporting Witt's and Ruiz's discriminatory behavior and comments repeatedly throughout his employment.

306.     Mr. Ford further engaged in protected activity by frequently reporting Defendant's wage and hour violations to Witt, Ruiz, and Pappas, stating that his hours timesheets were wrong.

307.     Within a few days of Mr. Ford's latest reports of discrimination, harassment, and wage violations, Defendant wrongfully terminated Mr. Ford under the guise of performance issues. However, Defendant never issued Mr. Ford a written warning prior to terminating him.

308.     There is a causal connection between Mr. Ford's reports of unlawful behavior and Defendant terminating Mr. Ford's employment.

309.     In response to Mr. Ford opposing the discriminatory conduct and asserting his right to enjoy the same employment benefits as every other employee, Defendant retaliated against Mr. Ford.

310.     Defendant retaliated against Mr. Ford by engaging in conduct, including but not limited to, forcing Mr. Ford to continue working with racist and discriminatory individuals; falsely alleging Mr. Ford had performance issues; and unlawfully terminating Mr. Ford.

311.     In fact, Ruiz texted his subordinates that Mr. Ford was terminated, and shortly thereafter threatened Defendant's employees not to "snitch."

312.     Defendant took the above-mentioned materially adverse actions, among others, against Mr. Ford because of his protected activities.

313.     Any reasonable employee in Mr. Ford's position would be dissuaded from reporting racism if he knew that he would be subjected to the kind of treatment that Mr. Ford was forced to endure.

314.     Defendant's alleged bases for its adverse employment actions against Mr. Ford are pretextual and have been asserted only to cover up the retaliatory nature of Defendant's conduct.

315.     As a direct and proximate result of Defendant's intentional discriminatory conduct in violation of Section 1981, Mr. Ford has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits. Mr. Ford has

also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages.

316.   Mr. Ford accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

317.   Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of Mr. Ford's rights under Section 1981, warranting the imposition of punitive damages in addition to compensatory damages.

318.   Defendant's conduct deprived Mr. Ford of his statutory rights guaranteed under Section 1981.

319.   Mr. Ford further requests that his attorney's fees and costs be awarded as permitted by law.

**COUNT XV**
**42 U.S.C. § 2000e-2**
**RACE and COLOR DISCRIMINATION**
**(Plaintiff Ford as Against Defendant)**

320.   Mr. Ford reincorporates the factual allegations in Paragraphs 25 through 96.

321.   Title VII provides, in relevant part, that "it shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of his race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

322.   Title VII further provides that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m).

323.   Mr. Ford is a Black individual, and he is therefore a protected class member.

324.     The elements of a prima facie case of disparate treatment are flexible and are tailored on a case-by-case basis to differing factual circumstances.

325.     Defendant subjected Mr. Ford to discriminatory treatment on the basis of his race and skin color.

326.     Defendant's discriminatory treatment included, but was not limited to, denying Mr. Ford the same employment privileges afforded to his non-Black co-workers; refusing to approve Mr. Ford's requested days off; denying Mr. Ford leave to mourn for his mother; denying Black employees the ability to stop for food on the way to the worksite; denying Black employees the ability to take lunch breaks; denying Black employees access to operate the company vehicles; denying Black employees access to company restrooms; denying Black employees similar work opportunities to non-Black employees; disciplining Black employees for performing the same actions as non-Black employees; reducing Mr. Ford's hours worked; forging Mr. Ford's signature on daily timesheets; subjecting Black employees to racial slurs such as "nigger"; and unlawfully terminating Mr. Ford.

327.     Defendant targeted Mr. Ford because he is Black. No similarly situated employee outside his protected class endured the discriminatory conduct that Mr. Ford was forced to endure.

328.     The discriminatory actions of Defendant against Mr. Ford, as described and set forth above, constitute an adverse employment action for purposes of Title VII. In subjecting Mr. Ford to adverse employment actions, Defendant intentionally discriminated against Mr. Ford with respect to the compensation, terms, conditions, or privileges of his employment.

329.     As a direct and proximate result of Defendant's intentional discriminatory conduct in violation of Title VII, Mr. Ford has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits. Mr. Ford has also suffered

and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages.

330.    Mr. Ford accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

331.    Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of Mr. Ford's rights under Title VII, warranting the imposition of punitive damages in addition to compensatory damages.

332.    Defendant's conduct deprived Mr. Ford of his statutory rights guaranteed under Title VII.

333.    Mr. Ford further requests that his attorney's fees and costs be awarded as permitted by law.

**COUNT XVI**
**42 U.S.C. § 2000e-2**
**HOSTILE WORK ENVIRONMENT**
**(Plaintiff Ford as Against Defendant)**

334.    Mr. Ford reincorporates the factual allegations in Paragraphs 25 through 96.

335.    Title VII provides, in relevant part, that "it shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of his race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

336.    Title VII further provides that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m).

44

337.   Mr. Ford is a Black individual, and he is therefore a protected class member.

338.   The Defendant's discriminatory conduct was severe or pervasive enough to make any reasonable person of the same legally protected class believe that the conditions of employment were altered, and that the working environment was intimidating, hostile, or abusive.

339.   Defendant's severe and pervasive conduct included, but was not limited to, repeatedly subjecting Mr. Hawkins to the use of racial slurs including "*nigger*" both in person and via text message; denying Black employees the right to operate Defendant's vehicles because "Black people always get pulled over"; sexualizing Black men, stating that "Black men have huge genitals"; and telling Mr. Ford about homosexual activity while at work.

340.   Defendant targeted Mr. Ford because he is Black. No similarly situated employee outside his protected classes endured the discriminatory conduct that Mr. Ford was forced to endure.

341.   Defendant's discriminatory conduct toward Mr. Ford negatively impacted both his professional life and his personal life. Defendant's conduct made Mr. Ford feel isolated, humiliated, embarrassed, and ashamed.

342.   As a direct and proximate result of Defendant's intentional discriminatory conduct in violation of Title VII, Mr. Ford has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.

343.   Mr. Ford has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages.

344.   Mr. Ford accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

345.     Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of Mr. Ford's rights under Title VII, warranting the imposition of punitive damages in addition to compensatory damages.

346.     Defendant's conduct deprived Mr. Ford of his statutory rights guaranteed under Title VII.

347.     Mr. Ford further requests that his attorney's fees and costs be awarded as permitted by law.

**COUNT XVII**
**42 U.S.C. § 2000e-3**
**RETALIATION**
**(Plaintiff Ford as Against Defendant)**

348.     Mr. Ford reincorporates the factual allegations in Paragraphs 25 through 96.

349.     Title VII prohibits retaliation in any manner against a person who has opposed a discriminatory practice, or who has participated in any investigation, proceeding or hearing related to an unlawful discriminatory practice. 42 U.S.C. § 2000e-3(a).

350.     The elements of a prima facie case of retaliation are flexible and are tailored on a case-by-case basis to differing factual circumstances.

351.     Defendant retaliated against Mr. Ford for reporting discrimination on the basis of his race and skin color in violation of Title VII.

352.     Mr. Ford engaged in protected activity by making several complaints to Defendant and opposing Defendant's unlawful actions.

353.     Mr. Ford was subjected to materially adverse actions at the time or within a relatively short time after the protected conduct took place.

354.     Defendant's actions were "materially adverse" because they were serious enough to discourage a reasonable worker from engaging in similar protected activity.

355.    Mr. Ford engaged in protected activity by reporting Witt's and Ruiz's discriminatory behavior and comments repeatedly throughout his employment.

356.    Mr. Ford further engaged in protected activity by frequently reporting Defendant's wage and hour violations to Witt, Ruiz, and Pappas, stating that his hours timesheets were wrong.

357.    Within a few days of Mr. Ford's latest reports of discrimination, harassment, and wage violations, Defendant wrongfully terminated Mr. Ford under the guise of performance issues. However, Defendant never issued Mr. Ford a written warning prior to terminating him.

358.    There is a causal connection between Mr. Ford's reports of unlawful behavior and Defendant terminating Mr. Ford's employment.

359.    In response to Mr. Ford opposing the discriminatory conduct and asserting his right to enjoy the same employment benefits as every other employee, Defendant retaliated against Mr. Ford.

360.    Defendant retaliated against Mr. Ford by engaging in conduct, including but not limited to, forcing Mr. Ford to continue working with racist and discriminatory individuals; falsely alleging Mr. Ford had performance issues; and unlawfully terminating Mr. Ford.

361.    Defendant took the above-mentioned materially adverse actions, among others, against Mr. Ford because of his protected activities.

362.    Any reasonable employee in Mr. Ford's position would be dissuaded from reporting racism if he knew that he would be subjected to the kind of treatment that Mr. Ford was forced to endure.

363.    Defendant's alleged bases for its adverse employment actions against Mr. Ford are pretextual and have been asserted only to cover up the retaliatory nature of Defendant's conduct.

364.     As a direct and proximate result of Defendant's intentional discriminatory conduct in violation of Title VII, Mr. Ford has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits. Mr. Ford has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages.

365.     Mr. Ford accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

366.     Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of Mr. Ford's rights under Title VII, warranting the imposition of punitive damages in addition to compensatory damages.

367.     Defendant's conduct deprived Mr. Ford of his statutory rights guaranteed under Title VII.

368.     Mr. Ford further requests that his attorney's fees and costs be awarded as permitted by law.

**COUNT XVIII**
**§ 760.10(1), Fla. Stat.**
**RACE and COLOR DISCRIMINATION**
**(Plaintiff Ford as Against Defendant)**

369.     Mr. Ford reincorporates the factual allegations in Paragraphs 25 through 96.

370.     The FCRA prohibits employment discrimination in an individual's terms, conditions, and privileges of employment because of the individual's race and color. § 760.10(1)(a), Fla. Stat.

371.     Mr. Ford is a Black individual, and he is therefore a protected class member.

372.     The elements of a prima facie case of disparate treatment are flexible and are tailored on a case-by-case basis to differing factual circumstances.

373.    Defendant subjected Mr. Ford to discriminatory treatment on the basis of his race and skin color.

374.    Defendant's discriminatory treatment included, but was not limited to, denying Mr. Ford the same employment privileges afforded to his non-Black co-workers; refusing to approve Mr. Ford's requested days off; denying Mr. Ford leave to mourn for his mother; denying Black employees the ability to stop for food on the way to the worksite; denying Black employees the ability to take lunch breaks; denying Black employees access to operate the company vehicles; denying Black employees access to company restrooms; denying Black employees similar work opportunities to non-Black employees; disciplining Black employees for performing the same actions as non-Black employees; reducing Mr. Ford's hours worked; forging Mr. Ford's signature on daily timesheets; subjecting Black employees to racial slurs such as "nigger"; and unlawfully terminating Mr. Ford.

375.    Defendant targeted Mr. Ford because he is Black. No similarly situated employee outside his protected class endured the discriminatory conduct that Mr. Ford was forced to endure.

376.    The discriminatory actions of Defendant against Mr. Ford, as described and set forth above, constitute an adverse employment action for purposes of the FCRA.  In subjecting Mr. Ford to adverse employment actions, Defendant intentionally discriminated against Mr. Ford with respect to the compensation, terms, conditions, or privileges of his employment.

377.    As a direct and proximate result of Defendant's intentional discriminatory conduct in violation of the FCRA, Mr. Ford has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.  Mr. Ford has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other

intangible damages Mr. Ford accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

378.    Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of Mr. Ford's rights under the FCRA, warranting the imposition of punitive damages in addition to compensatory damages.

379.    The conduct of Defendant deprived Mr. Ford of his statutory rights guaranteed under the FCRA.

380.    Mr. Ford further requests that his attorney's fees and costs be awarded as permitted by law.

**COUNT XIX**
**§ 760.10(1), Fla. Stat.**
**HOSTILE WORK ENVIRONMENT**
**(Plaintiff Ford as Against Defendant)**

381.    Mr. Ford reincorporates the factual allegations in Paragraphs 25 through 96.

382.    The FCRA prohibits employment discrimination in an individual's terms, conditions, and privileges of employment because of the individual's race and skin color. § 760.10(1), Fla. Stat.

383.    Mr. Ford is a Black individual, and he is therefore a protected class member.

384.    The Defendant's discriminatory conduct was severe or pervasive enough to make any reasonable person of the same legally protected class believe that the conditions of employment were altered, and that the working environment was intimidating, hostile, or abusive.

385.    Defendant's severe and pervasive conduct included, but was not limited to, repeatedly subjecting Mr. Hawkins to the use of racial slurs including "*nigger*" both in person and via text message; denying Black employees the right to operate Defendant's vehicles because

50

"Black people always get pulled over"; sexualizing Black men, stating that "Black men have huge genitals"; and telling Mr. Ford about homosexual activity while at work.

386.    Defendant targeted Mr. Ford because he is Black. No similarly situated employee outside his protected classes endured the discriminatory conduct that Mr. Ford was forced to endure.

387.    Defendant's discriminatory conduct toward Mr. Ford negatively impacted both his professional life and his personal life. Defendant's conduct made Mr. Ford feel isolated, humiliated, embarrassed, and ashamed.

388.    As a direct and proximate result of Defendant's intentional discriminatory conduct in violation of the FCRA, Mr. Ford has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.  Mr. Ford has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages Mr. Ford accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

389.    Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of the Mr. Ford's rights under the FCRA, warranting the imposition of punitive damages in addition to compensatory damages.

390.    The conduct of Defendant deprived Mr. Ford of his statutory rights guaranteed under the FCRA.

391.    Mr. Ford further requests that his attorney's fees and costs be awarded as permitted by law.

**COUNT XX**
**§ 760.10(7), Fla. Stat.**
**RETALIATION**
**(Plaintiff Ford as Against Defendant)**

392.     Mr. Ford reincorporates the factual allegations in Paragraphs 25 through 96.

393.     The FCRA prohibits retaliation in any manner against a person who has opposed a discriminatory practice, or who has participated in any investigation, proceeding or hearing related to an unlawful discriminatory practice. § 760.10(7), Fla. Stat.

394.     The elements of a prima facie case of retaliation are flexible and are tailored on a case-by-case basis to differing factual circumstances.

395.     Mr. Ford engaged in a protected activity when he opposed Defendant's unlawful discriminatory conduct on the basis of his race and color.

396.     Mr. Ford engaged in protected activity by making several complaints to Defendant and opposing Defendant's unlawful actions.

397.     Mr. Ford was subjected to materially adverse actions at the time or within a relatively short time after the protected conduct took place.

398.     Defendant's actions were "materially adverse" because he were serious enough to discourage a reasonable worker from engaging in similar protected activity.

399.     Mr. Ford engaged in protected activity by reporting Witt's and Ruiz's discriminatory behavior and comments repeatedly throughout his employment.

400.     Mr. Ford further engaged in protected activity by frequently reporting Defendant's wage and hour violations to Witt, Ruiz, and Pappas, stating that his hours timesheets were wrong.

401.     Within a few days of Mr. Ford's latest reports of discrimination, harassment, and wage violations, Defendant wrongfully terminated Mr. Ford under the guise of performance issues. However, Defendant never issued Mr. Ford a written warning prior to terminating him.

402.    There is a causal connection between Mr. Ford's reports of unlawful behavior and Defendant terminating Mr. Ford's employment.

403.    In response to Mr. Ford opposing the discriminatory conduct and asserting his right to enjoy the same employment benefits as every other employee, Defendant retaliated against Mr. Ford.

404.    Defendant retaliated against Mr. Ford by engaging in conduct, including but not limited to, forcing Mr. Ford to continue working with racist and discriminatory individuals; falsely alleging Mr. Ford had performance issues; and unlawfully terminating Mr. Ford.

405.    Defendant took the above-mentioned materially adverse actions, among others, against Mr. Ford because of his protected activities.

406.    Any reasonable employee in Mr. Ford's position would be dissuaded from reporting racism if he knew that he would be subjected to the kind of treatment that Mr. Ford was forced to endure.

407.    Defendant's alleged bases for its adverse employment actions against Mr. Ford are pretextual and have been asserted only to cover up the retaliatory nature of Defendant's conduct.

408.    As a direct and proximate result of Defendant's retaliatory conduct in violation of the FCRA, Mr. Ford has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.  Mr. Ford has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages Mr. Ford accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

409.     Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of the Mr. Ford's rights under the FCRA, warranting the imposition of punitive damages in addition to compensatory damages.

410.     The conduct of Defendant deprived Mr. Ford of his statutory rights guaranteed under the FCRA.

411.     Mr. Ford further requests that his attorney's fees and costs be awarded as permitted by law.

**COUNT XXI**
**29 U.S.C. § 207(1)**
**VIOLATION OF THE FLSA**
**(Plaintiff Ford against Defendant)**

412.     Mr. Ford reincorporates the factual allegations in Paragraphs 25 through 96.

413.     Defendant was Mr. Ford's employer for purposes of the FLSA, as the term "employer" is defined by 29 U.S.C. § 203(d).

414.     Under 29 U.S.C. § 207, "no employer shall employ any of his employees… for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1).

415.     At all times material, Defendant did not adequately compensate Mr. Ford for all hours worked above 40 each week.

416.     At all times material, Defendant failed to adequately compensate Mr. Ford at the rate of one and one-half times his regular rate for all hours worked over 40, in violation of the FLSA.

417.     Under 29 U.S.C. § 211(c), "[e]very employer subject to any provision of this chapter… shall make, keep, and preserve such records of the persons employed by him and of the

wages, hours, and other conditions and practices of employment maintained by him…" 29 U.S.C. § 211(c).

418.    At all times material, Defendant failed to keep adequate records of Mr. Ford's hours worked each day, total hours worked each workweek, and total overtime earnings for the workweek, in violation of the FLSA's collection of data provision.

419.    As a direct and proximate result of Defendant's failure to adequately compensate Mr. Ford's overtime hours, and Defendant's failure to collect and maintain data, Defendant violated the FLSA.

420.    Pursuant to 29 U.S.C. § 216(b), Mr. Ford is entitled to payment of overtime wages that Defendant was required to pay to Mr. Ford and that Defendant improperly withheld, and an additional equal amount in the form of liquidated damages.

421.    Defendant willfully and intentionally refused to pay Plaintiff overtime wages earned during the relevant time.

422.    Defendant either knew from prior reports, or recklessly failed to investigate whether its failure to pay Mr. Ford for any earned overtime wages violated the FLSA, and then it failed to timely correct its violation(s).

423.    The employment records for Mr. Ford from which the Defendant's liability can be ascertained are within the exclusive custody and control of the Defendant.

424.    At this time, the total amounts are unknown and are to be determined upon further investigation.

425.    Mr. Ford further requests that his attorney's fees and costs be awarded as permitted by law.

## COUNT XXII
## 29 U.S.C. § 215(a)(3)
## FLSA RETALIATION
### (Plaintiff Ford against Defendant)

426.     Mr. Ford reincorporates the factual allegations in Paragraphs 25 through 96.

427.     Defendant was Mr. Ford's employer for purposes of the FLSA, as the term "employer" is defined by 29 U.S.C. § 203(d).

428.     Under 29 U.S.C. § 215(a)(3), it is unlawful to "discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceed under of related to this Act, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee."

429.     Mr. Ford engaged in a protected activity when he opposed Defendant's unlawful wage and hour violations, complained about Defendant's unlawful wage and hour violations, and when he participated in an investigation into Defendant's unlawful conduct.

430.     In response to Mr. Ford asserting his right to enjoy the same employment benefits as every other employee, Defendant retaliated against Mr. Ford.

431.     Defendant retaliated against Mr. Ford by engaging in conduct, including but not limited to, refusing to correct Mr. Ford's incorrect timesheets, and unlawfully terminating Mr. Ford's employment.

432.     Defendant took the above-mentioned materially adverse actions, among others, against Mr. Ford because of his protected activities.

433.     Defendant's retaliatory actions were causally connected to Mr. Ford's protected activities.

434.   Any reasonable employee in Mr. Ford's position would be dissuaded from opposing unlawful pay practices if they knew that they would be subjected to the kind of treatment that Mr. Ford was forced to endure.

435.   Defendant's alleged basis for its adverse employment actions against Mr. Ford are pretextual and have been asserted only to cover up the retaliatory nature of Defendant's conduct.

436.   As a direct and proximate result of the Defendant's retaliatory conduct in violation of the FLSA, Mr. Ford has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.  Mr. Ford has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages. Mr. Ford accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

437.   Defendant willfully and intentionally retaliated against Mr. Ford for his protected activities under the FSLA.

438.   Mr. Ford further requests that his attorney's fees and costs be awarded as permitted by law

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request this Court enter judgment against the Defendant for all damages suffered by the Plaintiffs, including economic damages, lost wages (back pay and front pay) and benefits, liquidated damages, statutory damages, compensatory damages, emotional distress damages, punitive damages, interest, attorney's fees and costs, disbursements of action, and any other remedies (monetary and/or equitable) allowable by law as a result of the Defendant's conduct in violation of Section 1981, Title VII, the FLSA, and the FCRA.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury as to all issues.

Dated the 27th day of September, 2024.

Respectfully submitted,

**DEREK SMITH LAW GROUP, PLLC**
*Counsel for Plaintiffs*


*/s/ Daniel J. Barroukh*
Daniel J. Barroukh, Esq.
Florida Bar No.: 1049271
Derek Smith Law Group, PLLC
520 Brickell Key Drive, Suite O-301
Miami, FL 33131
Tel: (305) 946-1884
Fax: (305) 503-6741
Danielb@dereksmithlaw.com