# EXHIBIT 3

1                  UNITED STATE DISTRICT COURT
                   NORTHERN DISTRICT OF FLORIDA
2
                   CASE NO. 3:24-cv-00404-MCR
3

4    NICHOLAS FORD and                    )
     ALONZO HAWKINS,                       )
5                                          )
                      Plaintiffs,          )
6                                          )
     vs.                                   )
7                                          )
     SOUTHERN ROAD & BRIDGE, LLC,          )
8                                          )
                      Defendant.           )
9    _____)

10

11

12

13                  REMOTE DEPOSITION OF
                       GEORGE PAPPAS
14
               Taken on Behalf of the Plaintiff
15
          DATE TAKEN:    March 4, 2025
16        TIME:          9:33 AM - 12:35 PM
          PLACE:         via Zoom
17

18

19

20

21

22

23

24

25

```
 1    APPEARANCES:

 2    On Behalf of the Plaintiffs:
      DEREK SMITH LAW GROUP, PLLC
 3    BY:  DANIEL J. BARROUKH, ESQ.
      520 Brickell Key Drive, Suite O-301
 4    Miami, Florida 33131
      danielb@dereksmithlaw.com
 5

 6    On Behalf of the Defendant:
      COLE, SCOTT & KISSANE
 7    BY: ARTHUR L. JONES, ESQ.
      500 North Westshore Boulevard, Suite 700
 8    Tampa, Florida  33609

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Deposition of George Pappas                    Nicholas Ford and Alonzo Hawkins v. Southern Road & Bridge LLC

```
 1                        INDEX

 2                     EXAMINATION

 3   Witness Name                              Page

 4   GEORGE PAPPAS

 5       BY MR. BARROUKH ............................... 4

 6       BY MR. JONES .................................. 91

 7       BY MR. BARROUKH ............................... 95

 8

 9                      EXHIBITS

10   Exhibit     Description                   Page

11   Exhibit 1   Time sheets                   51

12   Exhibit 2   SRB employee handbook         62

13   Exhibit 3   Termination form for Ryan Witt    69

14   Exhibit 4   Termination form for Nicholas Ford    69

15   Exhibit 5   Text messages                 71

16   Exhibit 6   Text messages                 72

17   Exhibit 7   Printout of group chat        74

18   Exhibit 8   Communication between Mr. Ruiz and Mr.    76
                 Hawkins
19
     Exhibit 9   Text messages                 77
20
     Exhibit 10  Text messages, Bates AH25     79
21
     Exhibit 11  Declaration of Dezmond Jones  81
22
     Exhibit 12  Interrogatories               87
23
     Exhibit 13  Interrogatories               90
24
```

```
 1              P r o c e e d i n g s
 2         Deposition taken before Michele Anzivino, Court
 3    Reporter and Notary Public in and for the State of
 4    Florida at Large, in the above cause.
 5                        - - -
 6    Thereupon,
 7                   GEORGE PAPPAS,
 8    having been duly sworn or affirmed, was examined and
 9    testified as follows:
10              THE WITNESS:  Yes.
11    DIRECT EXAMINATION BY MR. BARROUKH:
12         Q.    All right.  Good morning.  How would you like
13    me to address you for today's deposition, George or Mr.
14    Pappas?
15         A.    George is fine.
16         Q.    All right.  George.  And have you ever given
17    a deposition before?
18         A.    No.
19         Q.    All right.  So I'm going to go over a few
20    ground rules.  Hopefully this makes things go quicker.
21    My goal here today is not to keep us here longer than
22    necessary.  My goal is to get answers and hopefully do
23    it as quickly as we can.
24              Now, the first ground rule is because we have
25    a court reporter here today, she is taking down your
```

1    testimony and my questions.  So we cannot give

2    inaudible answers.  That means in responding to one of

3    my questions you cannot shake your head or go "mm-hmm"

4    or "uh-huh".  You have to say yes or no.  Do you

5    understand?

6        A.    Yes.

7        Q.    And the second most important ground rule is

8    again, because we have a court reporter here today she

9    can only take down one of us talking at once.  So we

10   can not talk over each other.  Meaning I understand my

11   questions might be long, but allow me to complete my

12   question even if there's a tidbit at the end, and I

13   will give you all the time you need to complete your

14   answers.  All right?

15       A.    Yes.

16       Q.    And finally, anything that requires you to

17   tell me what you spoke to Mr. Jones or any of your

18   other attorneys about, I do not want to hear that

19   answer, okay?  So if I ask you if you spoke to your

20   attorney you can say yes, but do not tell me what you

21   spoke to your attorney about.  Does that make sense?

22       A.    Yes.

23       Q.    Okay.  And at any point today if you need a

24   break, I don't know how long exactly this is going to

25   take, but if we need lunch or if we need to stop for

1    food, let me know.  We can take as many breaks as you

2    need, water, restroom, coffee, whatever it may be.  I

3    just ask that you do not take a break in the middle of

4    a sitting question.  Does that make sense?

5        A.    Yes.

6        Q.    Is there anything preventing you from

7    testifying clearly and truthfully today?

8        A.    No.

9        Q.    Okay.  And you understand that even though we

10   are on Zoom and it's just you, me, Mr. Jones and the

11   court reporter, you understand your testimony has the

12   full weight and if you were in a court reporter room in

13   front of a judge?

14       A.    Yes.

15       Q.    Where are you testifying from today?

16       A.    From Southern Road & Bridge's office,

17   conference room.

18       Q.    Okay.  During today's deposition I might

19   refer to Southern Road & Bridge as SRB, but you

20   understand that to mean the defendant in this lawsuit.

21   Do you understand?

22       A.    Yes.

23       Q.    Okay.  Now, where exactly is Southern Road &

24   Bridge's office?

25       A.    In Palm Harbor, Florida.

Deposition of George Pappas                    Nicholas Ford and Alonzo Hawkins v. Southern Road & Bridge LLC

1    Q.    All right.  Do you have the address?

2    A.    2997 Alternate 19, Palm Harbor, Florida

3    34683.

4    Q.    All right.  And if I'm looking down I'm just

5    taking notes.  I don't mean to be disrespectful.  Okay?

6    A.    Yes.

7    Q.    All right.  Now what is your current address?

8    A.    My home address?

9    Q.    Yes, sir.

10   A.    That would be ███████████████████████

     ████████████████.

12   Q.    All right.  And is this a work office that

13   you're appearing to this deposition from?

14   A.    Yes.

15   Q.    All right.  Is anybody else in the office

16   with you?

17   A.    No.  I'm in a conference room by myself.

18   Q.    Understood.  And to be clear, nobody is in

19   the room with you, correct?

20   A.    Correct.

21   Q.    And do you have any documents or any devices

22   outside of the computer in which you're appearing for

23   today's deposition anywhere around you?

24   A.    I have my cell phone and a notepad.

25   Q.    That's fine.  For the purposes of the

```
 1   deposition, any documents that I want you to look at I

 2   will show you, okay?  So I ask that you -- if it's not

 3   an emergency to stay off your device or to not look at

 4   your phone.  Okay?

 5        A.    Yes.

 6        Q.    All right.  Now, did you prepare for today's

 7   deposition?

 8        A.    Yes.

 9        Q.    Okay.  How did you prepare?

10        A.    I tried to recall with everything that

11   happened two years ago.

12        Q.    Okay.  Did you meet with your attorney to

13   prepare for today's deposition?

14        A.    Yes.

15        Q.    All right.  And when did this meeting take

16   place?

17        A.    Friday.

18        Q.    Okay.  And how long did the meeting last?

19        A.    Two hours.

20        Q.    Okay.  And did you review any documents in

21   preparation for this deposition?

22        A.    Yes.

23        Q.    Do you recall what documents you reviewed?

24        A.    Our employee handbook.

25        Q.    All right.  What else?
```

```
 1        A.     And some text messages.

 2        Q.     All right.  Were there any other documents

 3   that you reviewed?

 4        A.     No.

 5        Q.     Okay.  How did you get the employee handbook

 6   and these text messages?

 7        A.     I had a copy of the employee handbook, and

 8   the attorney also had one.

 9        Q.     Okay.  And as far as the text messages, how

10   did you get those?

11        A.     I have the text messages that I exchanged

12   with the attorney.

13        Q.     Okay.

14        A.     They also had copies of my text messages.

15        Q.     Understood.  And how long did you review the

16   handbook for?

17        A.     Roughly about 30 minutes, 45 minutes during

18   the meeting.

19        Q.     Okay.  And was that the first time you had

20   reviewed the employee handbook?

21        A.     No.

22        Q.     All right.  Have you signed the employee

23   handbook for the company?

24        A.     Which year?

25        Q.     That's a good point.
```

1              How many employee handbooks does the company

2       have every year?

3              A.     I believe we have every year we refresh it.

4              Q.     All right.  And do you recall which year

5       employee handbook you reviewed?

6              A.     I do not recall.

7              Q.     Okay.  Sitting here today, do you believe

8       you've signed every revised employee handbook for the

9       company since you began your employment with them?

10             A.     Yes.

11             Q.     Okay.  Now, did you speak to anybody besides

12      your attorney about today's deposition?

13             A.     No.

14             Q.     Okay.  Do you have a family?

15             A.     Yes.

16             Q.     Okay.  And you did not discuss today's

17      deposition with your family; is that correct?

18             A.     No.

19             Q.     Did anybody else show you any documents

20      outside of the employee handbook in relation to this

21      deposition?

22             A.     No.

23             Q.     Now, what is your role with the company?

24             A.     I'm a project manager.

25             Q.     Okay.  And how long have you been working for

1   Southern Road & Bridge?

2       A.    Over eight years.  Since 2016.

3       Q.    All right.  And how long have you been

4   working in your current position as project manager?

5       A.    Six years.

6       Q.    Okay.  And what was your -- what are your

7   responsibilities and job duties as project manager?

8       A.    I supervise multiple projects within the

9   company in reference to payroll, budgets, scheduling

10  and supervising the field employees.

11      Q.    All right.  And when you say I "supervise" --

12  just to confirm you said you supervise projects,

13  payroll, budgets, scheduling and also supervise the

14  employees, correct?

15      A.    Correct.

16      Q.    Is there anything that your title of project

17  manager entails?

18      A.    It would also include any complaints, issues

19  with employees, with supervision, then I would report

20  to the owner or hr.

21      Q.    And who is the owner of the company?

22      A.    Lucas Pappas.

23      Q.    And who is the ownership of the company?

24      A.    Vested HR.

25      Q.    And what is your relationship to Lucas

1    Pappas?

2         A.    Cousin.

3         Q.    Do you know when Southern Road & Bridge was

4    founded as a company or began performing work?

5         A.    2012 I believe.

6         Q.    And is it fair to say that you're close with

7    your cousin Lucas?

8         A.    Yes.

9         Q.    Okay.  And does Lucas also live in Holiday,

10   Florida?

11        A.    No.

12        Q.    Where does Lucas live?

13        A.    Palm Harbor, Florida.

14        Q.    Now, you said you supervise payroll.  Could

15   Can you please tell me about that?

16        A.    All of the field employees, the foremen and

17   superintendent, fill out a time sheet with the

18   employees, the workers.  They then send it to myself, I

19   put it in an Excel format and send it over to our

20   payroll department and HR.

21        Q.    All right.  So you are responsible for

22   collecting completed time sheets and further inputting

23   them into an Excel spreadsheet and sending them to

24   Vested HR; is that fair?

25        A.    Correct.

1    Q.    Okay.  And with regards to the payroll is

2  there any other, you know, you gave a very streamlined

3  quick explanation of how the payroll system works.

4          Is there anything else I should understand

5  about the payroll system?

6    A.    Other than it's a paper copy that they fill

7  out in the field and then they scan it over to myself.

8  And then I -- like I said, I put it in the Excel and

9  send it over to payroll and HR.

10   Q.    Okay.  And with regards to the budget, could

11 you please tell me how you supervise the budget?

12   A.    I work with our comptroller, with profit and

13 loss, and I see all of the receipts and costs.  I order

14 the material, I run the subcontractors, and basically

15 supervise that.

16   Q.    Okay.  And next you spoke with scheduling.

17 Could you please discuss how you supervise the

18 scheduling?  Is that of the individual employees or is

19 that of the projects or both?

20   A.    Project only.  I do not schedule the

21 employees.

22   Q.    Do you know who does schedule the employees?

23   A.    The superintendent.

24   Q.    And who is that?

25   A.    That was Ryan Witt.

1    Q.    All right.  You said that was Ryan Witt.

2  Could you please state whether he is still with the

3  company?

4    A.    He is not.

5    Q.    We'll get back to that.

6          Now, you also said you supervise the

7  employees.  Could you please state how you supervise

8  the employees?

9    A.    I supervise basically if there's an issue.

10  If they need to discuss anything with me that they

11  can't have resolved with the superintendent, I then

12  step in and help them in any way I can.

13    Q.    Okay.  And what does that look like?  If you

14  could provide me with some examples.

15    A.    If an employee has a complaint or an issue

16  with their accommodations, where they're staying,

17  payroll, and they have nothing that was resolved with

18  the superintendent, then I resolve it.

19    Q.    All right.  So to be clear, do all employee

20  issues or complaints have to go through the

21  superintendent first before that issue can be brought

22  to your attention?

23    A.    No.  It can be brought both ways.

24    Q.    Okay.

25    A.    Our policy usually goes through the

1    superintendent first and then myself.  But any time

2    they have my communication, they can call the office,

3    speak to me or anything.

4         Q.    Okay.  And do all of the individual employees

5    have your personal cell phone number or a personal

6    number to reach you?

7         A.    They have the office number.

8         Q.    Okay.  And you always work from the office;

9    is that correct?

10        A.    Correct.

11        Q.    Okay.  Now you also said your

12   responsibilities include handling complaints, issues

13   and reports, correct?

14        A.    Correct.

15        Q.    Could you please explain what you mean by

16   that?

17        A.    If there's a complaint that is brought up to

18   me, I speak with the employee.  I also make sure that

19   if -- we can have them speak with the HR department or

20   EEO office at any time.

21        Q.    Okay.  And at what point in time would you

22   refer the employee to discuss with the HR officer or

23   the EEO officer?

24        A.    As soon as I speak with them, and then if

25   they would like to speak to them.

1    Q.    Okay.  And you say if they would like to

2  speak to them.  If the employee would like to speak to

3  the HR or EEO officer, do they have to request a

4  meeting with the HR or EEO officer or do you suggest

5  they speak or meet with the HR or EEO officer?

6    A.    They can call any time.  They have the number

7  in their employee handbook.  And then I also can

8  request them to tell them to call them if they have a

9  complaint.

10    Q.    Okay.  And at what point would you actually

11  suggest or refer an employee to HR?

12    A.    At any point they need to speak to them or

13  would like to speak to them.

14    Q.    Okay.  And how do you determine an employee

15  would need to speak with an HR officer?

16    A.    If it's anything out of my control.

17    Q.    Okay.  And how many times have you directed

18  an employee to seek HR's help?

19    A.    Never.

20    Q.    Okay.  And why not?

21    A.    I've never had an issue.

22    Q.    Okay.  Now, when you say you never had an

23  issue, does that mean you've never had a complaint or

24  you have never had a complaint that you couldn't solve?

25    A.    I've never had a complaint.

1    Q.    Okay.  And to be clear, you've never --

2    you're stating, and your testimony here today is that

3    you never had a complaint from a single employee

4    regarding any unlawful conduct whatsoever; is that

5    correct?

6    A.    Before Nicholas Ford and Alonzo, yes.

7    Q.    Okay.  Now going back to when you were

8    talking about the payroll, you said that, and correct

9    me if I'm wrong, but what you were telling me was the

10   employees go to work, perform their work, and the

11   foreman and superintendent track and confirm their

12   hours before sending you a completed time sheet to

13   input; is that correct?

14   A.    Correct.

15   Q.    So apart from the superintendent and the

16   foreman's confirmation, is there any other way to

17   confirm or validate the hours worked by the employees

18   named on the time sheets?

19   A.    No.

20   Q.    Okay.  And similarly, you cannot confirm

21   whether the hours on the time sheets are in fact true

22   or not true outside of the forman and the

23   superintendent's confirmation; is that fair to say?

24   A.    Correct.

25   Q.    Okay.  So you stated you were the project

1  manager for around six years, so roughly back to 2019.

2  What position did you hold with SRB prior to project

3  manager?

4      A.    Superintendent.

5      Q.    Okay.  What year did you start working as a

6  superintendent?  If you can give me a more specific

7  month or date that would be helpful, as well.

8      A.    The day I started.  2016.

9      Q.    Okay.  And as superintendent, what were your

10  job responsibilities?

11      A.    To supervise the project and supervise my

12  workers.

13      Q.    Okay.  And you had used the word "project"

14  and projects a few times.  Could you describe generally

15  what a project looks like for Southern Road & Bridge?

16      A.    The project would be a bridge repair project.

17  We repair bridges.  So the project would entail all of

18  the repairs for the state.  We work for mostly state

19  and government.  And all of the repairs I meet with the

20  state officials, the inspectors, and control the

21  day-to-day operations for all the repairs and the

22  employees and subcontractors, stuff like that.

23      Q.    Okay.  And how many employees does Southern

24  Road & Bridge currently employ?

25      A.    Around 200 I believe.

1    Q.    Okay.  And back when Alonzo and Nicholas were

2   working there in around 2023, how many employees did

3   Southern Road & Bridge employ?

4    A.    Around the same.

5    Q.    And again, sorry, I was about to cut you off.

6   I know we are talking about events that happened a

7   little bit of time ago, so if you don't remember I'd

8   rather you say "I don't remember" rather than giving an

9   answer that you may not be 100 percent sure.  It would

10  help you, it would help your attorney and it would help

11  myself.  Because the goal of today is to get the most

12  accurate and clear information.  Okay?

13   A.    Okay.

14   Q.    You stated as a project manager you regularly

15  worked from the office.  Did you ever work in the field

16  as a project manager?

17   A.    No.

18   Q.    Okay.  Did you ever go to a project site as a

19  project manager?

20   A.    Very rarely.

21   Q.    Okay.  Could you count the amount of times

22  you've been to a site as a project manager?

23   A.    I couldn't tell you.

24   Q.    I understand it's been six years, but would

25  you say it's more or less than 20 times on-site as a

Deposition of George Pappas                    Nicholas Ford and Alonzo Hawkins v. Southern Road & Bridge LLC

1    project manager?

2         A.    That would be a correct statement.

3         Q.    Okay.  So around 20 visits to the site as

4    project manager.  And when you were a superintendent,

5    how many days a week were you working on-site?

6         A.    Every day.

7         Q.    Okay.  And did the superintendent help repair

8    the bridge or more manage the team that was working at

9    the site?

10         A.    Manage the team.

11         Q.    Okay.  And could you describe the

12    superintendent's responsibilities for handling

13    complaints or reports from employees or team members?

14         A.    Responsibility would be to ask the employee

15    the issue.  And again, if it's something that cannot be

16    resolved by the superintendent I would then move it to

17    the project manager.  And at any time or course the

18    employee handbook, I would let them know they could

19    call the EEO officer or HR if they'd like to.

20         Q.    Okay.  And as a superintendent, not as a

21    project manager, did you ever receive complaints of any

22    unlawful activity of any kind from your team or your

23    employees?

24         A.    No.

25         Q.    Okay.  And you said before -- or I guess

1    there's a hierarchy beneath superintendent would be

2    foreman; is that correct?

3        A.    Correct.

4        Q.    And what does the foreman do?

5        A.    The foreman would run the employees

6    day-to-day, and what job or task that needs to be done

7    that day that the supervisor or superintendent would

8    tell them.

9        Q.    Okay.  Would the foreman assign the tasks or

10   distribute the tasks to the employees of the team?

11       A.    Yes.

12       Q.    Okay.  And I guess I'll get into this more

13   with the superintendent separately, but again did the

14   foreman have the ability to write up or issue a

15   disciplinary notice to an employee on his or her team?

16       A.    No.

17       Q.    Could the foreman have reported bad behavior

18   or poor work performance?

19       A.    Yes.

20       Q.    All right.  And did the foreman have the

21   ability to issue any discipline whatsoever, whether

22   it's sending an employee home or striking their hours

23   in terms of not adding them back on the schedule?

24       A.    No.

25       Q.    So a foreman could not send home any of his

 1   team members?

 2        A.    No.

 3        Q.    Okay.  What about the superintendent?  Did

 4   the superintendent have the ability to issue discipline

 5   in the form of a write-up or suspension or send an

 6   employee home?

 7        A.    Yes.

 8        Q.    Okay.  What other authority I guess did a

 9   foreman have over his team members?

10        A.    Basically what you said.  Hours, discipline,

11   writeups.  They also would be able to speak to the

12   lodging, the people at the hotel if they needed to.

13   And then of course they would speak to me.

14        Q.    Okay.  And was the foreman responsible for --

15   you mentioned lodging.  Was the foreman responsible for

16   the payment to the lodging company or the hotel or

17   motel or wherever the team would be staying?

18        A.    No.

19        Q.    Who was responsible for that?

20        A.    The company.  Southern Road & Bridge.

21        Q.    I understand.  So just so I understand, the

22   company would pay the lodging entity independently

23   prior to the team's arrival; is that correct?

24        A.    Correct.

25        Q.    Okay.  And the company also has company

1  trucks that they give to certain of its team members;

2  is that correct?

3       A.    Correct.

4       Q.    And how many -- so first let me ask this

5  because I'm not very sure.

6             Is every team that goes to a project or to a

7  work site the same number of employees?

8       A.    No.

9       Q.    Okay.  What is the range of individuals in

10 any team for an assignment or project?

11      A.    They can be 2 to 50 or 60.

12      Q.    Okay.  And how far geographically do the

13 projects span?  Across the State of Florida, across the

14 southeast United States?  If you could please let me

15 know.

16      A.    The whole United States.

17      Q.    Okay.  And does the company hire individuals

18 from across the country, or does the company require

19 certain individuals to drive to and from these sites or

20 both?

21      A.    The company hires from different states, and

22 once they're hired they are put in lodging for that

23 project.

24      Q.    Okay.  Does Southern Road & Bridge fly the

25 individuals to the project site, if necessary?

1    A.    If necessary, yes.

2    Q.    Does Southern Road & Bridge give those

3  individuals company cars to transport themselves to the

4  site instead of flying?

5    A.    Yes, sometimes.

6    Q.    And how is that determined, the issuance of a

7  company vehicle to an employee?

8    A.    Their position.

9    Q.    Okay.  Could you explain more?

10    A.    The superintendent, the foreman, with a valid

11  driver's license, and only if it's necessary for them

12  to drive to the state where they're hired.

13    Q.    Okay.  Would any other employees be driving a

14  company truck apart from the superintendent or foreman?

15    A.    Yes.

16    Q.    Okay.  And you stated that would be if it was

17  necessary.  What does that mean, if it's necessary?

18    A.    If we need to move the truck from one state

19  to the other.

20    Q.    Okay.  So how regular is it for a

21  non-superintendent or non-foreman employee to drive a

22  company truck?

23    A.    It's done regularly as long as it's necessary

24  and the truck's necessary for that team.

25    Q.    Okay.  And who is selected to drive the

1    company trucks?

2        A.    The foreman would select employees with the

3    superintendent, and the employee that has a valid

4    driver's license, that does not have issues with their

5    driver's license, any criminal issues, DUI or anything

6    like that in the past.

7        Q.    And is there a note or a record of like which

8    employee the foreman selects to drive a vehicle?

9        A.    Yes.  They have to be put on our insurance.

10       Q.    Okay.  Do you know if my clients, Alonzo and

11   Nicholas, were ever placed on your insurance for the

12   purpose of driving?

13       A.    I do not remember.

14       Q.    Okay.  Do you know if there were any other

15   determinations that a foreman makes in selecting

16   employees to drive the company trucks?

17            MR. JONES:  Form.

18   BY MR. BARROUKH:

19       Q.    You can answer.

20       A.    No.

21       Q.    Okay.  And what are the roles of the foreman

22   outside of supervising the employees on the job site?

23       A.    The role of the foreman?

24       Q.    Yes.

25       A.    Would be to control the day-to-day tasks that

1    the superintendent goes over with them that day, and to

2    make sure the employees are working.

3        Q.    Okay.  And the same hierarchy that we

4    described, which is the employee, the foreman, the

5    superintendent and the project manager, is that the

6    same chain of command for reports of discrimination,

7    harassment or retaliation?

8        A.    No.

9        Q.    Okay.  Can you please explain what is the --

10   the correct chain of command for reporting unlawful

11   activity?

12       A.    In the employee handbook and discussed with

13   the employee they can -- if they have the complaint of

14   any kind they are -- have the possibility of calling --

15   or they can call the EEO officer, HR which is in their

16   employee handbook.

17       Q.    WOuld an employee be allowed to make a report

18   of unlawful activity to their foreman?

19       A.    Yes.

20       Q.    And were they encouraged to make a report of

21   unlawful activity to their foreman?

22       A.    Yes.

23       Q.    All right.  And the same questions for the

24   superintendent.  Do the employees have the ability to

25   make a complaint or report of unlawful activity to the

```
 1   superintendents?

 2        A.    Yes.

 3        Q.    And were the employees encouraged to report

 4   unlawful activity to the superintendent?

 5        A.    Yes.

 6        Q.    And again, is the foreman or superintendent

 7   trained in how to handle complaints of unlawful

 8   activity?

 9        A.    Yes.

10        Q.    And what is the training for them with

11   respect to handling complaints of unlawful activity?

12        A.    The training would be to discuss it with the

13   employee, and also notify them that they can call the

14   EEO officer and HR department --

15        Q.    Okay.

16        A.    -- or the supervisor or the project manager.

17        Q.    Okay.  Now you understand that they might

18   have been informed to take those steps, but was there

19   any training they underwent in terms of learning how to

20   handle these complaints of unlawful activities?

21        A.    No.

22        Q.    Okay.  Have you ever been trained in how to

23   handle the complaints of unlawful activities?

24        A.    No.

25        Q.    Okay.  Do you know if the company has a
```

1  policy for how to handle -- for any non-HR or non-EEO

2  representative to handle complaints of unlawful

3  activity?

4       A.     No, no training.

5       Q.     Now, are you included in the company's hiring

6  practices whatsoever?

7       A.     Yes.

8       Q.     Okay.  What is your role in hiring for the

9  company?

10      A.     I can hire employees.

11      Q.     Who else can hire employees?

12      A.     The superintendent.

13      Q.     How many superintendents are employed by SRB?

14      A.     I cannot give a definite answer.  I can give

15  an approximate.

16      Q.     Sure.  Are we talking a hundred

17  superintendents or are we talking ten superintendents

18  here or what's your best estimate?

19      A.     Around 20.

20      Q.     Okay.  So would it be fair to say that

21  there's roughly nine to one employees to

22  superintendents or foreman/employees to superintendent?

23  Is that fair to say?

24      A.     Yes.

25      Q.     Okay.  And who has the final -- who gives the

1   final approval to hire an employee for SRB?

2       A.    The HR department --

3       Q.    Okay?

4       A.    -- once it gets -- they get E-verified.

5       Q.    Okay.  However, the final decision to extend

6   an offer of employment to an individual comes from

7   either you or a superintendent; is that correct?

8       A.    Correct.

9       Q.    And does a superintendent, do they ask you

10  whether you can hire an individual or not?

11      A.    Yes.

12      Q.    Okay.  And do you have the authority to

13  decline to hire an individual proposed by a

14  superintendent?

15      A.    Yes.

16      Q.    Okay.  Can a superintendent decline to hire

17  an individual you wish to bring on as an employee?

18      A.    No.

19      Q.    What role does the foreman have in being able

20  to contribute at all to the hiring process?

21      A.    The foreman can only suggest an employee or

22  somebody they know, but they cannot hire them.

23      Q.    Okay.  Can a foreman dissuade you by giving

24  information about an individual from hiring that

25  individual?

1      A.      No.

2      Q.      Okay.  How frequently do you speak with your

3   foreman?

4      A.      Minimal.

5      Q.      Okay.  How frequently do you speak with your

6   superintendents?

7      A.      One to three times a week.

8      Q.      Okay.  Is there a project manager and

9   superintendent meeting that happens every week or is it

10  random phone calls throughout the day from different

11  superintendents?

12     A.      Random phone calls.

13     Q.      Okay.  But you can definitely state that you

14  speak to each superintendent at least once a week; is

15  that fair?

16     A.      Fair.

17     Q.      Okay.  Now, do you know what Southern Road &

18  Bridge's policy is for investigating complaints of

19  unlawful activity?

20     A.      No.

21     Q.      Okay.  Do you know who leads the

22  investigations, if any are required, into complaints of

23  unlawful activity?

24     A.      The EEO officer, and I would -- HR.

25     Q.      Okay.  And is there a standard timeline for

Deposition of George Pappas                    Nicholas Ford and Alonzo Hawkins v. Southern Road & Bridge LLC

1    completing those investigations?

2         A.    I couldn't answer that.

3         Q.    Okay.  And sitting here today after working

4    for the company for six years, do you have any

5    knowledge of any complaint of unlawful activity made to

6    SRB or to the HR working for SRB?

7              MR. JONES:  Object to form.

8    BY MR. BARROUKH:

9         Q.    You can answer.

10        A.    Not to my knowledge.

11        Q.    Okay.  Do you know if there have been any

12   EEOC charges of discrimination filed against Southern

13   Road & Bridge?

14             MR. JONES:  Object to form.

15             MR. BARROUKH:  What's the objection on that?

16             MR. JONES:  Calls for speculation.  I don't

17        think he would know that in his position.

18             MR. BARROUKH:  Okay.  Well, I'm just asking

19        if he knows.

20   BY MR. BARROUKH:

21        Q.    I'm not asking you to speculate, George.  If

22   you know you can say yes, I know or no, I don't know.

23   Okay?  Is that fair?

24        A.    Fair.

25        Q.    Okay.  So sitting here today, do you know if

```
 1   any charges of discrimination have been filed against

 2   the company with the EEOC?

 3       A.    No.

 4       Q.    Okay.  Do you know if anything has been filed

 5   with the EEOC with regards to Southern Road & Bridge?

 6             MR. JONES:  Object to form.

 7   BY MR. BARROUKH:

 8       Q.    You can answer.

 9       A.    I do not know.  I'm not in the position to

10   know that.

11       Q.    Okay.  And who would know that outside of an

12   HR representative or the EEO representative?

13       A.    The owner.

14       Q.    Would it just be the owner who has knowledge

15   and information about that?

16             MR. JONES:  Object to form.

17       A.    I couldn't answer that either.

18       Q.    Okay.  Why do you think the owner would have

19   knowledge of that information?

20             MR. JONES:  Objection.  Form.

21             MR. BARROUKH:  What's the objection?  I'm

22       asking him why does he think it?

23             MR. JONES:  You're asking him why does he --

24       something that the owner thinks or would know?

25             MR. BARROUKH:  I'm asking him why does George
```

```
 1        believe that Lucas would have information.  I'm
 2        asking George to answer based on what he leaves.
 3             MR. JONES:  Yeah, about something that he
 4        would know, the owner would know.  You're still
 5        asking him about the owner's knowledge about
 6        something.
 7             MR. BARROUKH:  No, but does -- let's go off
 8        the record for one moment, please.
 9             (Informal discussion held off the record.)
10   BY MR. BARROUKH:
11        Q.    All right.  George, do you have any knowledge
12   of who is responsible for handling complaints made
13   against the company?
14        A.    Yes.
15        Q.    Okay.  Based on that knowledge, please tell
16   me who is responsible for who handles the complaints
17   made against the company.
18        A.    The EEO officer and HR.
19        Q.    Okay.  And to your knowledge, is there
20   anybody else that handles complaints made against the
21   company?
22        A.    No.
23        Q.    Okay.  And to be clear, to your knowledge
24   there have been no reports or complaints of
25   discrimination against Southern Road & Bridge by any
```

```
 1   employee; is that correct?
 2        A.    I cannot -- no.
 3        Q.    Okay.  And similarly, to your knowledge there
 4   have been no complaints against Southern Road & Bridge
 5   by any employee for harassment?  Again, this is apart
 6   from my clients?
 7             MR. JONES:  Object to form.
 8        A.    To my knowledge, no.
 9        Q.    And to your knowledge, there have been no
10   complaints made against the company for retaliation; is
11   that correct?
12             MR. JONES:  Object to form.
13        A.    Correct.
14        Q.    Okay.  I believe he may be objecting because
15   I'm using the word "retaliation".
16             Do you understand what I mean by
17   "retaliation".
18        A.    Yes.
19        Q.    What do you understand "retaliation" to mean?
20        A.    Retaliation would be anything that was done
21   under a issue with an employee to retaliate against
22   them in any way.
23        Q.    Okay.  And what do you believe discrimination
24   is?
25        A.    Discrimination would be any aspect of an
```

```
 1   unfair act toward a person.
 2           MR. BARROUKH:  I'm having a little bit of
 3       technical difficulties.  Off the record for one
 4       minute, please.
 5           (Brief recess taken.)
 6   BY MR. BARROUKH:
 7       Q.    Mr. Pappas, we did just have a quick break.
 8   Did you speak to your attorney during the break?
 9       A.    No.
10       Q.    Okay.  Now to your knowledge, has an employee
11   been punished for discrimination by SRB?
12       A.    No.
13       Q.    To your knowledge, has an employee been
14   punished for harassment by SRB?
15       A.    No.
16       Q.    To your knowledge, has an employee been
17   punished for retaliation by SRB?
18       A.    No.
19       Q.    And again, you have no knowledge of any
20   investigations that may have been conducted into a
21   complaint or report by Southern Road and Bridge; is
22   that correct?
23       A.    Correct.
24       Q.    Now, have you ever filed or had any
25   complaints with the company?
```

1    A.    No.

2    Q.    Do you play a role in terminating employees

3  for the company?

4    A.    Yes.

5    Q.    And what is your role in that?

6    A.    We have a company policy in our handbook, and

7  if in any individual breaks those policies I can

8  terminate them.

9    Q.    Okay.  And even if an individual does not

10  violate a company policy, can you still terminate them?

11    A.    Yes.  Only of lack of work or anything like

12  that, or the job gets shut down and I would have to lay

13  somebody off.

14    Q.    But even if these employees are at will, do

15  you believe you can terminate them whenever you want

16  for whatever reason you'd like?

17    A.    No.

18    Q.    Okay.  And why not?

19    A.    They would have to do something wrong.

20    Q.    Okay.  I'm not asking you if you have

21  actually ever terminated somebody for any reason

22  whatsoever, even if they didn't violate a policy.  I'm

23  just asking if you believe you have the authority to do

24  so.  Does that make sense?

25    A.    Yes.  I don't believe I have the authority.

1    Q.    Okay.  Now, what is the procedure if you do

2  wish to terminate an employee?  Could you please walk

3  me through that?

4    A.    Yes.  We would have a discussion with the

5  employee.  If it's a small offense we have a -- we just

6  have a discussion and tell them not to do it again.  If

7  it's a more severe policy that's been broken we do a

8  write-up, a written warning.  And if it's a direct

9  policy termination we can terminate them.

10    Q.    Okay.  And have you ever issued a written

11  warning or verbal warning to an employee before?

12    A.    Yes.

13    Q.    Okay.  How many times have you done that?

14    A.    Ten times approximately.

15    Q.    Okay.  And what were the reasons for doing

16  so?

17    A.    Tardiness, telephone use, no call-no show.

18  Insubordination.  Those are basically it.

19    Q.    Okay.  And how many of those individuals did

20  you end up terminating?

21    A.    I'd say half.

22    Q.    Okay.  And do you recall the names of the

23  individuals you terminated?

24    A.    I do not.

25    Q.    So for your tenure as a project manager --

1    well, strike that.

2            Does any other individual have the authority

3    to terminate employees at Southern Road & Bridge apart

4    from yourself?

5        A.    Superintendents.

6        Q.    Now, do you know how many employees your

7    superintendents have terminated or do they go to you

8    prior to terminating those individuals?

9        A.    I can't answer that for the whole company.

10       Q.    Okay.  Is there a formal procedure in

11   terminating an employee for SBR?

12       A.    Yes.  Just like I discussed, there's a

13   discussion, there can be a written warning, or if it's

14   a severe offense they can be terminated because of the

15   break in policy.

16       Q.    Now I know that was your prior answer, but

17   I'm wondering if there's any paperwork that needs to be

18   filled out or anything like that.

19       A.    Yes, there's a termination form.

20       Q.    Okay.  Who completes the termination form?

21       A.    The superintendent or the project manager.

22       Q.    Okay.  And does the employee have to sign the

23   termination form?

24       A.    No.

25       Q.    Okay.  So once the form is completed, correct

1    me if I'm wrong but this is what I'm understanding, is

2    that once the form is completed it is sent to the

3    employee and the employee is effectively terminated on

4    that date; is that correct?

5         A.    It is sent to HR.

6         Q.    Okay.  But the individual is notified that

7    they're terminated informally; is that fair to say?

8         A.    Not necessarily.

9         Q.    Okay.  So how would SRB or how would you

10   notify an employee that their employment has been

11   terminated?

12        A.    If the availability is possible we can call

13   them.  We can text them, but if they no call-no show

14   for multiple days and they don't receive our phone

15   calls, then we cannot notify them.  If they leave the

16   job, job abandonment, we cannot notify them.

17        Q.    Okay.  And are the company policies with

18   regards to termination to your knowledge consistent for

19   all employees?

20        A.    Can you rephrase that question?

21        Q.    Sure.

22              Is the way the company notifies individuals

23   of their termination or terminates these individuals

24   consistent and consistently applied to all employees?

25        A.    Yes.

1    Q.    Okay.  And apart from claims of

2  discrimination, retaliation or harassment, have there

3  been any complaints against the company for wrongful

4  termination?

5    A.    I couldn't answer that.

6    Q.    Do you know how many employees you've

7  terminated for absenteeism or no call-no show?

8    A.    Two to four.

9    Q.    Okay.  Do you have their names?

10   A.    I do not.

11   Q.    Do you know when the terminations occurred

12  for no call-no show or absenteeism?

13   A.    It's been ten years or eight years that I've

14  been here.  I've done it two to four times.  I can't

15  remember what years they were.

16   Q.    Did that occur in the last year for any of

17  those terminations?

18   A.    Yes.

19   Q.    Okay.  And do you recall what location or

20  what site the individual who was terminated for no

21  call-no show worked?

22   A.    Yes.

23   Q.    What site was that?

24   A.    The site that Alonzo and Nick Ford were on,

25  they both were terminated for that.

1          I have another individual, I can't remember

2  his name, it was a different site in Florida, but I

3  can't remember their exact date and name.

4          Q.    Okay.  Do you know what site?

5          A.    Do you mean which actual site it was on?

6          Q.    Yes.

7          A.    Pinellas County, here in Florida.

8          Q.    Do you know if it was in the summer, winter,

9  what season it was?

10         A.    Is that relevant?

11         Q.    You can just answer the question.

12         A.    I can't answer that question.  I can't

13 remember the time of year it was.

14         Q.    Okay.  Do you know who the superintendent was

15 for that team?

16         A.    Yes.

17         Q.    And what was his name?

18         A.    Jeff Muckle.  And I cannot recall the other

19 superintendents at the time.

20         Q.    Okay.  One more time.  Can you spell the area

21 of Florida that that was in?

22         A.    Pinellas, P-i-n-e-l-l-a-s County.

23         Q.    Okay.  And do you recall if this individual

24 that was terminated for no call-no show was white,

25 black or other, what his ethnicity was?

 1        A.      White.

 2        Q.      Were any alternatives considered to

 3   terminating Mr. Ford and Hawkins's employment?

 4        A.      Can you rephrase the question?

 5        Q.      Sure.  Did you ever consider, instead of

 6   terminating Mr. Ford and terminating Mr. Hawkins, to

 7   take another approach rather than terminate their

 8   employment, to solve any issues or discrepancies there

 9   may have been with those two individuals?

10        A.      Yes.  I spoke to both of them and asked --

11   requested that I come meet with them to discuss their

12   issues, to resolve them, and they both denied.

13        Q.      And did they tell you why they denied to meet

14   with you?

15        A.      Yes.

16        Q.      And what did they say?

17        A.      They were going to retain a lawyer and sue

18   us.

19        Q.      But why did they reject the meeting with you,

20   did they tell you?

21              MR. JONES:  Object to form.

22        A.      That was the answer.

23        Q.      Do you recall when you requested to meet with

24   them to discuss this?

25        A.      In November.

1    Q.    All right.  Do you recall what time of day it

2    was that you requested to meet with them?

3    A.    I can look on my phone.  It was during the --

4    can't give you the hour.  It was I believe sometime in

5    midday or nighttime.

6    Q.    Okay.  Do you think I would be incorrect in

7    saying that you requested to meet with them past 8:00

8    p.m. at night?

9    A.    I can't remember.

10   Q.    Okay.  Now, were Mr. Ford or Hawkins ever

11   given the option to appeal their termination?

12   A.    No.

13   Q.    And were they ever given the option or --

14   strike that.

15         Did SRB ever give Mr. Ford or Hawkins an exit

16   interview after being terminated or, you know, any

17   feedback as to why they were being terminated?

18   A.    The feedback was the no call-no show for

19   work.

20   Q.    Okay.  Now, with regards to the policies and

21   procedures SRB has for employees and their protection

22   and rights in the workplace, do you know how employees

23   are trained on the company's process for filing

24   discrimination complaints?

25   A.    No, I cannot answer that.

```
 1        Q.    Do you know who is responsible for training

 2   employees with regards to how to file a complaint of

 3   discrimination?

 4        A.    I cannot answer that either.

 5        Q.    Do you know if anybody, any individual for

 6   SRB is responsible for training the employees in how

 7   complain of discrimination, harassment or retaliation?

 8        A.    I cannot answer that either.

 9        Q.    Do you know how often the company's policies

10   for retaliation, harassment or discrimination are

11   updated?

12        A.    No.

13        Q.    Okay.  Do you have any knowledge of how

14   frequently the company's policies are updated?

15        A.    Every year.

16        Q.    Okay.  Do you have any control over the

17   updates to company policy?

18        A.    No.

19        Q.    Okay.  Do you have any control over the

20   complaint procedure or process for employees when they

21   want to report or complain of unlawful activities?

22        A.    I can only discuss with them how to -- that

23   they can call the EEO and HR, that I cannot tell them

24   they can't or anything like that.  I have no authority.

25   They can do whatever they'd like.
```

1    Q.    And are the employees allowed to bypass their

2    supervisor in reporting discrimination if the

3    supervisor was involved in discriminating against them?

4    A.    Yes.

5    Q.    And does the same apply for harassment and

6    retaliation?

7    A.    Yes.

8    Q.    Did Mr. Ford or Mr. Hawkins ever complain to

9    you about unlawful activity?

10    A.    No.

11    Q.    Did Mr. Ford or Mr. Hawkins complain to you

12    about unlawful discrimination on the basis of their

13    race?

14    A.    Yes.

15    Q.    And what did they say?

16    A.    They said that they were getting

17    discriminated against with their hours that were on

18    their time sheets.

19    Q.    Okay.  And what was your response to this?

20    A.    I responded in -- that I would look at the

21    time sheets, and if they had any issues that I couldn't

22    answer them, they could call the EEO officer and HR to

23    discuss their payroll and time sheets.

24    Q.    And did this conversation occur over the

25    phone or in text message?

1       A.     Phone call with both of them, and I can't

2    remember if I had any by text messages.

3       Q.     And what is your role in the onboarding and

4    hiring of employees?

5       A.     The onboarding?  Can you rephrase?

6       Q.     Yes.  Do you know what onboarding is for a

7    company?

8       A.     I do not.

9       Q.     Okay.  So typically onboarding refers to the

10   process of when a company hires a new employee, they

11   train them in understanding how things are done or in

12   the company policies in regards to how to report or

13   complain of unlawful activity or safety requirements

14   that the company may have.

15          Do you know if Southern Road & Bridge has an

16   onboarding process or procedure?

17      A.     Yes.

18      Q.     Okay.  And what is your knowledge of the

19   company's onboarding process?

20      A.     When they are hired they are given the

21   employee handbook, which states many of the onboarding

22   policies where it also says they can discuss with the

23   EEO officer, HR at any time, and stuff like that.

24      Q.     Okay.  And do you know if -- to your

25   knowledge, does SRB allow employees to begin work prior

Deposition of George Pappas                    Nicholas Ford and Alonzo Hawkins v. Southern Road & Bridge LLC

1    to signing that employee handbook?

2        A.    I can't answer that.

3        Q.    Why not?  Do you not know or do you have no

4    knowledge?

5        A.    I have no knowledge.  There's over 200

6    employees.

7        Q.    Okay.

8        A.    And I don't preside over all those employees.

9        Q.    Now more specifically, what did Mr. Ford and

10   Hawkins tell you about their hour dispute?

11       A.    They told me they were not being paid all of

12   their hours.

13       Q.    Okay.  And --

14       A.    And that --

15       Q.    Continue.

16       A.    And that there was fraudulent issues with

17   their time sheets.

18       Q.    Did they say why they believed those things

19   were happening?

20       A.    They did not.

21       Q.    Did you ask them?

22       A.    Yes.

23       Q.    And what did they say?

24       A.    They said because of the color of their skin.

25       Q.    And at that point did you contact an HR

Deposition of George Pappas                    Nicholas Ford and Alonzo Hawkins v. Southern Road & Bridge LLC

1    representative or EEO officer?

2        A.    I spoke to the HR.

3        Q.    And what did the HR tell you?

4        A.    They asked me to discuss the issues with them

5    and go over the time sheets with them and discuss

6    everything with them, and that's when I suggested that

7    we meet so that we could get them paid correctly.

8        Q.    Okay.

9        A.    And that's when they told me they were going

10   to contact their lawyer.

11       Q.    Okay.  Now, which individual do you recall

12   speaking with from HR?

13       A.    Keam.

14       Q.    Okay.  And what is the last name?

15       A.    I don't have that with me.  I can look at an

16   email.

17       Q.    Is that Keam Christofilis?

18       A.    Correct.

19            MR. BARROUKH:  And for the court reporter

20       that's K-e-a-m C-h-r-i-s-t-o-f-i-l-i-s.

21   BY MR. BARROUKH:

22       Q.    And do you know if Keam conducted an

23   investigation into Nick and Alonzo's reports of race

24   discrimination?

25            MR. JONES:  Objection to form.

Deposition of George Pappas                    Nicholas Ford and Alonzo Hawkins v. Southern Road & Bridge LLC

1      A.    I couldn't answer that.

2      Q.    And when you say you couldn't answer that,

3  again, do you mean you do not know?

4      A.    I do not know.

5      Q.    Okay.  I would prefer if you could say "I do

6  not know" instead of I cannot answer, because if you

7  cannot answer it makes me think you may be withholding

8  information instead of not knowing something.  Okay?

9      A.    Okay.  Understood.

10     Q.    Okay.  Did HR contact you further after that

11  initial discussion regarding Alonzo and Nick's

12  complaint of race discrimination?

13     A.    No.

14     Q.    Okay.  Do you know if HR -- strike that.

15          Did you inform Keam that their complaints

16  were handled or that the employees had been terminated

17  following their complaint of race discrimination?

18     A.    I discussed with her the aspect that I

19  discussed with you about wanting to meet with them to

20  go over their hours and get them paid.  And then they

21  said that they would call their attorney.  And then

22  they no call-no showed for multiple days, and I told

23  her that I terminated them.

24     Q.    Okay.  And why were you willing to correct

25  their hours?  Do you believe that their hours were

1  incorrectly tracked or reported by the foreman and the

2  superintendent?

3          MR. JONES:  Object to form.

4      A.    I don't believe that.

5      Q.    So why were you willing to correct their

6  hours if there was nothing wrong with them?

7          MR. JONES:  Object to form.  You can answer.

8      A.    I wasn't there to correct them.  I was there

9  to discuss and they show me where they had the

10 discrepancy and the discrimination towards them.

11     Q.    And I apologize.  I believe you stated a

12 couple moments ago that you wanted to correct their

13 hours.  Am I you incorrect?  Did I hear that wrong?

14     A.    No.  In correction, if they had any kind

15 of -- I don't know how to say it -- any knowledge or

16 any documentation that they were being discriminated

17 against and their hours were different from any other

18 employees, which I showed them their hours which was

19 the same as the whole crew and team.  They did not have

20 any different hours than anybody else on the team.  But

21 yet they were saying they were discriminated against

22 and they did not get the correct hours.

23     Q.    Understood.

24          Now, have you taken a look at any of Mr.

25 Hawkins or Ford's time sheets since they ceased

 1    employment with the company?

 2        A.    Yes.

 3        Q.    And did you notice anything interesting about

 4    the time sheets?

 5        A.    Yes.

 6        Q.    And what did you notice?

 7        A.    Some of the signatures were not theirs.

 8        Q.    And I'm going to go ahead and show you what

 9    I'm mark as Plaintiff's Exhibit 1 just so I can

10    actually provide you with the document to look at and

11    discuss while I question you on it.  Okay?

12            (Exhibit No. 1 marked for identification.)

13    BY MR. BARROUKH:

14        Q.    Now, let me know when you can see the

15    document.

16        A.    I can see it.

17        Q.    Okay.  Now again on the bottom right, there's

18    going to be a red marker stating Plaintiff's Bates No.,

19    and then a bunch of letters and numbers.  That just

20    means that we produced these documents to Mr. Jones's

21    office.  Do you understand?

22        A.    Yes.

23        Q.    It's three pages.  I'm only showing you three

24    time sheets that I'd like to focus on?

25        A.    Sure.

1    Q.    Now, the first time sheet is dated for June

2   7th of 2023; the second is dated for June 10th of 2023;

3   and the third is dated for June 11th of 2023.

4          Do you see that?

5   A.    Yes.

6    Q.    Okay.  Now for each time sheet, and I can

7   scroll it, it states the employee's names on the

8   left-hand side, and on the right hand site it has the

9   employee's signature.

10          Do you see that?

11   A.    Yes.

12   Q.    Who has to sign in the boxes underneath

13   "employee signature"?

14   A.    Employee.

15   Q.    Okay.  And beneath that there's additional

16   notes.  Do you know who writes these additional notes

17   or cost codes down on this sheet?

18   A.    The foreman or superintendent.

19   Q.    Okay.  Now, does only the foreman or

20   superintendent have access to these time sheets?

21   A.    No.

22   Q.    Who else has access to these time sheets?

23   A.    Myself.

24   Q.    Okay.  Now you stated you noticed something

25   interesting about the time sheets, and that some of the

1   signatures did not belong to the employees despite the

2   employees needing to sign their signature on this

3   sheet; is that correct?

4        A.    Correct.

5        Q.    Now, are you noticing this issue where the

6   employees did not sign their names on the time sheets

7   next to their names in this document I'm currently

8   showing you?

9        A.    Yes.

10        Q.    Okay.  And where do you see that occurring?

11        A.    Looks like all of them.

12        Q.    Okay.  And to be clear, I can't agree with

13   you on all of them, but specifically for Alonzo Hawkins

14   do you see that the name is spelled incorrectly, it's

15   A-l-a-n-z-o?

16             Do you see that?

17        A.    Sure.

18        Q.    Okay.  And similar to this sheet A-l-a

19   instead of A-l-o, and similar to the first sheet.

20             Now, these are only three time sheets and

21   records which my clients state they have never seen

22   before or signed before.  Do you understand?

23        A.    Yes.

24        Q.    Do you understand that either -- strike that.

25             Do you understand that an individual, not my

1    clients, signed their signature next to their names on

2    at least these three time sheets?  Do you understand?

3        A.    Yes.

4        Q.    And what is the importance of the time

5    sheets?  I believe you were discussing this previously

6    but if you could restate that, please.

7        A.    The importance is to make sure their names

8    are correct so that I can input them into the payroll

9    system and they get paid properly.

10       Q.    Okay.  Now, sitting here today after I'm sure

11   this issue was brought to your attention in one way or

12   another, how many time sheets have been affected by --

13   strike that.

14           How many time sheets have the same problem

15   where somebody other than my clients signed under their

16   employee signature box?

17       A.    Quite a few.

18       Q.    And how many would that be?

19       A.    I don't know the number.

20       Q.    Would you say that almost every single time

21   sheet was signed by somebody other than my clients?

22       A.    No.  Some of them were signed by them.

23       Q.    And how many were those?

24       A.    I don't know.

25       Q.    Do you believe that my clients signed more

1  than five time sheets during their employment with the

2  company?

3      A.    I don't know.

4      Q.    And do you have these time sheets available

5  on your system or in your records for Southern Road &

6  Bridge?

7      A.    Yes.

8      Q.    So you have all of the time sheets available

9  for my clients's employment for the duration of my

10  clients's employment with the company available to you

11  sitting here today; is that correct?

12      A.    Correct.

13      Q.    Why have these documents not been produced to

14  my office?

15          MR. JONES:  Are you asking me?

16          MR. BARROUKH:  On the record for Mr. George

17      Pappas.

18  BY MR. BARROUKH:

19      Q.    Did you supply your HR with the time sheets

20  for my clients?

21      A.    Yes.

22      Q.    And do you know why they were never sent to

23  my office?

24          MR. JONES:  Object to form.

25      A.    I do not.

1    Q.    Okay.

2          MR. BARROUKH:  Off the record, please.

3          (Informal discussion held off the record.)

4    BY MR. BARROUKH:

5    Q.    George, do you know who signed my clients's

6    signatures on these time sheets?

7    A.    I believe it was Enrique Ruiz there, Esequiel

8    Ruiz, or Ryan Witt.

9    Q.    Okay.

10   A.    I could not answer who exactly did that.  The

11   foreman or superintendent.

12   Q.    Do you understand that signing another

13   individual's name is forgery and is a criminal offense?

14   A.    Yes.

15   Q.    When did you discover my clients's signatures

16   were being forged on the time sheets?

17   A.    After they told me.  And that's when I did a

18   written warning to both the foreman and the

19   superintendent that this is not tolerable and next time

20   they would be fired, terminated.

21   Q.    And to be clear, this is the sole document

22   that reflects how many hours my clients worked; is that

23   correct?

24   A.    Correct.

25   Q.    And the sole individuals who were responsible

1    for verifying, confirming and validating those hours

2    was the foreman and the superintendent; is that

3    correct?

4         A.    Correct.

5         Q.    When in fact, those are the only two

6    individuals responsible for completing this form and

7    who knowingly forged my clients's signature, either one

8    of the foreman or the superintendent, correct?

9         A.    Correct.

10        Q.    Do you know if any of the other employees on

11   this time sheet in front of you complained about

12   incorrect hours?  And I can list their names if you

13   would like.

14        A.    None of them.

15        Q.    Okay.  However, do you know if the other

16   individuals's names were also forged on this time

17   sheet?

18        A.    Yes.

19        Q.    Which ones?

20        A.    It's hard to see, but I believe it looks like

21   all of them.

22        Q.    Okay.  Now, that means Mr. Ruiz and Mr. Ford

23   could also put whatever hours they wanted for

24   themselves, meaning theoretically they could list that

25   they worked from 7:00 p.m. to 4:00 a.m. but really they

1    could have only worked for 30 minutes; isn't that

2    correct?

3              MR. JONES:  Object to FORM.

4    BY MR. BARROUKH:

5         Q.    You can answer.

6         A.    It's possible.  But like I said the

7    supervisor, Ryan Witt, should have documented it and

8    checked them with the foreman.  But yes, that is the

9    only way they get their hours.

10        Q.    So it's also correct that each these

11   individuals apart from the foreman and superintendent,

12   so Nicholas Ford, Fidencio Reyes, Alonzo Hawkins,

13   Dezmond Jones and Cadden Coates, who were having their

14   signatures forged may not have been compensated for the

15   proper amount of hours performed; is that correct?

16             MR. JONES:  Objection.  Form.

17        A.    Correct.

18        Q.    Have you ever reached out to Mr. Jones, Mr.

19   Coates or Mr. Reyes to inform them that their hours

20   were incorrect or -- strike that -- to inform them that

21   their signatures were forged onto their time sheets?

22        A.    I do not remember.

23        Q.    Have you personally reached out to any of

24   those individuals to inform them that their signatures

25   were forged onto their time sheets?

1     A.    No.

2     Q.    Have you personally reached out to any of

3  these individuals to ask them whether the hours on

4  these forged time sheets were correct?

5     A.    No.

6     Q.    Do you know sitting here today if the hours

7  listed on this time sheet for June 7 of 2023 is correct

8  at all?

9     A.    No.  Because like I said, this is done by the

10  foreman and superintendent and then sent to me.  So I

11  did not have a chance to verify that in any way.  And

12  that's when I spoke to Alonzo and Nick to go over that

13  with them, to meet with them.

14     Q.    Do you know if Ryan Witt or Esequiel Ruiz

15  spoke to Alonzo and Nick about their hours?

16     A.    Yes.  Ryan Witt did.

17     Q.    And do you know if Esequiel went by the

18  nickname Pollo?

19     A.    No.

20     Q.    Do you know if anybody working with my

21  clients at Southern Road & Bridge went by the nickname

22  of Pollo?

23     A.    Yes.

24     Q.    And who was that?

25     A.    Fidencio Reyes.

```
 1        Q.    Okay.  Now, who is Esequiel Ruiz?  Is he the

 2   foreman?

 3        A.    Yes.

 4        Q.    Okay.  Now, you said you know Mr. Witt spoke

 5   to my clients about their hour complaints.

 6              Do you know what Mr. Witt and my clients

 7   discussed in that conversation?

 8              MR. JONES:  Objection.  Form.

 9        A.    No.

10        Q.    Now, you said you issued a write-up to Mr.

11   Ruiz and to Mr. Witt, correct?

12        A.    Correct.

13        Q.    Do either of those individuals still work for

14   Southern Road & Bridge today?

15        A.    No.

16        Q.    And do you know the reason for well -- strike

17   that.

18              Were either Mr. Ruiz or Mr. Witt terminated

19   or did they voluntarily resign?

20        A.    They voluntarily resigned.

21        Q.    Okay.  And do you know, did they provide you

22   personally with the reason for their designation?

23        A.    Esequiel told me he needed to stay in Texas,

24   he could not work on the road anymore.  And Ryan Witt I

25   do not know.  He just resigned a little while ago.
```

1    Q.    When did they resign?

2    A.    Esequiel resigned in I think November or

3  December, or December.  And Ryan I believe was 2024, a

4  few months ago I believe.

5    Q.    Okay.  And was there any conversation with

6  Mr. Witt or Mr. Ruiz regarding their employment and

7  potential termination as a result of these forged time

8  sheets?

9    A.    Yes.

10    Q.    Were you a member, participant in that

11  conversation?

12    A.    Yes.

13    Q.    Who else was there?

14    A.    No one.

15    Q.    And what did you say to them?

16    A.    I told them -- I gave them a written warning.

17  If it keeps happening then we're going to have to look

18  into terminating you.

19    Q.    Okay.  Do you have a copy of that written

20  warning?

21    A.    Yes.

22    Q.    Okay.  Sitting here today, can you access

23  that written warning?

24    A.    Yes.

25    Q.    Okay.

1    A.    I know I sent them to the HR department, and

2    Mr. Jones should have them, too, I believe.

3    Q.    Do you know if Nick and Alonzo reported

4    anything else to you regarding Mr. Ruiz or Mr. Witt's

5    behavior?

6    A.    No.

7    Q.    Did Alonzo or Nick ever report to you that

8    there were drugs used on the company site?

9    A.    No.

10    Q.    Okay.  Are you aware of what Mr. Ruiz and Mr.

11    Reyes messaged my clients following their termination

12    from SRB?

13            MR. JONES:  Object to form.

14    A.    No.

15    Q.    Do you have knowledge of any threats made to

16    my clients by SRB employees following their termination

17    from SRB?

18    A.    No.

19    Q.    Now I'd like to show you what I'll mark as

20    Plaintiff's Exhibit 2.  Let me know when you can see

21    the document.

22            (Exhibit No. 2 marked for identification.)

23    A.    I can see it.

24    Q.    Let me know if you'd like me to zoom in,

25    however this document is -- I'll zoom in on the bottom

1  left.  There is a little marker here.  Do you see that?

2  400065?

3       A.    Mm-hmm, yes.

4       Q.    This just indicates that this handbook was

5  sent to me by Mr. Jones's office.  Do you understand?

6       A.    Yes.

7       Q.    And do you know what this document is?

8       A.    It's an employee handbook.

9       Q.    Okay.  And for which company?

10      A.    Southern Road & Bridge.

11      Q.    All right.  And I know you -- we both see the

12  screen, but it is for the record when the court

13  reporter types it down.  Okay?

14      A.    Yes.

15      Q.    Now it states January 21, 2023 on it.

16            So is it understood that this is the employee

17  handbook for the year of 2023 for Southern Road &

18  Bridge?

19      A.    Yes.

20      Q.    Okay.  Now I'd like to bring your attention

21  to page 46, which states "standards of conduct".  Do

22  you see that?

23      A.    Yes.

24      Q.    Okay.  Now, it states that "Southern Road &

25  Bridge LLC strives for a healthy and safe work

1    environment for all employees.  Workplace rules and

2    standards of conduct observed by Southern Road & Bridge

3    LLC are essential to a healthy and productive

4    workplace.  All employees are urged to familiarize

5    themselves with these rules and standards, as they will

6    be held accountable for upholding them".

7            And I'm not going to read the rest, but I

8    will ask you to read the rest of the paragraph and the

9    next one to yourself, and let me know when you are

10   ready you to answer questions about it.

11       A.    Can you make it larger?

12       Q.    Yes.  Just read it to yourself and let me

13   know you've read the whole thing?

14       A.    Okay.

15       Q.    Now, the first example of misconduct is

16   "falsification of time keeping records".

17            Do you see that?

18       A.    Yes.

19       Q.    Okay.  Now in the standards of conduct it

20   says "behaviors such as these, as well as any other

21   misconduct, may result in disciplinary action, up to

22   and including termination of employment".

23            Do you see that?

24       A.    Yes.

25       Q.    Who makes the determination of what

1    discipline is assigned to any action of misconduct for

2    the company?

3        A.    Myself when it comes to my team.

4        Q.    And who is your team?

5        A.    My superintendent and my foreman.

6        Q.    Okay.  Now to be clear, the discipline

7    assigned to actions of misconduct are subjectively

8    assigned by yourself; is that correct?  Or is there a

9    clear written structure where a certain act of

10   misconduct results in a specific discipline?

11           MR. JONES:  Object to form.

12       A.    There's nothing written except for the

13   employee handbook.

14       Q.    Is there a chart that assigns discipline to

15   certain acts of misconduct?

16       A.    No.

17       Q.    So you subjectively assigned discipline to

18   acts of misconduct conducted by your foremen and

19   superintendents, correct?

20       A.    And with discussion with HR.  So yes.

21       Q.    Okay.  And did you discuss Mr. -- well, when

22   you were discussing the forgery of time sheets with Mr.

23   Ruiz and Mr. Witt, what did they tell you?

24       A.    They apologized, and said they would not do

25   it again.

1    Q.    Did they both have knowledge of the documents

2    being forged?

3    A.    They both looked at them, yes.

4    Q.    And did one of them say that they forged the

5    signatures of the employees?

6    A.    Yes.

7    Q.    Which one?

8    A.    Esequiel.

9    Q.    Okay.  But did Mr. Witt have knowledge that

10    Esequiel forged the employees's signatures on the time

11    sheets?

12            MR. JONES:  Object to form.

13    A.    I do not remember.

14    Q.    Did Mr. Witt tell you that he knew Esequiel

15    was forging the employees's signatures on the time

16    sheets?

17    A.    I don't remember.

18    Q.    Well, why was Mr. Witt punished if Esequiel

19    was the one forging time sheets?

20    A.    Because he was the supervisor over Esequiel,

21    and he was supposed to be reviewing those time sheets.

22    Q.    So he was punished for failure to supervise

23    the time sheets or what exactly was he punished for?

24    A.    Reviewing the time sheets.

25    Q.    For reviewing the time sheets and failing to

 1    report forgery, correct?

 2         A.    Correct.

 3         Q.    So does that mean -- did Mr. Witt tell you he

 4    knew the forgery was occurring and happening at the

 5    time?

 6               MR. JONES:  Object to form.

 7         A.    Rephrase the question, please.

 8         Q.    Did Mr. Witt ever tell you that the forgery

 9    was -- strike that.

10               Did Mr. Witt tell you he knew the forgery of

11    signatures was happening at the time?

12               MR. JONES:  Form.

13         A.    No.

14         Q.    Okay.  Did Mr. Witt tell you afterwards that

15    he knew the forgery of time sheets was happening?

16         A.    After our discussion where I noticed it, yes.

17         Q.    Okay.  Now, did you discuss with HR Mr. Witt

18    Mr. Ruiz's knowledge of the forgery of time sheets?

19         A.    Yes.

20         Q.    And did you discuss with HR that Mr. Ruiz

21    personally forged dozens of time sheets?

22               MR. JONES:  Object to form.

23         A.    Yes.

24         Q.    And what did HR tell you in response?

25         A.    We discussed writing them up and disciplining

```
 1   them.

 2        Q.    Did you ever discuss or talk about

 3   terminating them?

 4        A.    Yes.

 5        Q.    And what happened with that discussion with

 6   regards to termination?

 7        A.    If they did it again they would be

 8   terminated.

 9        Q.    Okay.  Did you not believe that doing it time

10   and time again was not sufficient to terminate Mr.

11   Ruiz?

12        A.    Not at the time.

13        Q.    You understood how serious these actions were

14   in terms of being a criminal violation?

15        A.    I guess I didn't understand the seriousness

16   of it, no.

17        Q.    Did HR ever explain to you how serious this

18   conduct was?

19        A.    No.  They said it was wrong.

20        Q.    So HR never disclosed to you the serious

21   nature of falsely forging employee signatures onto time

22   sheets that resulted in their compensation?

23        A.    They discussed it and said it was wrong, yes.

24        Q.    But HR did not recommend Mr. Ruiz be

25   terminated; is that correct?
```

 1      A.      Correct.

 2      Q.      Okay.  Do you recall any discrepancies with

 3  Mr. Ford's hiring with regards to his initial wage when

 4  he began working for the company?

 5      A.      No.

 6      Q.      Do you recall when Mr. Ford was terminated by

 7  the company?

 8      A.      I do not recall the actual date.

 9      Q.      I'll show you what I will mark as Exhibit 3.

10          (Exhibit No. 3 marked for identification.)

11  BY MR. BARROUKH:

12      Q.      Can you see the document?

13      A.      Yes.

14      Q.      What does this look like to you?

15      A.      That is Ryan Witt's termination form.

16      Q.      Okay.  And again, this was produced by your

17  attorney's office as seen in the bottom left-hand

18  corner.

19          Now does this date, November 6, 2023, seem

20  accurate with regards to the date Mr. Ford was

21  terminated by SRB? object to form?

22      A.      Yes.

23      Q.      Okay.  Now I'm going to show you what I'll

24  mark as Plaintiff's Exhibit 4.

25          (Exhibit No. 4 marked for identification.)

```
 1   BY MR. BARROUKH:

 2       Q.    Let me know when you can see the document.

 3       A.    I can see it.

 4       Q.    Okay.  Do you know what this document is?

 5       A.    Nick Ford's termination form.

 6       Q.    It also states that he's notified of his

 7   termination on July 29, 2023 and he is not eligible for

 8   rehire.

 9             Do you see that?

10       A.    Yes.

11       Q.    Have you ever seen this form before?

12       A.    No.

13       Q.    Do you know why this form was drafted and

14   filed?

15             MR. JONES:  Object to form.

16       A.    No.

17       Q.    Is it a company policy to mark on an employee

18   termination notice that an employee is not eligible for

19   rehire, and then to rehire that employee again anyways?

20       A.    I believe so.

21       Q.    Do you know why Mr. Ford marked as not

22   eligible for rehire on this form?

23       A.    I do not.

24       Q.    Okay.  Who would know?

25       A.    Ryan Witt.
```

1    Q.    Okay.  And is that his signature on the

2    bottom of this page?

3              MR. JONES:  Object to form.

4    A.    Yes.

5    Q.    Okay.

6              (Exhibit No. 5 marked for identification.)

7    BY MR. BARROUKH:

8    Q.    I'll share with you what I marked as

9    Plaintiff's Exhibit 5.

10   A.    I can see it.

11   Q.    Would you like me to zoom in?

12   A.    Yes, please.  It's very small.

13   Q.    Okay.  Now can you see the texts?

14   A.    Yes.

15   Q.    Okay.  I'm not going to ask you to read the

16   text, but read it to yourself.

17   A.    Yes.

18   Q.    Do you know who Trouble is?

19   A.    I heard it was a nickname for somebody.  I'm

20   not exactly sure.

21   Q.    Okay.  I believe it was a nickname for Alonzo

22   Hawkins.  Okay?

23   A.    Okay.

24   Q.    Let me represent that to you.

25              Now again, I can't confirm exactly whose

```
1    phone number this is, but from what was represented by

2    my client this is a former colleague from Southern Road

3    & Bridge.  Okay?

4         A.    Okay.

5         Q.    Now if you continue scrolling, read this

6    message to yourself, please.

7         A.    Okay.

8         Q.    Have you ever seen this message before?

9         A.    No.

10        Q.    Do you know who Alfredo is?

11        A.    He was another employee.

12        Q.    Okay.  Now, do you know whose phone number

13   this is?

14        A.    I'm not sure.

15             MR. BARROUKH:  Okay.  We can take a

16        five-minute break, as well.

17             (Brief recess taken.)

18   BY MR. BARROUKH:

19        Q.    George, I'm going to show you another

20   document that I'll mark as Plaintiff's Exhibit 6.

21             (Exhibit No. 6 marked for identification.)

22   BY MR. BARROUKH:

23        Q.    Let me know when you can see the document.

24        A.    I can see it.

25        Q.    Please read the messages to yourself.
```

```
 1        A.    Okay.

 2        Q.    Now, I can represent to you that this is a

 3   text message sent or exchanged between Roach, who I'm

 4   not sure who this is, my client Alonzo Hawkins and

 5   Isaac Ruiz.

 6        A.    Okay.

 7        Q.    Now, do you see Isaac's message on the bottom

 8   of the page?

 9        A.    Yes.

10        Q.    Did you ever hear Isaac use racial slurs like

11   the "N" word used here?

12        A.    No.

13        Q.    Did you ever hear Isaac use the "N" word in

14   the workplace?

15        A.    No.

16        Q.    Were you ever told Isaac used the "N" word in

17   the workplace?

18        A.    No.

19        Q.    Is Isaac African American or black?

20        A.    No.

21        Q.    Do you believe it's acceptable for anybody to

22   use the "N" word in the workplace?

23        A.    No.

24        Q.    Do you believe it's acceptable for a foreman,

25   a non-black foreman to use the "N" word to a black
```

```
 1   subordinate?

 2        A.    No.

 3        Q.    Okay.  Have you seen this text exchange

 4   before?

 5        A.    No.

 6        Q.    Okay.  I'll show you what I'll mark as

 7   Plaintiff's Exhibit 7.  Let me know when you can see

 8   the document.

 9             (Exhibit No. 7 marked for identification.)

10        A.    I can see it, but it's small.

11        Q.    Let me zoom in for you.  And let me represent

12   to you that this is a group chat between Mr. Hawkins,

13   Ryan Witt, Mr. Ruiz and other unnamed individuals.

14   Okay?

15        A.    Okay.

16        Q.    Now, just take a moment to read it and let me

17   know when you want me to scroll.  Okay?

18        A.    Okay.  You can scroll.  Okay.

19        Q.    All right.  Now do you know who Roach is?

20        A.    It's a nickname for one of them.  I'm not

21   sure which one it was.

22        Q.    No problem.

23             Now, again in a group chat with seven total

24   people including Ryan Witt, Mr. Ruiz again uses the "N"

25   word in two different messages.
```

Nicholas Ford and Alonzo Hawkins v. Southern Road & Bridge LLC

1          Do you see that?

2     A.    Yes.

3     Q.    Do you believe at this point Mr. Witt should

4  have reported Mr. Ruiz's conduct?

5          MR. JONES:  Object to form.

6     A.    Yes.

7     Q.    And did Mr. Witt ever report this conduct to

8  you?

9     A.    No.

10    Q.    Had Mr. Witt reported this conduct to you,

11 what would your process have been?

12         MR. JONES:  Object to the form.

13    A.    I would have discussed it with the HR

14 department and let them handle it.

15    Q.    Okay.  Do you believe that either of those

16 messages are appropriate?

17    A.    No.

18    Q.    And again, with regards to Isaac's comments

19 "beaner hallway", do you know what that means?

20    A.    I do not.

21    Q.    Do you believe that's a derogatory slur

22 towards a certain group of Hispanic individuals?

23         MR. JONES:  Object to form.

24    A.    I don't know what that means.

25    Q.    Okay.  Do you know why he would say it?

```
 1              MR. JONES:  Objection to form.

 2         A.    I do not.

 3         Q.    Thank you.

 4              Are you aware if my clients reported their

 5  hour dispute to Mr. Ruiz or Mr. Witt?

 6         A.    Yes, I did know they reported it to Ryan

 7  Witt.

 8         Q.    Okay.  Now, I'm going to go with help and

 9  show you what I'll mark as Plaintiff's Exhibit 8.  Let

10  me know when you can see the document.

11              (Exhibit No. 8 marked for identification.)

12         A.    Can you zoom in?

13         Q.    Yes.

14              Now, let me tell you that this document

15  reflects a communication between Mr. Ruiz and Mr.

16  Hawkins?

17         A.    Okay.

18         Q.    Read it to yourself and let me know when

19  you're ready to answer questions.

20         A.    Okay.

21         Q.    All right.  To be clear, I know it is cut off

22  on the bottom, but it does say "system to track hours

23  of people".  Do you understand?

24         A.    Okay.

25         Q.    Now, what does this message appear to you as?
```

1    A.    It appears to Alonzo asking Isaac about his

2  hours, and he's saying report it to Ryan.

3    Q.    Okay.  And again, Isaac says that "they

4  should have a file record, I don't know how they

5  operate but sure, they have a system to track hours of

6  people".

7          Do you see that?

8    A.    Yes.

9    Q.    Is that true?  Does Isaac not understand how

10 they track hours of people?

11         MR. JONES:  Object to form.

12   A.    I don't know how he could know that.

13   Q.    Are foreman taught and trained how to record

14 hours of their employees at SRB?

15   A.    Yes.  They're trained to use that time sheet.

16   Q.    Okay.  Now I'm showing you what I'm marking

17 as Plaintiff's Exhibit 9.

18         (Exhibit No. 9 marked for identification.)

19 BY MR. BARROUKH:

20   Q.    Let me know when you can see the document.

21   A.    I can see it.

22   Q.    Okay.  Now, let me represent to you that this

23 is a text message between Alonzo Hawkins, Isaac Ruiz,

24 Pollo Ruiz who we believe is Fidencio Reyes --

25   A.    Correct.

1    Q.    -- and several other people.

2          Do you see that?

3    A.    Yes.

4    Q.    Now, are you aware that Mr. Ford's nickname

5    when he worked for SRB was Buck?

6    A.    No.

7    Q.    Well, let me represent to you that Mr. Ford

8    went by "Buck" as a nickname, okay?

9    A.    Okay.

10   Q.    Please read the text message, and let me when

11   you're done reading.

12   A.    Okay.

13   Q.    Okay.  Now, what do you understand this text

14   from Isaac to be saying?

15   A.    It seems like he's talking about -- talking

16   with Ryan it looks like.  I'm not 100 percent sure.

17   Talking about something about hours and meeting up at

18   the yard to go over the hours and the problems they're

19   having or -- and to be like men and not snitches or

20   something about women or something like that.

21   Q.    Now, you see "snitching is hoe shit and "you

22   better than us know that Trouble" -- who was Alonzo

23   Hawkins -- "your own brother trying to throw us under

24   the bus".

25          Do you see that?

```
 1        A.    Yes.

 2        Q.    Do you know what Hawkins is referring to when

 3   he says "snitching is hoe shit"?  Do you know what

 4   specific act he's referring to?

 5              MR. JONES:  Objection to form.

 6        A.    No.

 7        Q.    All right.  I'm going to show you what I'm

 8   mark as Plaintiff's Exhibit 10.

 9              (Exhibit No. 10 marked for identification.)

10   BY MR. BARROUKH:

11        Q.    And this was produced to your attorney that's

12   office as Plaintiff's Bates number AH25.

13              Do you see that?

14        A.    Yes.

15        Q.    Now let me represent to you that this is a

16   text message exchanged between a group of six people

17   including Fidencio Ruiz, Esequiel Ruiz, and my client

18   Alonzo Hawkins amongst other people, okay?

19        A.    Okay.

20        Q.    Now Isaac states "I don't know but I just ass

21   chewed cuz of my hours that me and Pollo get more hours

22   but I like y'all so I make sure we all bring a paycheck

23   home to our families.  So I as a responsibility try and

24   make sure we have work cuz no work means no money so no

25   purposes of us being out of town".
```

```
 1                Do you see that?

 2        A.     Yes.

 3        Q.     Do you know what Mr. Ruiz is referring to in

 4   that message?

 5                MR. JONES:  Object to form.

 6        A.     No.

 7        Q.     And Fidencio replies "first of all who ever

 8   say and watching me they need with watch their job.  I

 9   dnt need no baby sitter if thers sum sum one" -- I

10   don't reall know what that means.  However he does

11   state "whoever say and watching me, they need to watch

12   their job".

13                Do you see that?

14        A.     Yes.

15        Q.     Do you understand that to be a threat in any

16   way, shape or form?

17                MR. JONES:  Object to form.

18        A.     Yes.

19        Q.     Okay.  And Isaac is in the group chat and was

20   Fidencio's foreman.

21                Do you believe Isaac had a duty to report any

22   threats made by his employees?

23        A.     Yes.

24        Q.     And was a threat ever reported by Isaac to

25   Mr. Witt or to yourself?
```

```
 1        A.    Not to myself.  And I cannot answer to Ryan
 2   Witt.
 3        Q.    Okay.  And again, because you did not go to
 4   the work site with my clients you do not have any
 5   knowledge of what occurred or transpired at those
 6   worsteds, correct?
 7        A.    Correct.
 8        Q.    Okay.  I'm going to show you what I'm marking
 9   as Plaintiff's Exhibit 11.
10              (Exhibit No. 11 marked for identification.)
11   BY MR. BARROUKH:
12        Q.    Let me know when you can see this document.
13        A.    I can see it.
14        Q.    Let me represent to you that this is a signed
15   declaration of Dezmond Jones.
16              Do you know who Dezmond Jones is?
17        A.    No.
18        Q.    Okay.  Now as you can see, Mr. Jones says "I
19   worked alongside Mr. Ford and Mr. Hawkins at Southern
20   Road & Bridge LLC".
21              Do you see that?
22        A.    I'm sorry.  Yes.  He was one of our
23   employees.
24        Q.    Do you recall Mr. Jones now?
25        A.    Yes.
```

1    Q.    How do you know Mr. Dezmond Jones?

2    A.    He was an employee.  That's all I know.

3    Q.    Did you ever meet Mr. Jones in person?

4    A.    No.

5    Q.    Did you ever speak with Mr. Jones over the

6    phone?

7    A.    I do not recall.

8    Q.    Okay.  Please read to yourself paragraph nine

9    of Mr. Jones's statement.

10   A.    Okay.

11   Q.    Were you aware of any of the conduct

12   discussed in paragraph nine of Mr. Jones's statement?

13   A.    No.

14   Q.    Do you believe that if this occurred on the

15   job site it was the foreman's responsibility to report

16   this conduct?

17        MR. JONES:  Objection.  Form.

18   A.    Yes.

19   Q.    And did you ever receive a report from the

20   foreman or the superintendent of this conduct

21   occurring?

22   A.    No.

23   Q.    All right.  Could you please continue reading

24   to yourself?

25   A.    Okay.

1    Q.    Now Mr. Jones states that "SRB further

2  discriminated against its black employees including

3  myself, Mr. Ford and Mr. Hawkins".

4          Do you understand?

5    A.    Yes.

6    Q.    Do you understand that Mr. Jones did not file

7  or bring forth this lawsuit?

8    A.    Yes.

9    Q.    Did you understand that Mr. Jones is not an

10  interested party in this lawsuit to the extent he will

11  not recover any money or anything if the plaintiffs

12  within?

13    A.    Yes.

14    Q.    Now, Mr. Jones is stating that "Mr. Ruiz did

15  not let black employees drive company cars, did not let

16  black employees stop to eat lunch, and did not let

17  black employees use the porta potties on the job site".

18          Do you understand that's Mr. Jones's

19  declaration?

20    A.    Yes.

21    Q.    Is any of that acceptable in accordance with

22  SRB's policies?

23    A.    No.

24    Q.    Was any of that ever reported to you during

25  your employment with SRB?

1   A.    No.

2   Q.    Mr. Jones even states that "on one occasion I

3   saw Mr. Ruiz deny Mr. Hawkins the ability to use the

4   restroom, and Mr. Ruiz told Mr. Hawkins to urinate and

5   defecate beneath one of the bridges we were working

6   on".

7         Do you see that?

8   A.    Yes.

9   Q.    What is your thought on that?

10        MR. JONES:  Objection.  Form.

11  A.    It's untolerable.

12  Q.    Now, please to yourself read paragraphs 15

13  through 17.

14  A.    Okay.

15  Q.    Was any of this ever brought to your

16  attention during your employment with Southern Road &

17  Bridge?

18  A.    No.

19  Q.    Number 18.  Mr. Jones states "during my

20  employment for SRB I never signed a time sheet to

21  confirm the number of hours I worked".

22        Do you see that?

23  A.    Yes.

24  Q.    Do you know how long Mr. Jones was employed

25  by Southern Road & Bridge?

Deposition of George Pappas                    Nicholas Ford and Alonzo Hawkins v. Southern Road & Bridge LLC

1        A.      I do not recall.

2        Q.      Do you know how many time sheets per week

3   these employees were required to sign?

4        A.      Five.

5        Q.      Okay.  And in number 20 Mr. Jones states "I

6   complained to Mr. Ruiz about my compensation on many

7   occasions because the number of hours SRB paid me was

8   significantly less than the number of hours I actually

9   worked".

10               Do you see that?

11       A.      Yes.

12       Q.      At any point did Mr. Witt or Mr. Ruiz bring

13  this complaint to your attention?

14       A.      No.

15       Q.      And Mr. Jones states "within five days of my

16  last complaint to Mr. Ruiz about the failure to pay me

17  owed wages, SRB, by and through Mr. Ruiz, terminated my

18  employment".

19               Do you see that?

20       A.      Yes.

21       Q.      Do you know if Mr. Ruiz has the authority to

22  terminate employees?

23       A.      No.

24       Q.      Would there be a termination notice for Mr.

25  Dezmond Jones?

1    A.    There should have been from Ryan Witt.

2    Q.    Okay.  Have you checked your system to see if

3  there's a termination notice for Mr. Dezmond Jones?

4    A.    I have not checked.  I can look.

5    Q.    Okay.  We may need you to.  I will let you

6  know.

7    A.    Okay.

8    Q.    Now, have you ever heard of these complaints

9  from Dezmond Jones or from any other employees at

10  Southern Road & Bridge apart from my clients?

11    A.    No.

12    Q.    How regularly did you speak with Mr. Ruiz?

13    A.    Very minimal.  Maybe one to five times in the

14  six months.

15    Q.    And based off Mr. Jones's statements, and

16  again I can show them to you, do you believe Mr. Ruiz

17  properly followed SRB company policy?

18        MR. JONES:  Object to form.

19    A.    No.

20    Q.    And had you known about Mr. Ruiz's conduct

21  which did not follow SRB company policy, what action

22  would you have taken against him?

23        MR. JONES:  Objection to form.

24    A.    There would have been discussion with him and

25  the HR department.

1    Q.    Okay.  All right.  Give me a couple minutes,

2    George.  I think I'm almost done.  I just want to go

3    over a couple things but, I may be done?

4             (Brief recess taken.)

5    BY MR. BARROUKH:

6    Q.    I only have two more things to show you.  The

7    first thing I'm going to show you is what I'm marking

8    as Plaintiff's Exhibit 12.  So let me know when you can

9    see the document, and I will zoom in if you need.

10            (Exhibit No. 12 marked for identification.)

11   BY MR. BARROUKH:

12   Q.    All right.  Do you understand or have you

13   ever seen this document before?

14   A.    I can't see it.

15   Q.    No.  All right.  Let me represent to you that

16   an interrogatory is ultimately a written set of

17   questions that whoever answers them has to provide a

18   written response, right, and the words are binding on

19   the company.  Meaning Mr. Jones, Arthur, is confirming

20   that he's producing these documents or these responses

21   to us.  And at the bottom of the page you can see Keam

22   Christofilis is confirming that the answers are true to

23   the best of his knowledge.

24            Do you see that?

25   A.    To her knowledge, yes.

1    Q.    Her.   Excuse me.

2         Now I'd like to bring your attention to

3    response number 18, okay?   Interrogatory 18 asks SRB to

4    "identify any investigations or inquiries conducted in

5    response to any complaints of discrimination or

6    harassment reported by the plaintiff to defendant".

7         Do you understand?

8    A.    Yes.

9    Q.    Now, the answer here is that "plaintiff never

10   made any complaints or any reporting regarding any

11   discrimination or harassment".

12        Do you see that?

13   A.    Yes.

14   Q.    You previously told me that Mr. Ford and

15   Hawkins complained to you about race discrimination in

16   the form of their hours not being paid properly; isn't

17   that correct?

18   A.    Correct.

19   Q.    Do you believe that this is an incorrect

20   answer?

21        MR. JONES:  Object to form.

22   A.    I believe it's subjective.

23   Q.    How so?

24   A.    Does it pertain to Keam herself or the

25   company or myself?

```
 1        Q.    This -- so without, you know, speaking too

 2   broadly, the answer reflects the company's response

 3   which includes the valid knowledge and information of

 4   the agents of the companies including yourself.  So

 5   when this question is asked, the company has a duty to

 6   investigate it and make sure they ask their managers,

 7   their HR specifically, and they generate this response

 8   based on what they discover.

 9             MR. BARROUKH:  And Arthur, if you want to

10        jump in and give him any other understanding,

11        please feel free do so.

12   BY MR. BARROUKH:

13        Q.    So this question is being asked to the

14   company all inclusive of the information its agents or

15   its HR has, as well.  Okay?

16        A.    Yes.  So that would be incorrect.

17        Q.    Okay.  Now, just to clearly respond to this

18   interrogatory number 18, could you please explain the

19   nature of the complaint or allegation -- excuse me.

20   Strike that.

21             You did report that you spoke to HR about my

22   client's complaint of discrimination, correct?

23        A.    Correct.

24        Q.    To your knowledge, was there an investigation

25   done by HR into your discussion regarding my client's
```

1  complaint of discrimination?

2          MR. JONES:  Objection, form.

3     A.    I do not know.  Not to my knowledge.

4     Q.    Okay.  Now I'll show you what I'll mark as

5  Plaintiff's Exhibit 13.

6          (Exhibit No. 13 marked for identification.)

7  BY MR. BARROUKH:

8     Q.    And again, let me explain to you that this is

9  Mr. Hawkins's questions to Southern Road & Bridge.  And

10  again Cole, Scott & Kissane has asserted that they are

11  sending the document to us.  And on the bottom you can

12  see that Keam Christofilis, she signed the document

13  confirming that the answers are true to the best of

14  their knowledge and belief.  Do you see that?

15     A.    Yes.

16     Q.    All right.  Now again, the same issue as to

17  the first set of interrogatories is present here, and

18  that is in interrogatory 17 where it asked SRB to

19  "identify any investigations or inquiries conducted in

20  response to any complaints of discrimination or

21  harassment reported to the defendant".

22          Do you see that?

23     A.    Yes.

24     Q.    And the response is that "plaintiff never

25  made any complaints or any reporting regarding any

1    discrimination or harassment".

2              Do you see that?

3      A.    Yes.

4      Q.    And again, sitting here today based on what

5    you told me, is this statement true?

6      A.    Partly.  The discrimination yes.  The

7    harassment was never brought up.

8      Q.    So this statement is incorrect as to the

9    plaintiff's reporting discrimination; is that fair to

10   say?

11     A.    Yes.

12     Q.    Okay.  And again, with regards to Mr.

13   Hawkins, do you know if HR investigated your discussion

14   informing them that Mr. Hawkins complained of race

15   discrimination?

16           MR. JONES:  Object to form.

17     A.    Not to my knowledge.

18     Q.    I have no further questions.

19     A.    Thank you.

20     Q.    Mr. Jones may have questions for you at this

21   time.  If he does.

22           MR. BARROUKH:  Arthur, feel free.

23   CROSS-EXAMINATION BY MR. JONES:

24     Q.    Right.  George, I do have couple follow-up

25   questions.

1        Regarding the complaints that Mr. Hawkins and

2   Mr. Ford made regarding their hours, could you kind of

3   explain the process of what you were willing to do to

4   attempt to remedy this situation if there was an issue

5   that was found?

6        MR. BARROUKH:   Objection to form.   You can

7     answer.

8     A.    Yes.   The remedy was to meet them on-site and

9   to go over the time sheets with them with the foreman

10  and superintendent and get the issue resolved that they

11  were stating.

12    Q.    In what ways were you looking to try to

13  verify if their hours were correct or if there was any

14  discrepancies in the hours?

15    A.    I would have all of us verify and show any

16  documentation on the hours that they had started, and

17  that they allegedly said that we did not put on the

18  time sheet and that they were improperly paid, and then

19  I would get them paid.

20    Q.    And during these discussions when you reached

21  out both to Mr. Ford and Mr. Hawkins, did they at any

22  point engage you and provide any type of documentation?

23    A.    No.

24    Q.    And during this time when you were attempting

25  to meet with them to discuss their hours and if there

1  was any discrepancy, were they reporting to work at any

2  time?

3      A.    No.

4      Q.    Did they provide any type of notice to their

5  supervisor or yourself letting them know that they

6  would be out during this time?

7      A.    No.

8      Q.    How long had they stopped showing up to work

9  when you were looking into this hour situation?

10      A.    Multiple days.

11      Q.    And could you kind of explain why it's

12  important for a member just within your workspace for

13  an individual or an employee to show up for work each

14  day or, you know, let someone know that they are not

15  going to be there?

16      A.    Yes.  They work with a team, and multiple

17  things need to be done.  So if they don't show up it

18  affects the rest of the team with more jobs and more

19  work, missing the man.  So there's more man hours that

20  are needed for the rest of the team.

21      Q.    So the termination form that was entered in

22  in this matter is just kind of like a formality to

23  notify that the employee is not showing up for work?

24          MR. BARROUKH:  Objection to form.  You can

25      answer.

1    A.    Correct.

2    Q.    Were Nicholas Ford and Alonzo Hawkins

3    actually terminated in this matter?

4          MR. BARROUKH:  Objection to form.  You can

5     answer.

6    A.    No.

7    Q.    How did their employment end with Southern

8    Road & Bridge?

9    A.    They were laid off due to job abandonment and

10   no call-no show.

11   Q.    Now, regarding any prior complaints that you

12   had received from the employees, could you just kind of

13   describe, you know, how the employees are informed of

14   the different avenues that they can reach out to if

15   they have an issue with their supervisor or a foreman

16   or a superintendent?

17         MR. BARROUKH:  Objection to form.  You can

18    answer.

19   A.    Yes.  In their employee handbook they have

20   the ability to call the EEO office directly, the HR

21   department directly, and myself and the office of

22   Southern R&B.

23   Q.    Is there anywhere in the office where this

24   would be written down, this contact information?

25   A.    Yes.  It's in their employee handbook.  Also,

1    on the job there is a job board with all of the

2    policies and state government requirements, OSHA, EEO

3    officer, Board of Labor.  All of that was visible by

4    them.

5        Q.    Now, did you receive any type of complaints

6    from Mr. Hawkins or Mr. Ford regarding any

7    inappropriate or racist language that made them feel

8    uncomfortable?

9            MR. BARROUKH:  Objection.  Form.  You can

10       answer.

11       A.    No.

12       Q.    Did you receive any complaints from any of

13   the employees regarding hours missing from their time

14   sheets?

15       A.    No.

16           MR. JONES:  All right.  I have no other

17       questions.

18           MR. BARROUKH:  I just have a couple quick

19       questions.

20   REDIRECT EXAMINATION BY MR. BARROUKH:

21       Q.    Had you ever met Alonzo and Nicholas in

22   person before asking to meet with them in person to go

23   over their hours?

24       A.    No.

25       Q.    Had you ever spoken on the phone with Alonzo

1    or Nicholas before you asked to meet them in person to

2    go over their hours?

3        A.    Yes.

4        Q.    And how many times did you speak with them on

5    the phone?

6        A.    I believe it was the day before or -- once or

7    twice as they were telling me the complaint.  And

8    that's when I discussed that I could come and meet with

9    them.

10       Q.    So prior to that phone call, for the entire

11   duration of Mr. Ford's employment you had never

12   contacted either of them; is that correct?

13       A.    Correct.  Nor had they contacted me.

14       Q.    Understood.  But they, to that point they had

15   no -- even during the phone call potentially Mr. Ford

16   and Mr. Hawkins had no personal relationship or

17   familiarity with you whatsoever; is that correct?

18       A.    They had knowledge of me, but no familiarity

19   or anything like that.

20       Q.    Now, as you saw Mr. Hawkins and Ford's

21   co-workers threaten them with physical violence, do you

22   believe that one of the reasons that they did not want

23   to meet with you at night on a random day after never

24   seeing you before is because they were scared?

25            MR. JONES:  Objection, form.

Deposition of George Pappas                    Nicholas Ford and Alonzo Hawkins v. Southern Road & Bridge LLC

1        A.    No, I don't believe that.

2        Q.    Why not?

3        A.    Because they kept working.  If they felt

4   physical threat, they should have notified the

5   authorities and notified HR or anybody else.  They kept

6   working multiple weeks.

7        Q.    Give me one moment.  I'm just looking for a

8   document.

9            MR. BARROUKH:  All right.  I have no further

10       questions at this time.

11           MR. JONES:  No questions.

12           MR. BARROUKH:  Ms.  Court reporter, we are

13       not going ordering at this time, but I'll email the

14       exhibits to you later today.

15           MR. JONES:  George, you have the right to

16       read or waive the transcript.  What that means is

17       you can read it over and see if there's any

18       grammatical mistakes that you need to correct.  You

19       can't make any substantive changes.  Or you can

20       waive that and take the transcript as is.

21           THE WITNESS:  Okay.  I need to decide that

22       now.

23           MR. BARROUKH:  Typically people read just to

24       get the chance to correct any mistakes that there

25       may be in the record.

1           MR. JONES:  You don't have to if you don't

2      want to.

3           THE WITNESS:  I think I'm okay.  I'll waive

4      it.

5           (Thereupon, the deposition was concluded at

6    12:35 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          - - -

 2              E R R A T A    S H E E T

 3                          - - -

 4

 5    PAGE       LINE       CHANGE

 6    _____     _____     _____

 7    _____     _____     _____

 8    _____     _____     _____

 9    _____     _____     _____

10    _____     _____     _____

11    _____     _____     _____

12    _____     _____     _____

13    _____     _____     _____

14    _____     _____     _____

15    _____     _____     _____

16    _____     _____     _____

17    _____     _____     _____

18    _____     _____     _____

19    _____     _____     _____

20    _____     _____     _____

21    _____     _____     _____

22    _____     _____     _____

23    _____     _____     _____

24    _____     _____     _____

25    _____     _____     _____
```

```
 1                  ACKNOWLEDGMENT OF DEPONENT

 2

 3         I,                        , do hereby

 4    certify that I have read the foregoing pages and

 5    that the same is a correct transcription of the

 6    answers given by me to the questions therein

 7    propounded, except for the corrections or

 8    changes in form or substance, if any, noted in

 9    the attached Errata Sheet.

10

11

12

13

14

15    _____    _____
      Date           Signature

16

17

18

19

20

21

22

23

24

25
```

1                     CERTIFICATE OF OATH

2

3     STATE OF FLORIDA :

4     COUNTY OF BROWARD:

5

6     I, Michele Anzivino, Notary Public, State of Florida,

7     do hereby certify that GEORGE PAPPAS, personally

8     appeared before me via videoconferencing technology on

9     March 4, 2025, and was duly sworn and produced driver's

10    license/I.D.  as identification.

11

12                 Signed on March 4, 2025.

13

14            _____,

15            Michele Anzivino

16            Notary Public - State of Florida

17            My Commission Expires: 03/19/2027

18            My Commission No.: HH-375658

19

20

21

22

23

24

25

Deposition of George Pappas                    Nicholas Ford and Alonzo Hawkins v. Southern Road & Bridge LLC

1                    CERTIFICATE OF REPORTER

2

3    STATE OF FLORIDA              )

4    COUNTY OF BROWARD             )

5

6            I, Michele Anzivino, Court Reporter, do
     hereby certify that I was authorized to and did
7    stenographically report the deposition of
     GEORGE PAPPAS, that a review of the transcript was not
8    requested; and that the foregoing transcript, pages 1
     through 100, is a true and correct record of my
9    stenographic notes.

10

11           I FURTHER CERTIFY that I am not a relative,
     employee, or attorney, or counsel of any of the
     parties, nor am I a relative or employee of any of the
12   parties' attorney or counsel connected with the action,
     nor am I financially interested in the action.

13

14           DATED this 19th day of April, 2025.

15

16

17

18

19   _____

20   Michele Anzivino, FPR, Notary Public

21           Notary Public - State of Florida
             My Commission Expires: 03/19/2027
22           My Commission No.: HH-375658

23

24

25

Case 3:24-cv-00404-MCR-ZCB    Document 21-4    Filed 06/05/25    Page 104 of 124
Deposition of George Pappas
Nicholas Ford and Alonzo Hawkins v. Southern Road & Bridge LLC

**WORD INDEX**

**< 0 >**
**03/19/2027**  101:*17*
102:*21*

**< 1 >**
**1**  3:*11*  51:*9, 12*
102:*8*
**10**  3:*18*  79:8, *9*
**100**  19:*9*  78:*16*
102:*8*
**10th**  52:*2*
**11**  3:*18*  81:*9, 10*
**11th**  52:*3*
**12**  3:*18*  87:*8, 10*
**12:35**  1:*16*  98:*6*
**13**  3:*18*  90:*5, 6*
**15**  84:*12*
**17**  84:*13*  90:*18*
**18**  84:*19*  88:*3*  89:*18*
**19**  7:*2*
**19th**  102:*14*

**< 2 >**
**2**  3:*12*  23:*11*  62:*20,*
*22*
**20**  19:*25*  20:*3*  28:*19*
85:*5*
**200**  18:*25*  47:*5*
**2012**  12:*5*
**2016**  11:*2*  18:*8*
**2019**  18:*1*
**2023**  19:*2*  52:*2, 3*
59:*7*  63:*15, 17*  69:*19*
70:*7*
**2024**  61:*3*
**2025**  1:*13*  101:*9, 12*
102:*14*
**21**  63:*15*
**29**  70:*7*
**2907**  7:*10*
**2997**  7:*2*

**< 3 >**
**3**  3:*13*  69:*9, 10*
**3:24-cv-00404-MCR**
1:*1*
**30**  9:*17*  58:*1*

**33131**  2:*4*
**33609**  2:*8*
**34683**  7:*3*
**34691**  7:*11*

**< 4 >**
**4**  1:*13*  3:*5, 14*  69:*24,*
*25*  101:*9, 12*
**4:00**  57:*25*
**400065**  63:*2*
**45**  9:*17*
**46**  63:*21*

**< 5 >**
**5**  3:*15*  71:*6, 9*
**50**  23:*11*
**500**  2:*7*
**51**  3:*11*
**520**  2:*3*

**< 6 >**
**6**  3:*16*  69:*19*  72:*20,*
*21*
**60**  23:*11*
**62**  3:*12*
**69**  3:*13, 14*

**< 7 >**
**7**  3:*17*  59:*7*  74:*7, 9*
**7:00**  57:*25*
**700**  2:*7*
**71**  3:*15*
**72**  3:*16*
**74**  3:*17*
**76**  3:*18*
**77**  3:*18*
**79**  3:*18*
**7th**  52:*2*

**< 8 >**
**8**  3:*18*  76:*9, 11*
**8:00**  43:*7*
**81**  3:*18*
**87**  3:*18*

**< 9 >**
**9**  3:*18*  77:*17, 18*
**9:33**  1:*16*
**90**  3:*18*

**91**  3:*6*
**95**  3:*7*

**< A >**
**a.m.**  57:*25*
**abandonment**  39:*16*
94:*9*
**ability**  21:*14, 21*
22:*4*  26:*24*  84:*3*
94:*20*
**able**  22:*11*  29:*19*
**absenteeism**  40:*7, 12*
**acceptable**  73:*21, 24*
83:*21*
**access**  52:*20, 22*
61:*22*
**accommodations**
14:*16*
**accountable**  64:*6*
**accurate**  19:*12*  69:*20*
**ACKNOWLEDGMEN**
**T**  100:*1*
**act**  35:*1*  65:*9*  79:*4*
**action**  64:*21*  65:*1*
86:*21*  102:*12*
**actions**  65:*7*  68:*13*
**activities**  27:*20, 23*
44:*21*
**activity**  20:*22*  26:*11,*
*18, 21, 25*  27:*4, 8, 11*
28:*3*  30:*19, 23*  31:*5*
45:*9*  46:*13*
**acts**  65:*15, 18*
**actual**  41:*5*  69:*8*
**adding**  21:*23*
**additional**  52:*15, 16*
**address**  4:*13*  7:*1, 7, 8*
**affirmed**  4:*8*
**African**  73:*19*
**agents**  89:*4, 14*
**ago**  8:*11*  19:*7*  50:*12*
60:*25*  61:*4*
**agree**  53:*12*
**AH25**  3:*18*  79:*12*
**ahead**  51:*8*
**A-l-a**  53:*18*
**A-l-a-n-z-o**  53:*15*
**Alfredo**  72:*10*
**allegation**  89:*19*

**allegedly**  92:*17*
**allow**  5:*11*  46:*25*
**allowed**  26:*17*  45:*1*
**A-l-o**  53:*19*
**alongside**  81:*19*
**ALONZO**  1:*4*  17:*6*
19:*1*  25:*10*  40:*24*
49:*11*  53:*13*  58:*12*
59:*12, 15*  62:*3, 7*
71:*21*  73:*4*  77:*1, 23*
78:*22*  79:*18*  94:*2*
95:*21, 25*
**Alonzo's**  48:*23*
**Alternate**  7:*2*
**alternatives**  42:*2*
**American**  73:*19*
**amount**  19:*21*  58:*15*
**answer**  5:*19*  19:*9*
25:*19*  28:*14*  31:*2, 9*
32:*8, 17*  33:*2*  38:*9,*
*16*  40:*5*  41:*11, 12*
42:*22*  43:*25*  44:*4, 8*
45:*22*  47:*2*  49:*1, 2, 6,*
*7*  50:*7*  56:*10*  58:*5*
64:*10*  76:*19*  81:*1*
88:*9, 20*  89:*2*  92:*7*
93:*25*  94:*5, 18*  95:*10*
**answers**  4:*22*  5:*2, 14*
87:*17, 22*  90:*13*
100:*6*
**anybody**  7:*15*  10:*11,*
*19*  33:*20*  44:*5*  50:*20*
59:*20*  73:*21*  97:*5*
**anymore**  60:*24*
**anyways**  70:*19*
**Anzivino**  4:*2*  101:*6,*
*15*  102:*6, 20*
**apart**  17:*15*  24:*14*
34:*5*  38:*3*  40:*1*
58:*11*  86:*10*
**apologize**  50:*11*
**apologized**  65:*24*
**appeal**  43:*11*
**appear**  76:*25*
**APPEARANCES**  2:*1*
**appeared**  101:*8*
**appearing**  7:*13, 22*
**appears**  77:*1*
**applied**  39:*24*

apply 45:5
approach 42:7
appropriate 75:16
approval 29:1
approximate 28:15
approximately 37:14
April 102:14
area 41:20
arrival 22:23
ARTHUR 2:7 87:19
  89:9 91:22
asked 42:10 48:4
  89:5, 13 90:18 96:1
asking 31:18, 21
  32:22, 23, 25 33:2, 5
  36:20, 23 55:15 77:1
  95:22
asks 88:3
aspect 34:25 49:18
ass 79:20
asserted 90:10
assign 21:9
assigned 65:1, 7, 8, 17
assignment 23:10
assigns 65:14
attached 100:9
attempt 92:4
attempting 92:24
attention 14:22
  54:11 63:20 84:16
  85:13 88:2
attorney 5:20, 21
  8:12 9:8, 12 10:12
  19:10 35:8 49:21
  79:11 102:11, 12
attorneys 5:18
attorney's 69:17
authorities 97:5
authority 22:8 29:12
  36:23, 25 38:2 44:24
  85:21
authorized 102:6
availability 39:12
available 55:4, 8, 10
avenues 94:14
aware 62:10 76:4
  78:4 82:11

< B >
baby 80:9

back 14:5 17:7 18:1
  19:1 21:23
bad 21:17
BARROUKH 2:3
  3:5, 7 4:11 25:18
  31:8, 15, 18, 20 32:7,
  21, 25 33:7, 10 35:2,
  6 48:19, 21 51:13
  55:16, 18 56:2, 4
  58:4 69:11 70:1
  71:7 72:15, 18, 22
  77:19 79:10 81:11
  87:5, 11 89:9, 12
  90:7 91:22 92:6
  93:24 94:4, 17 95:9,
  18, 20 97:9, 12, 23
based 33:2, 15 86:15
  89:8 91:4
basically 13:14 14:9
  22:10 37:18
basis 45:12
Bates 3:18 51:18
  79:12
beaner 75:19
began 10:9 12:4
  69:4
Behalf 1:13 2:2, 6
behavior 21:17 62:5
behaviors 64:20
belief 90:14
believe 10:3, 7 12:5
  18:25 33:1 34:14, 23
  36:15, 23, 25 43:4
  49:25 50:4, 11 54:5,
  25 56:7 57:20 61:3,
  4 62:2 68:9 70:20
  71:21 73:21, 24 75:3,
  15, 21 77:24 80:21
  82:14 86:16 88:19,
  22 96:6, 22 97:1
believed 47:18
belong 53:1
beneath 21:1 52:15
  84:5
best 28:18 87:23
  90:13
better 78:22
binding 87:18
bit 19:7 35:2

black 41:25 73:19,
  25 83:2, 15, 16, 17
board 95:1, 3
bottom 51:17 62:25
  69:17 71:2 73:7
  76:22 87:21 90:11
Boulevard 2:7
box 54:16
boxes 52:12
break 5:24 6:3 35:7,
  8 38:15 72:16
breaks 6:1 36:7
Brickell 2:3
BRIDGE 1:7 6:19
  11:1 12:3 18:15, 16,
  24 19:3 20:8 22:20
  23:24 24:2 31:13
  32:5 33:25 34:4
  35:21 38:3 46:15
  55:6 59:21 60:14
  63:10, 18, 25 64:2
  72:3 81:20 84:17, 25
  86:10 90:9 94:8
bridges 18:17 84:5
Bridge's 6:16, 24
  30:18
Brief 35:5 72:17
  87:4
bring 29:17 63:20
  79:22 83:7 85:12
  88:2
broadly 89:2
broken 37:7
brother 78:23
brought 14:21, 23
  15:17 54:11 84:15
  91:7
BROWARD 101:4
  102:4
Buck 78:5, 8
budget 13:10, 11
budgets 11:9, 13
bunch 51:19
bus 78:24
bypass 45:1

< C >
Cadden 58:13
call 15:2 16:6, 8
  20:19 26:15 27:13

39:12 44:23 45:22
  46:1 49:21 94:20
  96:10, 15
calling 26:14
call-no 37:17 39:13
  40:7, 12, 21 41:24
  43:18 49:22 94:10
calls 30:10, 12 31:16
  39:15
cars 24:3 83:15
CASE 1:1
cause 4:4
ceased 50:25
cell 7:24 15:5
certain 23:1, 19 65:9,
  15 75:22
CERTIFICATE
  101:1 102:1
certify 100:4 101:7
  102:6, 9
chain 26:6, 10
chance 59:11 97:24
CHANGE 99:5
changes 97:19 100:8
charges 31:12 32:1
chart 65:14
chat 3:17 74:12, 23
  80:19
checked 58:8 86:2, 4
chewed 79:21
Christofilis 48:17
  87:22 90:12
C-h-r-i-s-t-o-f-i-l-i-s
  48:20
claims 40:1
clear 7:18 14:19
  17:1 19:12 33:23
  53:12 56:21 65:6, 9
  76:21
clearly 6:7 89:17
client 72:2 73:4
  79:17
clients 25:10 34:6
  53:21 54:1, 15, 21, 25
  55:20 56:22 59:21
  60:5, 6 62:11, 16
  76:4 81:4 86:10
client's 89:22, 25
clients's 55:9, 10

Deposition of George Pappas
Nicholas Ford and Alonzo Hawkins v. Southern Road & Bridge LLC

56:5, 15  57:7
**close**  12:6
**Coates**  58:13, 19
**codes**  52:17
**coffee**  6:2
**COLE**  2:6  90:10
**colleague**  72:2
**collecting**  12:22
**color**  47:24
**come**  42:11  96:8
**comes**  29:6  65:3
**command**  26:6, 10
**comments**  75:18
**Commission**  101:17, 18  102:21, 22
**Communication**  3:18 15:2  76:15
**companies**  89:4
**company**  9:23  10:1, 9, 23  11:9, 21, 23 12:4  14:3  22:16, 20, 22, 25  23:17, 18, 21 24:3, 7, 14, 22  25:1, 16  27:25  28:9  31:4 32:2  33:13, 17, 21 34:10  35:25  36:3, 6, 10  38:9  39:17, 22 40:3  44:17  46:7, 10, 12, 14  51:1  55:2, 10 62:8  63:9  65:2  69:4, 7  70:17  83:15  86:17, 21  87:19  88:25  89:5, 14
**company's**  28:5 43:23  44:9, 14  46:19 89:2
**compensated**  58:14
**compensation**  68:22 85:6
**complain**  44:7, 21 45:8, 11  46:13
**complained**  57:11 85:6  88:15  91:14
**complaint**  14:15 15:17  16:9, 23, 24, 25 17:3  26:13, 25  31:5 35:21  44:2, 20  49:12, 17  85:13, 16  89:19, 22  90:1  96:7

**complaints**  11:18 14:20  15:12  20:13, 21  27:7, 11, 20, 23 28:2  30:18, 22  33:12, 16, 20, 24  34:4, 10 35:25  40:3  43:24 49:15  60:5  86:8 88:5, 10  90:20, 25 92:1  94:11  95:5, 12
**complete**  5:11, 13
**completed**  12:22 17:12  38:25  39:2
**completes**  38:20
**completing**  31:1  57:6
**comptroller**  13:12
**computer**  7:22
**concluded**  98:5
**conduct**  17:4  63:21 64:2, 19  68:18  75:4, 7, 10  82:11, 16, 20 86:20
**conducted**  35:20 48:22  65:18  88:4 90:19
**conference**  6:17  7:17
**confirm**  11:12  17:11, 17, 20  71:25  84:21
**confirmation**  17:16, 23
**confirming**  57:1 87:19, 22  90:13
**connected**  102:12
**consider**  42:5
**considered**  42:2
**consistent**  39:18, 24
**consistently**  39:24
**contact**  47:25  48:10 49:10  94:24
**contacted**  96:12, 13
**Continue**  47:15  72:5 82:23
**contribute**  29:20
**control**  16:16  18:20 25:25  44:16, 19
**conversation**  45:24 60:7  61:5, 11
**copies**  9:14
**copy**  9:7  13:6  61:19
**corner**  69:18

**correct**  7:19, 20 10:17  11:14, 15 12:25  15:9, 10, 13, 14 17:5, 8, 13, 14, 24 20:2  21:2, 3  22:23, 24  23:2, 3  26:10 29:7, 8  34:1, 11, 13 35:22, 23  38:25  39:4 48:18  49:24  50:5, 8, 12, 22  53:3, 4  54:8 55:11, 12  56:23, 24 57:3, 4, 8, 9  58:2, 10, 15, 17  59:4, 7  60:11, 12  65:8, 19  67:1, 2 68:25  69:1  77:25 81:6, 7  88:17, 18 89:22, 23  92:13  94:1 96:12, 13, 17  97:18, 24  100:5  102:8
**correction**  50:14
**corrections**  100:7
**correctly**  48:7
**cost**  52:17
**costs**  13:13
**counsel**  102:11, 12
**count**  19:21
**country**  23:18
**County**  41:7, 22 101:4  102:4
**couple**  50:12  87:1, 3 91:24  95:18
**course**  20:17  22:13
**COURT**  1:1  4:2, 25 5:8  6:11, 12  48:19 63:12  97:12  102:6, 20
**Cousin**  12:2, 7
**co-workers**  96:21
**crew**  50:19
**criminal**  25:5  56:13 68:14
**CROSS-EXAMINATION** 91:23
**current**  7:7  11:4
**currently**  18:24  53:7
**cut**  19:5  76:21
**cuz**  79:21, 24

**< D >**
**DANIEL**  2:3
danielb@dereksmithla w.com  2:4
**DATE**  1:13  18:7 39:4  41:3  69:8, 19, 20  100:15
**dated**  52:1, 2, 3 102:14
**day**  18:8  20:6  21:7 26:1  30:10  43:1 93:14  96:6, 23 102:14
**days**  20:5  39:14 49:22  85:15  93:10
**day-to-day**  18:21 21:6  25:25
**December**  61:3
**decide**  97:21
**decision**  29:5
**Declaration**  3:18 81:15  83:19
**decline**  29:13, 16
**defecate**  84:5
**Defendant**  1:8  2:6 6:20  88:6  90:21
**definite**  28:14
**definitely**  30:13
**denied**  42:12, 13
**deny**  84:3
**department**  12:20 15:19  27:14  29:2 62:1  75:14  86:25 94:21
**DEPONENT**  100:1
**DEPOSITION**  1:13 4:2, 13, 17  6:18  7:13, 23  8:1, 7, 13, 21 10:12, 17, 21  98:5 102:7
**DEREK**  2:2
**derogatory**  75:21
**describe**  18:14  20:11 94:13
**described**  26:4
**Description**  3:10
**designation**  60:22
**despite**  53:1
**determination**  64:25

determinations  25:*15*
determine  16:*14*
determined  24:*6*
device  8:*3*
devices  7:*21*
Dezmond  3:*18*  58:*13*
81:*15, 16*  82:*1*  85:*25*
86:*3, 9*
different  23:*21*
30:*10*  41:*2*  50:*17, 20*
74:*25*  94:*14*
difficulties  35:*3*
DIRECT  4:*11*  37:*8*
directed  16:*17*
directly  94:*20, 21*
disciplinary  21:*15*
64:*21*
discipline  21:*21*  22:*4,*
*10*  65:*1, 6, 10, 14, 17*
disciplining  67:*25*
disclosed  68:*20*
discover  56:*15*  89:*8*
discrepancies  42:*8*
69:*2*  92:*14*
discrepancy  50:*10*
93:*1*
discriminated  45:*17*
50:*16, 21*  83:*2*
discriminating  45:*3*
discrimination  26:*6*
31:*12*  32:*1*  33:*25*
34:*23, 25*  35:*11*  40:*2*
43:*24*  44:*3, 7, 10*
45:*2, 12*  48:*24*  49:*12,*
*17*  50:*10*  88:*5, 11, 15*
89:*22*  90:*1, 20*  91:*1,*
*6, 9, 15*
discuss  10:*16*  13:*17*
14:*10*  15:*22*  27:*12*
42:*11, 24*  44:*22*
45:*23*  46:*22*  48:*4, 5*
50:*9*  51:*11*  65:*21*
67:*17, 20*  68:*2*  92:*25*
discussed  26:*12*
38:*12*  49:*18, 19*  60:*7*
67:*25*  68:*23*  75:*13*
82:*12*  96:*8*
discussing  54:*5*  65:*22*
discussion  33:*9*  37:*4,*
*6*  38:*13*  49:*11*  56:*3*

65:*20*  67:*16*  68:*5*
86:*24*  89:*25*  91:*13*
discussions  92:*20*
dispute  47:*10*  76:*5*
disrespectful  7:*5*
dissuade  29:*23*
distribute  21:*10*
DISTRICT  1:*1*
dnt  80:*9*
document  51:*10, 15*
53:*7*  56:*21*  62:*21, 25*
63:*7*  69:*12*  70:*2, 4*
72:*20, 23*  74:*8*  76:*10,*
*14*  77:*20*  81:*12*  87:*9,*
*13*  90:*11, 12*  97:*8*
documentation  50:*16*
92:*16, 22*
documented  58:*7*
documents  7:*21*  8:*1,*
*20, 23*  9:*2*  10:*19*
51:*20*  55:*13*  66:*1*
87:*20*
doing  37:*15*  68:*9*
dozens  67:*21*
drafted  70:*13*
Drive  2:*3*  7:*10*
23:*19*  24:*12, 21, 25*
25:*8, 16*  83:*15*
driver's  24:*11*  25:*4,*
*5*  101:*9*
driving  24:*13*  25:*12*
drugs  62:*8*
due  94:*9*
DUI  25:*5*
duly  4:*8*  101:*9*
duration  55:*9*  96:*11*
duties  11:*7*
duty  80:*21*  89:*5*

< E >
eat  83:*16*
EEO  15:*20, 23*  16:*3,*
*4, 5*  20:*19*  26:*15*
27:*14*  30:*24*  32:*12*
33:*18*  44:*23*  45:*22*
46:*23*  48:*1*  94:*20*
95:*2*
EEOC  31:*12*  32:*2, 5*
effectively  39:*3*
eight  11:*2*  40:*13*

either  29:*7*  32:*17*
44:*4, 8*  53:*24*  57:*7*
60:*13, 18*  75:*15*
96:*12*
eligible  70:*7, 18, 22*
email  48:*16*  97:*13*
emergency  8:*3*
employ  18:*24*  19:*3*
employed  28:*13*
84:*24*
employee  3:*12*  8:*24*
9:*5, 7, 20, 22*  10:*1, 5,*
*8, 20*  14:*15, 19*  15:*18,*
*22*  16:*2, 7, 11, 14, 18*
17:*3*  20:*14, 18*  21:*15,*
*22*  22:*6*  24:*7, 21*
25:*3, 8*  26:*4, 12, 13,*
*16, 17*  27:*13*  29:*1, 17,*
*21*  34:*1, 5, 21*  35:*10,*
*13, 16*  37:*2, 5, 11*
38:*11, 22*  39:*3, 10*
46:*10, 21*  47:*1*  52:*13,*
*14*  54:*16*  63:*8, 16*
65:*13*  68:*21*  70:*17,*
*18, 19*  72:*11*  82:*2*
93:*13, 23*  94:*19, 25*
102:*11*
employees  11:*10, 14,*
*19*  12:*16, 18*  13:*18,*
*21, 22*  14:*7, 8*  15:*4*
17:*10, 17*  18:*22, 23*
19:*2*  20:*13, 23*  21:*5,*
*10*  23:*7*  24:*13*  25:*2,*
*16, 22*  26:*2, 24*  27:*3*
28:*10, 11, 21*  36:*2, 14*
38:*3, 6*  39:*19, 24*
40:*6*  43:*21, 22*  44:*2,*
*6, 20*  45:*1*  46:*4, 25*
47:*6, 8*  49:*16*  50:*18*
53:*1, 2, 6*  57:*10*
62:*16*  64:*1, 4*  66:*5*
77:*14*  80:*22*  81:*23*
83:*2, 15, 16, 17*  85:*3,*
*22*  86:*9*  94:*12, 13*
95:*13*
employee's  52:*7, 9*
employees's  66:*10, 15*
employment  10:*9*
29:*6*  39:*10*  42:*3, 8*
51:*1*  55:*1, 9, 10*  61:*6*

64:*22*  83:*25*  84:*16,*
*20*  85:*18*  94:*7*  96:*11*
encouraged  26:*20*
27:*3*
engage  92:*22*
Enrique  56:*7*
entail  18:*17*
entails  11:*17*
entered  93:*21*
entire  96:*10*
entity  22:*22*
environment  64:*1*
Errata  100:*9*
Esequiel  56:*7*  59:*14,*
*17*  60:*1, 23*  61:*2*
66:*8, 10, 14, 18, 20*
79:*17*
ESQ  2:*3, 7*
essential  64:*3*
estimate  28:*18*
ethnicity  41:*25*
events  19:*6*
E-verified  29:*4*
exact  41:*3*
exactly  5:*24*  6:*23*
56:*10*  66:*23*  71:*20,*
*25*
EXAMINATION  3:*2*
4:*11*  95:*20*
examined  4:*8*
example  64:*15*
examples  14:*14*
Excel  12:*19, 23*  13:*8*
exchange  74:*3*
exchanged  9:*11*  73:*3*
79:*16*
Excuse  88:*1*  89:*19*
Exhibit  3:*10, 11, 12,*
*13, 14, 15, 16, 17, 18*
51:*9, 12*  62:*20, 22*
69:*9, 10, 24, 25*  71:*6,*
*9*  72:*20, 21*  74:*7, 9*
76:*9, 11*  77:*17, 18*
79:*8, 9*  81:*9, 10*  87:*8,*
*10*  90:*5, 6*
EXHIBITS  3:*9*  97:*14*
exit  43:*15*
Expires  101:*17*
102:*21*

Deposition of George Pappas

Nicholas Ford and Alonzo Hawkins v. Southern Road & Bridge LLC

**explain** 15:*15* 24:*9* 26:*9* 68:*17* 89:*18* 90:*8* 92:*3* 93:*11*
**explanation** 13:*3*
**extend** 29:*5*
**extent** 83:*10*

**< F >**
**fact** 17:*21* 57:*5*
**failing** 66:*25*
**failure** 66:*22* 85:*16*
**fair** 12:*6, 24* 17:*23* 28:*20, 23* 30:*15, 16* 31:*23, 24* 39:*7* 91:*9*
**falsely** 68:*21*
**falsification** 64:*16*
**familiarity** 96:*17, 18*
**familiarize** 64:*4*
**families** 79:*23*
**family** 10:*14, 17*
**far** 9:*9* 23:*12*
**feedback** 43:*17, 18*
**feel** 89:*11* 91:*22* 95:*7*
**felt** 97:*3*
**Fidencio** 58:*12* 59:*25* 77:*24* 79:*17* 80:*7*
**Fidencio's** 80:*20*
**field** 11:*10* 12:*16* 13:*7* 19:*15*
**file** 44:*2* 77:*4* 83:*6*
**filed** 31:*12* 32:*1, 4* 35:*24* 70:*14*
**filing** 43:*23*
**fill** 12:*17* 13:*6*
**filled** 38:*18*
**final** 28:*25* 29:*1, 5*
**finally** 5:*16*
**financially** 102:*12*
**fine** 4:*15* 7:*25*
**fired** 56:*20*
**first** 4:*24* 9:*19* 14:*21* 15:*1* 23:*4* 52:*1* 53:*19* 64:*15* 80:*7* 87:*7* 90:*17*
**five** 55:*1* 85:*4, 15* 86:*13*
**five-minute** 72:*16*

**FLORIDA** 1:*1* 2:*4, 8* 4:*4* 6:*25* 7:*2, 11* 12:*10, 13* 23:*13* 41:*2, 7, 21* 101:*3, 6, 16* 102:*3, 21*
**fly** 23:*24*
**flying** 24:*4*
**focus** 51:*24*
**follow** 86:*21*
**followed** 86:*17*
**following** 49:*17* 62:*11, 16*
**follows** 4:*9*
**follow-up** 91:*24*
**food** 6:*1*
**FORD** 1:*4* 3:*14* 17:*6* 40:*24* 42:*3, 6* 43:*10, 15* 45:*8, 11* 47:*9* 57:*22* 58:*12* 69:*6, 20* 70:*21* 78:*7* 81:*19* 83:*3* 88:*14* 92:*2, 21* 94:*2* 95:*6* 96:*15*
**Ford's** 50:*25* 69:*3* 70:*5* 78:*4* 96:*11, 20*
**foregoing** 100:*4* 102:*8*
**foreman** 17:*11* 21:*2, 4, 5, 9, 14, 17, 20, 25* 22:*9, 14, 15* 24:*10, 14* 25:*2, 8, 15, 21, 23* 26:*4, 18, 21* 27:*6* 29:*19, 21, 23* 30:*3* 50:*1* 52:*18, 19* 56:*11, 18* 57:*2, 8* 58:*8, 11* 59:*10* 60:*2* 65:*5* 73:*24, 25* 77:*13* 80:*20* 82:*20* 92:*9* 94:*15*
**foreman/employees** 28:*22*
**foreman's** 17:*16* 82:*15*
**foremen** 12:*16* 65:*18*
**forged** 56:*16* 57:*7, 16* 58:*14, 21, 25* 59:*4* 61:*7* 66:*2, 4, 10* 67:*21*
**forgery** 56:*13* 65:*22* 67:*1, 4, 8, 10, 15, 18*

**forging** 66:*15, 19* 68:*21*
**form** 3:*13, 14* 22:*5* 25:*17* 31:*7, 14* 32:*6, 16, 20* 34:*7, 12* 38:*19, 20, 23, 25* 39:*2* 42:*21* 48:*25* 50:*3, 7* 55:*24* 57:*6* 58:*3, 16* 60:*8* 62:*13* 65:*11* 66:*12* 67:*6, 12, 22* 69:*15, 21* 70:*5, 11, 13, 15, 22* 71:*3* 75:*5, 12, 23* 76:*1* 77:*11* 79:*5* 80:*5, 16, 17* 82:*17* 84:*10* 86:*18, 23* 88:*16, 21* 90:*2* 91:*16* 92:*6* 93:*21, 24* 94:*4, 17* 95:*9* 96:*25* 100:*8*
**formal** 38:*10*
**formality** 93:*22*
**forman** 17:*22*
**format** 12:*19*
**former** 72:*2*
**forth** 83:*7*
**found** 92:*5*
**founded** 12:*4*
**four** 40:*8, 14*
**fraudulent** 47:*16*
**free** 89:*11* 91:*22*
**frequently** 30:*2, 5* 44:*14*
**Friday** 8:*17*
**front** 6:*13* 57:*11*
**full** 6:*12*
**further** 12:*22* 49:*10* 83:*1* 91:*18* 97:*9* 102:*9*

**< G >**
**generally** 18:*14*
**generate** 89:*7*
**geographically** 23:*12*
**GEORGE** 1:*13* 3:*4* 4:*7, 13, 15, 16* 31:*21* 32:*25* 33:*2, 11* 55:*21* 56:*5* 72:*19* 87:*2* 91:*24* 97:*15* 101:*7* 102:*7*
**getting** 45:*16*

**give** 5:*1, 13* 18:*6* 23:*1* 24:*2* 28:*14* 43:*4, 15* 87:*1* 89:*10* 97:*7*
**given** 4:*16* 43:*11, 13* 46:*20* 100:*6*
**gives** 28:*25*
**giving** 19:*8* 29:*23*
**go** 4:*19, 20* 5:*3* 14:*20* 17:*10* 19:*18* 33:*7* 38:*7* 48:*5* 49:*20* 51:*8* 59:*12* 76:*8* 78:*18* 81:*3* 87:*2* 92:*9* 95:*22* 96:*2*
**goal** 4:*21, 22* 19:*11*
**goes** 14:*25* 23:*6* 26:*1*
**going** 4:*19* 5:*24* 17:*7* 42:*17* 48:*9* 51:*8, 18* 61:*17* 64:*7* 69:*23* 71:*15* 72:*19* 76:*8* 79:*7* 81:*8* 87:*7* 93:*15* 97:*13*
**Good** 4:*12* 9:*25*
**government** 18:*19* 95:*2*
**grammatical** 97:*18*
**ground** 4:*20, 24* 5:*7*
**GROUP** 2:*2* 3:*17* 74:*12, 23* 75:*22* 79:*16* 80:*19*
**guess** 20:*25* 21:*12* 22:*8* 68:*15*

**< H >**
**half** 37:*21*
**hallway** 75:*19*
**hand** 52:*8*
**handbook** 3:*12* 8:*24* 9:*5, 7, 16, 20, 23* 10:*5, 8, 20* 16:*7* 20:*18* 26:*12, 16* 36:*6* 46:*21* 47:*1* 63:*4, 8, 17* 65:*13* 94:*19, 25*
**handbooks** 10:*1*
**handle** 27:*7, 20, 23* 28:*1, 2* 75:*14*
**handled** 49:*16*
**handles** 33:*16, 20*

Deposition of George Pappas
Nicholas Ford and Alonzo Hawkins v. Southern Road & Bridge LLC

handling 15:*12*
20:*12* 27:*11* 33:*12*
happened 8:*11* 19:*6*
68:*5*
happening 47:*19*
61:*17* 67:*4, 11, 15*
happens 30:*9*
harassment 26:*7*
34:*5* 35:*14* 40:*2*
44:*7, 10* 45:*5* 88:*6,*
*11* 90:*21* 91:*1, 7*
Harbor 6:*25* 7:*2*
12:*13*
hard 57:*20*
HAWKINS 1:*4* 3:*18*
42:*6* 43:*10, 15* 45:*8,*
*11* 47:*10* 50:*25*
53:*13* 58:*12* 71:*22*
73:*4* 74:*12* 76:*16*
77:*23* 78:*23* 79:*2, 18*
81:*19* 83:*3* 84:*3, 4*
88:*15* 91:*13, 14* 92:*1,*
*21* 94:*2* 95:*6* 96:*16,*
*20*
Hawkins's 42:*3* 90:*9*
head 5:*3*
healthy 63:*25* 64:*3*
hear 5:*18* 50:*13*
73:*10, 13*
heard 71:*19* 86:*8*
held 33:*9* 56:*3* 64:*6*
help 14:*12* 16:*18*
19:*10* 20:*7* 76:*8*
helpful 18:*7*
HH-375658 101:*18*
102:*22*
hierarchy 21:*1* 26:*3*
hire 23:*17* 28:*10, 11*
29:*1, 10, 13, 16, 22*
hired 23:*22* 24:*12*
46:*20*
hires 23:*21* 46:*10*
hiring 28:*5, 8* 29:*20,*
*24* 46:*4* 69:*3*
Hispanic 75:*22*
hoe 78:*21* 79:*3*
hold 18:*2*
Holiday 7:*10* 12:*9*
home 7:*8* 21:*22, 25*

22:*6* 79:*23*
Hopefully 4:*20, 22*
hotel 22:*12, 16*
hour 43:*4* 47:*10*
60:*5* 76:*5* 93:*9*
hours 8:*19* 17:*12, 17,*
*21* 21:*22* 22:*10*
45:*17* 47:*12* 49:*20,*
*25* 50:*6, 13, 17, 18, 20,*
*22* 56:*22* 57:*1, 12, 23*
58:*9, 15, 19* 59:*3, 6,*
*15* 76:*22* 77:*2, 5, 10,*
*14* 78:*17, 18* 79:*21*
84:*21* 85:*7, 8* 88:*16*
92:*2, 13, 14, 16, 25*
93:*19* 95:*13, 23* 96:*2*
hr 11:*20, 24* 12:*20,*
*24* 13:*19* 15:*19, 22*
16:*3, 4, 5, 11, 15*
20:*19* 26:*15* 27:*14*
29:*2* 30:*24* 31:*6*
32:*12* 33:*18* 39:*5*
44:*23* 45:*22* 46:*23*
47:*25* 48:*2, 3, 12*
49:*10, 14* 55:*19* 62:*1*
65:*20* 67:*17, 20, 24*
68:*17, 20, 24* 75:*13*
86:*25* 89:*7, 15, 21, 25*
91:*13* 94:*20* 97:*5*
HR's 16:*18*
hundred 28:*16*

< I >
identification 51:*12*
62:*22* 69:*10, 25* 71:*6*
72:*21* 74:*9* 76:*11*
77:*18* 79:*9* 81:*10*
87:*10* 90:*6* 101:*10*
identify 88:*4* 90:*19*
importance 54:*4, 7*
important 5:*7* 93:*12*
improperly 92:*18*
inappropriate 95:*7*
inaudible 5:*2*
include 11:*18* 15:*12*
included 28:*5*
includes 89:*3*
including 64:*22*
74:*24* 79:*17* 83:*2*

89:*4*
inclusive 89:*14*
incorrect 43:*6* 50:*13*
57:*12* 58:*20* 88:*19*
89:*16* 91:*8*
incorrectly 50:*1*
53:*14*
independently 22:*22*
INDEX 3:*1*
indicates 63:*4*
individual 13:*18*
15:*4* 29:*6, 10, 13, 17,*
*24, 25* 36:*7, 9* 38:*2*
39:*6* 40:*20* 41:*1, 23*
44:*5* 48:*11* 53:*25*
93:*13*
individuals 23:*9, 17,*
*19, 25* 34:*3* 37:*19, 23*
38:*8* 39:*22, 23* 42:*9*
56:*25* 57:*6* 58:*11, 24*
59:*3* 60:*13* 74:*13*
75:*22*
individual's 56:*13*
individuals's 57:*16*
inform 49:*15* 58:*19,*
*20, 24*
Informal 33:*9* 56:*3*
informally 39:*7*
information 19:*12*
29:*24* 32:*15, 19* 33:*1*
49:*8* 89:*3, 14* 94:*24*
informed 27:*18*
94:*13*
informing 91:*14*
initial 49:*11* 69:*3*
input 17:*13* 54:*8*
inputting 12:*22*
inquiries 88:*4* 90:*19*
inspectors 18:*20*
Insubordination
37:*18*
insurance 25:*9, 11*
interested 83:*10*
102:*12*
interesting 51:*3*
52:*25*
Interrogatories 3:*18*
90:*17*
interrogatory 87:*16*

88:*3* 89:*18* 90:*18*
interview 43:*16*
investigate 89:*6*
investigated 91:*13*
investigating 30:*18*
investigation 48:*23*
89:*24*
investigations 30:*22*
31:*1* 35:*20* 88:*4*
90:*19*
involved 45:*3*
Isaac 73:*5, 10, 13, 16,*
*19* 77:*1, 3, 9, 23*
78:*14* 79:*20* 80:*19,*
*21, 24*
Isaac's 73:*7* 75:*18*
issuance 24:*6*
issue 14:*9, 15, 21*
16:*21, 23* 20:*15*
21:*14, 21* 22:*4* 34:*21*
53:*5* 54:*11* 90:*16*
92:*4, 10* 94:*15*
issued 37:*10* 60:*10*
issues 11:*18* 14:*20*
15:*12* 25:*4, 5* 42:*8,*
*12* 45:*21* 47:*16* 48:*4*
its 23:*1* 83:*2* 89:*14,*
*15*

< J >
January 63:*15*
Jeff 41:*18*
job 11:*7* 18:*10* 21:*6*
25:*22* 36:*12* 39:*16*
80:*8, 12* 82:*15* 83:*17*
94:*9* 95:*1*
jobs 93:*18*
JONES 2:*7* 3:*6, 18*
5:*17* 6:*10* 25:*17*
31:*7, 14, 16* 32:*6, 16,*
*20, 23* 33:*3* 34:*7, 12*
42:*21* 48:*25* 50:*3, 7*
55:*15, 24* 58:*3, 13, 16,*
*18* 60:*8* 62:*2, 13*
65:*11* 66:*12* 67:*6, 12,*
*22* 70:*15* 71:*3* 75:*5,*
*12, 23* 76:*1* 77:*11*
79:*5* 80:*5, 17* 81:*15,*
*16, 18, 24* 82:*1, 3, 5,*
*17* 83:*1, 6, 9, 14* 84:*2,*

Case 3:24-cv-00404-MCR-ZCB   Document 21-4   Filed 06/05/25   Page 110 of 124
Deposition of George Pappas
Nicholas Ford and Alonzo Hawkins v. Southern Road & Bridge LLC

10, 19, 24   85:5, 15, 25
86:3, 9, 18, 23   87:19
88:21   90:2   91:16, 20,
23   95:16   96:25
97:11, 15   98:1
**Jones's**   51:20   63:5
82:9, 12   83:18   86:15
**judge**   6:13
**July**   70:7
**jump**   89:10
**June**   52:1, 2, 3   59:7

**< K >**
**Keam**   48:13, 17, 22
49:15   87:21   88:24
90:12
**K-e-a-m**   48:20
**keep**   4:21
**keeping**   64:16
**keeps**   61:17
**kept**   97:3, 5
**Key**   2:3
**kind**   20:22   26:14
50:14   92:2   93:11, 22
94:12
**KISSANE**   2:6   90:10
**knew**   66:14   67:4, 10,
15
**know**   5:24   6:1   12:3
13:2, 22   19:6   20:18
23:15   25:10, 14
27:25   29:22   30:17,
21   31:11, 17, 22, 25
32:4, 9, 10, 11, 24
33:4   38:6, 16   40:6,
11   41:4, 8, 14   43:16,
22   44:1, 5, 9   46:6, 15,
24   47:3   48:22   49:3,
4, 6, 14   50:15   51:14
52:16   54:19, 24   55:3,
22   56:5   57:10, 15
59:6, 14, 17, 20   60:4,
6, 16, 21, 25   62:1, 3,
20, 24   63:7, 11   64:9,
13   70:2, 4, 13, 21, 24
71:18   72:10, 12, 23
74:7, 17, 19   75:19, 24,
25   76:6, 10, 18, 21
77:4, 12, 20   78:22
79:2, 3, 20   80:3, 10

81:12, 16   82:1, 2
84:24   85:2, 21   86:6
87:8   89:1   90:3
91:13   93:5, 14   94:13
**knowing**   49:8
**knowingly**   57:7
**knowledge**   31:5, 10
32:14, 19   33:5, 11, 15,
19, 23   34:3, 8, 9
35:10, 13, 16, 19
39:18   44:13   46:18,
25   47:4, 5   50:15
62:15   66:1, 9   67:18
81:5   87:23, 25   89:3,
24   90:3, 14   91:17
96:18
**known**   86:20
**knows**   31:19

**< L >**
**Labor**   95:3
**lack**   36:11
**laid**   94:9
**language**   95:7
**Large**   4:4
**larger**   64:11
**LAW**   2:2
**lawsuit**   6:20   83:7, 10
**lawyer**   42:17   48:10
**lay**   36:12
**leads**   30:21
**learning**   27:19
**leave**   39:15
**leaves**   33:2
**left**   63:1
**left-hand**   52:8   69:17
**letters**   51:19
**letting**   93:5
**license**   24:11   25:4, 5
**license/I.D**   101:10
**LINE**   99:5
**list**   57:12, 24
**listed**   59:7
**little**   19:7   35:2
60:25   63:1
**live**   12:9, 12
**LLC**   1:7   63:25   64:3
81:20
**location**   40:19

**lodging**   22:12, 15, 16,
22   23:22
**long**   5:11, 24   8:18
9:15   10:25   11:3
24:23   84:24   93:8
**longer**   4:21
**look**   8:1, 3   14:13
43:3   45:20   48:15
50:24   51:10   61:17
69:14   86:4
**looked**   66:3
**looking**   7:4   92:12
93:9   97:7
**looks**   18:15   53:11
57:20   78:16
**loss**   13:13
**Lucas**   11:22, 25   12:7,
9, 12   33:1
**lunch**   5:25   83:16

**< M >**
**man**   93:19
**manage**   20:8, 10
**manager**   10:24   11:4,
7, 17   18:1, 3   19:14,
16, 19, 22   20:1, 4, 17,
21   26:5   27:16   30:8
37:25   38:21
**managers**   89:6
**March**   1:13   101:9,
12
**mark**   51:9   62:19
69:9, 24   70:17   72:20
74:6   76:9   79:8   90:4
**marked**   51:12   62:22
69:10, 25   70:21   71:6,
8   72:21   74:9   76:11
77:18   79:9   81:10
87:10   90:6
**marker**   51:18   63:1
**marking**   77:16   81:8
87:7
**material**   13:14
**matter**   93:22   94:3
**mean**   6:20   7:5
15:15   16:23   24:17
34:16, 19   41:5   49:3
67:3
**Meaning**   5:10   57:24
87:19

**means**   5:2   51:20
57:22   75:19, 24
79:24   80:10   97:16
**meet**   8:12   16:5
18:19   42:11, 13, 23
43:2, 7   48:7   49:19
59:13   82:3   92:8, 25
95:22   96:1, 8, 23
**meeting**   8:15, 18
9:18   16:4   30:9
42:19   78:17
**member**   61:10   93:12
**members**   20:13   22:1,
9   23:1
**men**   78:19
**mentioned**   22:15
**message**   45:25   72:6,
8   73:3, 7   76:25
77:23   78:10   79:16
80:4
**messaged**   62:11
**messages**   3:15, 16, 18
9:1, 6, 9, 11, 14   46:2
72:25   74:25   75:16
**met**   95:21
**Miami**   2:4
**Michele**   4:2   101:6,
15   102:6, 20
**midday**   43:5
**middle**   6:3
**Minimal**   30:4   86:13
**minute**   35:4
**minutes**   9:17   58:1
87:1
**misconduct**   64:15, 21
65:1, 7, 10, 15, 18
**missing**   93:19   95:13
**mistakes**   97:18, 24
**mm-hmm**   5:3   63:3
**moment**   33:8   74:16
97:7
**moments**   50:12
**money**   79:24   83:11
**month**   18:7
**months**   61:4   86:14
**morning**   4:12
**motel**   22:17
**move**   20:16   24:18
**Muckle**   41:18

Case 3:24-cv-00404-MCR-ZCB    Document 21-4    Filed 06/05/25    Page 111 of 124
Deposition of George Pappas
Nicholas Ford and Alonzo Hawkins v. Southern Road & Bridge LLC

**multiple** 11:*8* 39:*14* 49:*22* 93:*10, 16* 97:*6*

**< N >**
**Name** 3:*3* 41:*2, 3, 17* 48:*14* 53:*14* 56:*13*
**named** 17:*18*
**names** 37:*22* 40:*9* 52:*7* 53:*6, 7* 54:*1, 7* 57:*12, 16*
**Narcissus** 7:*10*
**nature** 68:*21* 89:*19*
**necessarily** 39:*8*
**necessary** 4:*22* 23:*25* 24:*1, 11, 17, 23, 24*
**need** 5:*13, 23, 25* 6:*2* 14:*10* 16:*12, 15* 24:*18* 80:*8, 9, 11* 86:*5* 87:*9* 93:*17* 97:*18, 21*
**needed** 22:*12* 60:*23* 93:*20*
**needing** 53:*2*
**needs** 21:*6* 38:*17*
**Never** 16:*19, 21, 22, 23, 24, 25* 17:*1, 3* 53:*21* 55:*22* 68:*20* 84:*20* 88:*9* 90:*24* 91:*7* 96:*11, 23*
**new** 46:*10*
**NICHOLAS** 1:*4* 3:*14* 17:*6* 19:*1* 25:*11* 58:*12* 94:*2* 95:*21* 96:*1*
**Nick** 40:*24* 48:*23* 59:*12, 15* 62:*3, 7* 70:*5*
**nickname** 59:*18, 21* 71:*19, 21* 74:*20* 78:*4, 8*
**Nick's** 49:*11*
**night** 43:*8* 96:*23*
**nighttime** 43:*5*
**nine** 28:*21* 82:*8, 12*
**non-black** 73:*25*
**non-EEO** 28:*1*
**non-foreman** 24:*21*
**non-HR** 28:*1*
**non-superintendent**

24:*21*
**North** 2:*7*
**NORTHERN** 1:*1*
**Notary** 4:*3* 101:*6, 16* 102:*21*
**note** 25:*7*
**noted** 100:*8*
**notepad** 7:*24*
**notes** 7:*5* 52:*16* 102:*9*
**notice** 21:*15* 51:*3, 6* 70:*18* 85:*24* 86:*3* 93:*4*
**noticed** 52:*24* 67:*16*
**noticing** 53:*5*
**notified** 39:*6* 70:*6* 97:*4, 5*
**notifies** 39:*22*
**notify** 27:*13* 39:*10, 15, 16* 93:*23*
**November** 42:*25* 61:*2* 69:*19*
**number** 15:*5, 6, 7* 16:*6* 23:*7* 54:*19* 72:*1, 12* 79:*12* 84:*19, 21* 85:*5, 7, 8* 88:*3* 89:*18*
**numbers** 51:*19*

**< O >**
**O-301** 2:*3*
**OATH** 101:*1*
**Object** 31:*7, 14* 32:*6, 16* 34:*7, 12* 42:*21* 50:*3, 7* 55:*24* 58:*3* 62:*13* 65:*11* 66:*12* 67:*6, 22* 69:*21* 70:*15* 71:*3* 75:*5, 12, 23* 77:*11* 80:*5, 17* 86:*18* 88:*21* 91:*16*
**objecting** 34:*14*
**objection** 31:*15* 32:*20, 21* 48:*25* 58:*16* 60:*8* 76:*1* 79:*5* 82:*17* 84:*10* 86:*23* 90:*2* 92:*6* 93:*24* 94:*4, 17* 95:*9* 96:*25*
**observed** 64:*2*

**occasion** 84:*2*
**occasions** 85:*7*
**occur** 40:*16* 45:*24*
**occurred** 40:*11* 81:*5* 82:*14*
**occurring** 53:*10* 67:*4* 82:*21*
**offense** 37:*5* 38:*14* 56:*13*
**offer** 29:*6*
**office** 6:*16, 24* 7:*12, 15* 15:*2, 7, 8, 20* 19:*15* 51:*21* 55:*14, 23* 63:*5* 69:*17* 79:*12* 94:*20, 21, 23*
**officer** 15:*22, 23* 16:*3, 4, 5, 15* 20:*19* 26:*15* 27:*14* 30:*24* 33:*18* 45:*22* 46:*23* 48:*1* 95:*3*
**officials** 18:*20*
**okay** 5:*19, 23* 6:*9, 18, 23* 7:*5* 8:*2, 4, 9, 12, 18, 20* 9:*5, 9, 13, 19* 10:*7, 11, 14, 16, 25* 11:*6* 12:*9* 13:*1, 10, 16* 14:*13, 24* 15:*4, 8, 11, 21* 16:*1, 10, 14, 17, 20, 22* 17:*1, 7, 20, 25* 18:*5, 9, 13, 23* 19:*1, 12, 13, 18, 21* 20:*3, 7, 11, 20, 25* 21:*9, 12* 22:*3, 8, 14, 25* 23:*9, 12, 17, 24* 24:*9, 13, 16, 20, 25* 25:*10, 14, 21* 26:*3, 9* 27:*15, 17, 22, 25* 28:*8, 20, 25* 29:*3, 5, 12, 16, 23* 30:*2, 5, 8, 13, 17, 21, 25* 31:*3, 11, 18, 23, 25* 32:*4, 11, 18* 33:*15, 19, 23* 34:*3, 14, 23* 35:*10* 36:*9, 18, 20* 37:*1, 10, 13, 15, 19, 22* 38:*10, 20, 22, 25* 39:*6, 9, 17* 40:*1, 9, 19* 41:*4, 14, 20, 23* 43:*6, 10, 20* 44:*13, 16, 19* 45:*19* 46:*9, 18, 24* 47:*7, 13* 48:*8, 11, 14* 49:*5, 8, 9, 10, 14, 24* 51:*11, 17*

52:*6, 15, 19, 24* 53:*10, 12, 18* 54:*10* 56:*1, 9* 57:*15, 22* 60:*1, 4, 21* 61:*5, 19, 22, 25* 62:*10* 63:*9, 13, 20, 24* 64:*14, 19* 65:*6, 21* 66:*9* 67:*14, 17* 68:*9* 69:*2, 16, 23* 70:*4, 24* 71:*1, 5, 13, 15, 21, 22, 23* 72:*3, 4, 7, 12, 15* 73:*1, 6* 74:*3, 6, 14, 15, 17, 18* 75:*15, 25* 76:*8, 17, 20, 24* 77:*3, 16, 22* 78:*8, 9, 12, 13* 79:*18, 19* 80:*19* 81:*3, 8, 18* 82:*8, 10, 25* 84:*14* 85:*5* 86:*2, 5, 7* 87:*1* 88:*3* 89:*15, 17* 90:*4* 91:*12* 97:*21* 98:*3*
**onboarding** 46:*3, 5, 6, 9, 16, 19, 21*
**once** 5:*9* 23:*22* 29:*4* 30:*14* 38:*25* 39:*2* 96:*6*
**ones** 57:*19*
**on-site** 19:*25* 20:*5* 92:*8*
**operate** 77:*5*
**operations** 18:*21*
**option** 43:*11, 13*
**order** 13:*13*
**ordering** 97:*13*
**OSHA** 95:*2*
**outside** 7:*22* 10:*20* 17:*22* 25:*22* 32:*11*
**owed** 85:*17*
**owner** 11:*20, 21* 32:*13, 14, 18, 24* 33:*4*
**owner's** 33:*5*
**ownership** 11:*23*

**< P >**
**p.m** 43:*8* 57:*25* 98:*6*
**Page** 3:*3, 10* 63:*21* 71:*2* 73:*8* 87:*21* 99:*5*
**pages** 51:*23* 100:*4* 102:*8*

**paid** 47:*11* 48:*7*
49:*20* 54:*9* 85:*7*
88:*16* 92:*18, 19*
**Palm** 6:*25* 7:*2* 12:*13*
**paper** 13:*6*
**paperwork** 38:*17*
**PAPPAS** 1:*13* 3:*4*
4:*7, 14* 11:*22* 12:*1*
35:*7* 55:*17* 101:*7*
102:*7*
**paragraph** 64:*8* 82:*8,*
*12*
**paragraphs** 84:*12*
**participant** 61:*10*
**parties** 102:*11, 12*
**Partly** 91:*6*
**party** 83:*10*
**pay** 22:*22* 85:*16*
**paycheck** 79:*22*
**payment** 22:*16*
**payroll** 11:*9, 13*
12:*14, 20* 13:*1, 3, 5, 9*
14:*17* 17:*8* 45:*23*
54:*8*
**people** 22:*12* 74:*24*
76:*23* 77:*6, 10* 78:*1*
79:*16, 18* 97:*23*
**percent** 19:*9* 78:*16*
**perform** 17:*10*
**performance** 21:*18*
**performed** 58:*15*
**performing** 12:*4*
**person** 35:*1* 82:*3*
95:*22* 96:*1*
**personal** 15:*5* 96:*16*
**personally** 58:*23*
59:*2* 60:*22* 67:*21*
101:*7*
**pertain** 88:*24*
**phone** 7:*24* 8:*4*
15:*5* 30:*10, 12* 39:*14*
43:*3* 45:*25* 46:*1*
72:*1, 12* 82:*6* 95:*25*
96:*5, 10, 15*
**physical** 96:*21* 97:*4*
**Pinellas** 41:*7, 22*
**P-i-n-e-l-l-a-s** 41:*22*
**PLACE** 1:*16* 8:*16*
**placed** 25:*11*

**Plaintiff** 1:*13* 88:*6, 9*
90:*24*
**Plaintiffs** 1:*5* 2:*2*
83:*11*
**Plaintiff's** 51:*9, 18*
62:*20* 69:*24* 71:*9*
72:*20* 74:*7* 76:*9*
77:*17* 79:*8, 12* 81:*9*
87:*8* 90:*5* 91:*9*
**play** 36:*2*
**please** 12:*15* 13:*11,*
*17* 14:*2, 7* 15:*15*
23:*14* 26:*9* 33:*8, 15*
35:*4* 37:*2* 54:*6* 56:*2*
67:*7* 71:*12* 72:*6, 25*
78:*10* 82:*8, 23* 84:*12*
89:*11, 18*
**PLLC** 2:*2*
**PM** 1:*16*
**point** 5:*23* 9:*25*
15:*21* 16:*10, 12*
47:*25* 75:*3* 85:*12*
92:*22* 96:*14*
**policies** 36:*7* 39:*17*
43:*20* 44:*9, 14* 46:*12,*
*22* 83:*22* 95:*2*
**policy** 14:*25* 28:*1*
30:*18* 36:*6, 10, 22*
37:*7, 9* 38:*15* 44:*17*
70:*17* 86:*17, 21*
**Pollo** 59:*18, 22*
77:*24* 79:*21*
**poor** 21:*18*
**porta** 83:*17*
**position** 11:*4* 18:*2*
24:*8* 31:*17* 32:*9*
**possibility** 26:*14*
**possible** 39:*12* 58:*6*
**potential** 61:*7*
**potentially** 96:*15*
**potties** 83:*17*
**practices** 28:*6*
**prefer** 49:*5*
**preparation** 8:*21*
**prepare** 8:*6, 9, 13*
**present** 90:*17*
**preside** 47:*8*
**preventing** 6:*6*
**previously** 54:*5*

88:*14*
**Printout** 3:*17*
**prior** 18:*2* 22:*23*
38:*8, 16* 46:*25* 94:*11*
96:*10*
**problem** 54:*14* 74:*22*
**problems** 78:*18*
**procedure** 37:*1*
38:*10* 44:*20* 46:*16*
**procedures** 43:*21*
**process** 29:*20* 43:*23*
44:*20* 46:*10, 16, 19*
75:*11* 92:*3*
**produced** 51:*20*
55:*13* 69:*16* 79:*11*
101:*9*
**producing** 87:*20*
**productive** 64:*3*
**profit** 13:*12*
**project** 10:*24* 11:*4, 7,*
*16* 13:*20* 17:*25* 18:*2,*
*11, 13, 15, 16, 17*
19:*14, 16, 18, 19, 22*
20:*1, 4, 17, 21* 23:*6,*
*10, 23, 25* 26:*5* 27:*16*
30:*8* 37:*25* 38:*21*
**projects** 11:*8, 12*
13:*19* 18:*14* 23:*13*
**proper** 58:*15*
**properly** 54:*9* 86:*17*
88:*16*
**proposed** 29:*13*
**propounded** 100:*7*
**protection** 43:*21*
**provide** 14:*14* 51:*10*
60:*21* 87:*17* 92:*22*
93:*4*
**Public** 4:*3* 101:*6, 16*
102:*21*
**punished** 35:*11, 14,*
*17* 66:*18, 22, 23*
**purpose** 25:*12*
**purposes** 7:*25* 79:*25*
**put** 12:*19* 13:*8*
23:*22* 25:*9* 57:*23*
92:*17*

**< Q >**

**question** 5:*12* 6:*4*
39:*20* 41:*11, 12* 42:*4*
51:*11* 67:*7* 89:*5, 13*
**questions** 5:*1, 3, 11*
26:*23* 64:*10* 76:*19*
87:*17* 90:*9* 91:*18, 20,*
*25* 95:*17, 19* 97:*10,*
*11* 100:*6*
**quick** 13:*3* 35:*7*
95:*18*
**quicker** 4:*20*
**quickly** 4:*23*
**Quite** 54:*17*

**< R >**
**R&B** 94:*22*
**race** 45:*13* 48:*23*
49:*12, 17* 88:*15*
91:*14*
**racial** 73:*10*
**racist** 95:*7*
**random** 30:*10, 12*
96:*23*
**range** 23:*9*
**rarely** 19:*20*
**reach** 15:*6* 94:*14*
**reached** 58:*18, 23*
59:*2* 92:*20*
**read** 64:*7, 8, 12, 13*
71:*15, 16* 72:*5, 25*
74:*16* 76:*18* 78:*10*
82:*8* 84:*12* 97:*16, 17,*
*23* 100:*4*
**reading** 78:*11* 82:*23*
**ready** 64:*10* 76:*19*
**reall** 80:*10*
**really** 57:*25*
**reason** 36:*16, 21*
60:*16, 22*
**reasons** 37:*15* 96:*22*
**recall** 8:*10, 23* 10:*4,*
*6* 37:*22* 40:*19* 41:*18,*
*23* 42:*23* 43:*1* 48:*11*
69:*2, 6, 8* 81:*24* 82:*7*
85:*1*
**receipts** 13:*13*
**receive** 20:*21* 39:*14*
82:*19* 95:*5, 12*
**received** 94:*12*

recess 35:5 72:17 87:4
recommend 68:24
record 25:7 33:8, 9 35:3 55:16 56:2, 3 63:12 77:4, 13 97:25 102:8
records 53:21 55:5 64:16
recover 83:11
red 51:18
REDIRECT 95:20
refer 6:19 15:22 16:11
reference 11:9
referring 79:2, 4 80:3
refers 46:9
reflects 56:22 76:15 89:2
refresh 10:3
regarding 17:4 49:11 61:6 62:4 88:10 89:25 90:25 92:1, 2 94:11 95:6, 13
regards 13:1, 10 32:5 39:18 43:20 44:2 46:12 68:6 69:3, 20 75:18 91:12
regular 24:20
regularly 19:14 24:23 86:12
rehire 70:8, 19, 22
reject 42:19
relation 10:20
relationship 11:25 96:16
relative 102:9, 11
relevant 41:10
remedy 92:4, 8
remember 19:7, 8 25:13 40:15 41:1, 3, 13 43:9 46:2 58:22 66:13, 17
REMOTE 1:13
repair 18:16, 17 20:7
repairs 18:18, 19, 21
rephrase 39:20 42:4

46:5 67:7
replies 80:7
report 11:19 26:17, 20, 25 27:3 35:21 44:21 46:12 62:7 67:1 75:7 77:2 80:21 82:15, 19 89:21 102:7
reported 21:17 50:1 62:3 75:4, 10 76:4, 6 80:24 83:24 88:6 90:21
Reporter 4:3, 25 5:8 6:11, 12 48:19 63:13 97:12 102:1, 6, 20
reporting 26:10 45:2 88:10 90:25 91:9 93:1
reports 15:13 20:13 26:6 33:24 48:23
represent 71:24 73:2 74:11 77:22 78:7 79:15 81:14 87:15
representative 28:2 32:12 48:1
represented 72:1
request 16:3, 8
requested 42:11, 23 43:2, 7 102:8
require 23:18
required 30:22 85:3
requirements 46:13 95:2
requires 5:16
resign 60:19 61:1
resigned 60:20, 25 61:2
resolve 14:18 42:12
resolved 14:11, 17 20:16 92:10
respect 27:11
respond 89:17
responded 45:20
responding 5:2
response 45:19 67:24 87:18 88:3, 5 89:2, 7 90:20, 24
responses 87:20
responsibilities 11:7 15:12 18:10 20:12

Responsibility 20:14 79:23 82:15
responsible 12:21 22:14, 15, 19 33:12, 16 44:1, 6 56:25 57:6
rest 64:7, 8 93:18, 20
restate 54:6
restroom 6:2 84:4
result 61:7 64:21
resulted 68:22
results 65:10
retain 42:17
retaliate 34:21
retaliation 26:7 34:10, 15, 17, 19, 20 35:17 40:2 44:7, 10 45:6
review 8:20 9:15 102:7
reviewed 8:23 9:3, 20 10:5
reviewing 66:21, 24, 25
revised 10:8
Reyes 58:12, 19 59:25 62:11 77:24
right 4:12, 16, 19 5:14 7:1, 4, 7, 12, 15 8:6, 15, 25 9:2, 22 10:4 11:3, 11 12:21 14:1, 19 21:20 26:23 33:11 43:1 51:17 52:8 63:11 74:19 76:21 79:7 82:23 87:1, 12, 15, 18 90:16 91:24 95:16 97:9, 15
rights 43:22
Roach 73:3 74:19
ROAD 1:7 6:16, 19, 23 11:1 12:3 18:15, 24 19:3 22:20 23:24 24:2 30:17 31:13 32:5 33:25 34:4 35:21 38:3 46:15 55:5 59:21 60:14, 24 63:10, 17, 24 64:2 72:2 81:20 84:16, 25 86:10 90:9 94:8

role 10:23 25:23 28:8 29:19 36:2, 5 46:3
roles 25:21
room 6:12, 17 7:17, 19
Roughly 9:17 18:1 28:21
Ruiz 3:18 56:7, 8 57:22 59:14 60:1, 11, 18 61:6 62:4, 10 65:23 67:20 68:11, 24 73:5 74:13, 24 76:5, 15 77:23, 24 79:17 80:3 83:14 84:3, 4 85:6, 12, 16, 17, 21 86:12, 16
Ruiz's 67:18 75:4 86:20
rule 4:24 5:7
rules 4:20 64:1, 5
run 13:14 21:5
Ryan 3:13 13:25 14:1 56:8 58:7 59:14, 16 60:24 61:3 69:15 70:25 74:13, 24 76:6 77:2 78:16 81:1 86:1

< S >
safe 63:25
safety 46:13
saw 84:3 96:20
saying 43:7 50:21 77:2 78:14
says 46:22 64:20 77:3 79:3 81:18
SBR 38:11
scan 13:7
scared 96:24
schedule 13:20, 22 21:23
scheduling 11:9, 13 13:16, 18
SCOTT 2:6 90:10
screen 63:12
scroll 52:7 74:17, 18
scrolling 72:5
season 41:9
second 5:7 52:2

**see** 13:*13* 51:*14, 16*
52:*4, 10* 53:*10, 14, 16*
57:*20* 62:*20, 23* 63:*1,*
*11, 22* 64:*17, 23*
69:*12* 70:*2, 3, 9*
71:*10, 13* 72:*23, 24*
73:*7* 74:*7, 10* 75:*1*
76:*10* 77:*7, 20, 21*
78:*2, 21, 25* 79:*13*
80:*1, 13* 81:*12, 13, 18,*
*21* 84:*7, 22* 85:*10, 19*
86:*2* 87:*9, 14, 21, 24*
88:*12* 90:*12, 14, 22*
91:*2* 97:*17*
**seeing** 96:*24*
**seek** 16:*18*
**seen** 53:*21* 69:*17*
70:*11* 72:*8* 74:*3*
87:*13*
**select** 25:*2*
**selected** 24:*25*
**selecting** 25:*15*
**selects** 25:*8*
**send** 12:*18, 19* 13:*9*
21:*25* 22:*5*
**sending** 12:*23* 17:*12*
21:*22* 90:*11*
**sense** 5:*21* 6:*4* 36:*24*
**sent** 39:*2, 5* 55:*22*
59:*10* 62:*1* 63:*5*
73:*3*
**separately** 21:*13*
**serious** 68:*13, 17, 20*
**seriousness** 68:*15*
**set** 87:*16* 90:*17*
**seven** 74:*23*
**severe** 37:*7* 38:*14*
**shake** 5:*3*
**shape** 80:*16*
**share** 71:*8*
**sheet** 12:*17* 17:*12*
52:*1, 6, 17* 53:*3, 18,*
*19* 54:*21* 57:*11, 17*
59:*7* 77:*15* 84:*20*
92:*18* 100:*9*
**sheets** 3:*11* 12:*22*
17:*18, 21* 45:*18, 21,*
*23* 47:*17* 48:*5* 50:*25*
51:*4, 24* 52:*20, 22, 25*
53:*6, 20* 54:*2, 5, 12,*

*14* 55:*1, 4, 8, 19* 56:*6,*
*16* 58:*21, 25* 59:*4*
61:*8* 65:*22* 66:*11, 16,*
*19, 21, 23, 24, 25*
67:*15, 18, 21* 68:*22*
85:*2* 92:*9* 95:*14*
**shit** 78:*21* 79:*3*
**show** 8:*2* 10:*19*
37:*17* 39:*13* 40:*7, 12,*
*21* 41:*24* 43:*18* 50:*9*
51:*8* 62:*19* 69:*9, 23*
72:*19* 74:*6* 76:*9*
79:*7* 81:*8* 86:*16*
87:*6, 7* 90:*4* 92:*15*
93:*13, 17* 94:*10*
**showed** 49:*22* 50:*18*
**showing** 51:*23* 53:*8*
77:*16* 93:*8, 23*
**shut** 36:*12*
**side** 52:*8*
**sign** 38:*22* 52:*12*
53:*2, 6* 85:*3*
**signature** 52:*9, 13*
53:*2* 54:*1, 16* 57:*7*
71:*1* 100:*15*
**signatures** 51:*7* 53:*1*
56:*6, 15* 58:*14, 21, 24*
66:*5, 10, 15* 67:*11*
68:*21*
**signed** 9:*22* 10:*8*
53:*22* 54:*1, 15, 21, 22,*
*25* 56:*5* 81:*14* 84:*20*
90:*12* 101:*12*
**significantly** 85:*8*
**signing** 47:*1* 56:*12*
**similar** 53:*18, 19*
**similarly** 17:*20* 34:*3*
**single** 17:*3* 54:*20*
**sir** 7:*9*
**site** 19:*18, 22* 20:*3, 9*
23:*7, 25* 24:*4* 25:*22*
40:*20, 23, 24* 41:*2, 4,*
*5* 52:*8* 62:*8* 81:*4*
82:*15* 83:*17*
**sites** 23:*19*
**sitter** 80:*9*
**sitting** 6:*4* 10:*7*
31:*3, 25* 54:*10* 55:*11*
59:*6* 61:*22* 91:*4*
**situation** 92:*4* 93:*9*

**Six** 11:*5* 18:*1* 19:*24*
31:*4* 79:*16* 86:*14*
**skin** 47:*24*
**slur** 75:*21*
**slurs** 73:*10*
**small** 37:*5* 71:*12*
74:*10*
**SMITH** 2:*2*
**snitches** 78:*19*
**snitching** 78:*21* 79:*3*
**sole** 56:*21, 25*
**solve** 16:*24* 42:*8*
**somebody** 29:*22*
36:*13, 21* 54:*15, 21*
71:*19*
**soon** 15:*24*
**sorry** 19:*5* 81:*22*
**southeast** 23:*14*
**SOUTHERN** 1:*7*
6:*16, 19, 23* 11:*1*
12:*3* 18:*15, 23* 19:*3*
22:*20* 23:*24* 24:*2*
30:*17* 31:*12* 32:*5*
33:*25* 34:*4* 35:*21*
38:*3* 46:*15* 55:*5*
59:*21* 60:*14* 63:*10,*
*17, 24* 64:*2* 72:*2*
81:*19* 84:*16, 25*
86:*10* 90:*9* 94:*7, 22*
**span** 23:*13*
**speak** 10:*11* 15:*3, 18,*
*19, 24, 25* 16:*2, 5, 12,*
*13, 15* 22:*11, 13* 30:*2,*
*5, 14* 35:*8* 82:*5*
86:*12* 96:*4*
**speaking** 48:*12* 89:*1*
**specific** 18:*6* 65:*10*
79:*4*
**specifically** 47:*9*
53:*13* 89:*7*
**speculate** 31:*21*
**speculation** 31:*16*
**spell** 41:*20*
**spelled** 53:*14*
**spoke** 5:*17, 19, 21*
13:*16* 42:*10* 48:*2*
59:*12, 15* 60:*4* 89:*21*
**spoken** 95:*25*
**spreadsheet** 12:*23*

**SRB** 3:*12* 6:*19* 18:*2*
28:*13* 29:*1* 31:*6*
35:*11, 14, 17* 39:*9*
43:*15, 21* 44:*6* 46:*25*
62:*12, 16, 17* 69:*21*
77:*14* 78:*5* 83:*1, 25*
84:*20* 85:*7, 17* 86:*17,*
*21* 88:*3* 90:*18*
**SRB's** 83:*22*
**standard** 30:*25*
**standards** 63:*21*
64:*2, 5, 19*
**start** 18:*5*
**started** 18:*8* 92:*16*
**STATE** 1:*1* 4:*3*
14:*2, 7* 18:*18, 20*
23:*13* 24:*12, 18*
30:*13* 53:*21* 80:*11*
95:*2* 101:*3, 6, 16*
102:*3, 21*
**stated** 17:*25* 19:*14*
24:*16* 50:*11* 52:*24*
**statement** 20:*2* 82:*9,*
*12* 91:*5, 8*
**statements** 86:*15*
**States** 23:*14, 16, 21*
46:*21* 52:*7* 63:*15, 21,*
*24* 70:*6* 79:*20* 83:*1*
84:*2, 19* 85:*5, 15*
**stating** 17:*2* 51:*18*
83:*14* 92:*11*
**stay** 8:*3* 60:*23*
**staying** 14:*16* 22:*17*
**stenographic** 102:*9*
**stenographically**
102:*7*
**step** 14:*12*
**steps** 27:*18*
**stop** 5:*25* 83:*16*
**stopped** 93:*8*
**streamlined** 13:*2*
**strike** 38:*1* 43:*14*
49:*14* 53:*24* 54:*13*
58:*20* 60:*16* 67:*9*
89:*20*
**striking** 21:*22*
**strives** 63:*25*
**structure** 65:*9*
**stuff** 18:*22* 46:*23*

**subcontractors** 13:*14* 18:*22*
**subjective** 88:*22*
**subjectively** 65:*7, 17*
**subordinate** 74:*1*
**substance** 100:*8*
**substantive** 97:*19*
**sue** 42:*17*
**sufficient** 68:*10*
**suggest** 16:*4, 11* 29:*21*
**suggested** 48:*6*
**Suite** 2:*3, 7*
**sum** 80:*9*
**summer** 41:*8*
**superintendent** 12:*17* 13:*23* 14:*11, 18, 21* 15:*1* 17:*11, 15* 18:*4, 6, 9* 20:*4, 7, 16, 20* 21:*1, 7, 13* 22:*3, 4* 24:*10, 14* 25:*3* 26:*1, 5, 24* 27:*4, 6* 28:*12, 22* 29:*7, 9, 14, 16* 30:*9, 14* 38:*21* 41:*14* 50:*2* 52:*18, 20* 56:*11, 19* 57:*2, 8* 58:*11* 59:*10* 65:*5* 82:*20* 92:*10* 94:*16*
**superintendents** 27:*1* 28:*13, 17, 22* 30:*6, 11* 38:*5, 7* 41:*19* 65:*19*
**superintendent's** 17:*23* 20:*12*
**supervise** 11:*8, 11, 12, 13* 12:*14* 13:*11, 15, 17* 14:*6, 7, 9* 18:*11* 66:*22*
**supervising** 11:*10* 25:*22*
**supervision** 11:*19*
**supervisor** 21:*7* 27:*16* 45:*2, 3* 58:*7* 66:*20* 93:*5* 94:*15*
**supply** 55:*19*
**supposed** 66:*21*
**sure** 15:*18* 19:*9* 23:*5* 26:*2* 28:*16* 39:*21* 42:*5* 51:*25* 53:*17* 54:*7, 10* 71:*20* 72:*14* 73:*4* 74:*21*

77:*5* 78:*16* 79:*22, 24* 89:*6*
**suspension** 22:*5*
**sworn** 4:*8* 101:*9*
**system** 13:*3, 5* 54:*9* 55:*5* 76:*22* 77:*5* 86:*2*

**< T >**
**take** 5:*9, 25* 6:*1, 3* 8:*15* 27:*18* 42:*7* 72:*15* 74:*16* 97:*20*
**Taken** 1:*13* 4:*2* 35:*5* 50:*24* 72:*17* 86:*22* 87:*4*
**talk** 5:*10* 68:*2*
**talking** 5:*9* 17:*8* 19:*6* 28:*16, 17* 78:*15, 17*
**Tampa** 2:*8*
**Tardiness** 37:*17*
**task** 21:*6*
**tasks** 21:*9, 10* 25:*25*
**taught** 77:*13*
**team** 20:*8, 10, 13, 22* 21:*10, 15* 22:*1, 9, 17* 23:*1, 6, 10* 24:*24* 41:*15* 50:*19, 20* 65:*3, 4* 93:*16, 18, 20*
**team's** 22:*23*
**technical** 35:*3*
**technology** 101:*8*
**telephone** 37:*17*
**tell** 5:*17, 20* 12:*15* 13:*11* 16:*8* 19:*23* 21:*8* 33:*15* 37:*6* 42:*13, 20* 44:*23* 47:*10* 48:*3* 65:*23* 66:*14* 67:*3, 8, 10, 14, 24* 76:*14*
**telling** 17:*9* 96:*7*
**ten** 28:*17* 37:*14* 40:*13*
**tenure** 37:*25*
**terminate** 36:*8, 10, 15* 37:*2, 9* 38:*3* 42:*7* 68:*10* 85:*22*
**terminated** 36:*21* 37:*23* 38:*7, 14* 39:*3, 7, 11* 40:*7, 20, 25*

41:*24* 43:*16, 17* 49:*16, 23* 56:*20* 60:*18* 68:*8, 25* 69:*6, 21* 85:*17* 94:*3*
**terminates** 39:*23*
**terminating** 36:*2* 37:*20* 38:*8, 11* 42:*3, 6* 61:*18* 68:*3*
**Termination** 3:*13, 14* 37:*9* 38:*19, 20, 23* 39:*18, 23* 40:*4* 43:*11* 61:*7* 62:*11, 16* 64:*22* 68:*6* 69:*15* 70:*5, 7, 18* 85:*24* 86:*3* 93:*21*
**terminations** 40:*11, 17*
**terms** 21:*23* 27:*19* 68:*14*
**testified** 4:*9*
**testifying** 6:*7, 15*
**testimony** 5:*1* 6:*11* 17:*2*
**Texas** 60:*23*
**Text** 3:*15, 16, 18* 9:*1, 6, 9, 11, 14* 39:*13* 45:*25* 46:*2* 71:*16* 73:*3* 74:*3* 77:*23* 78:*10, 13* 79:*16*
**texts** 71:*13*
**Thank** 76:*3* 91:*19*
**theirs** 51:*7*
**theoretically** 57:*24*
**thers** 80:*9*
**thing** 64:*13* 87:*7*
**things** 4:*20* 46:*11* 47:*18* 87:*3, 6* 93:*17*
**think** 31:*17* 32:*18, 22* 43:*6* 49:*7* 61:*2* 87:*2* 98:*3*
**thinks** 32:*24*
**third** 52:*3*
**thought** 84:*9*
**threat** 80:*15, 24* 97:*4*
**threaten** 96:*21*
**threats** 62:*15* 80:*22*
**three** 30:*7* 51:*23* 53:*20* 54:*2*
**throw** 78:*23*
**tidbit** 5:*12*

**TIME** 1:*16* 3:*11* 5:*13* 9:*19* 12:*17, 22* 15:*1, 20, 21* 16:*6* 17:*12, 18, 21* 19:*7* 20:*17* 41:*13, 19, 20* 43:*1* 45:*18, 21, 23* 46:*23* 47:*17* 48:*5* 50:*25* 51:*4, 24* 52:*1, 6, 20, 22, 25* 53:*6, 20* 54:*2, 4, 12, 14, 20* 55:*1, 4, 8, 19* 56:*6, 16, 19* 57:*11, 16* 58:*21, 25* 59:*4, 7* 61:*7* 64:*16* 65:*22* 66:*10, 15, 19, 21, 23, 24, 25* 67:*5, 11, 15, 18, 21* 68:*9, 10, 12, 21* 77:*15* 84:*20* 85:*2* 91:*21* 92:*9, 18, 24* 93:*2, 6* 95:*13* 97:*10, 13*
**timeline** 30:*25*
**times** 16:*17* 18:*14* 19:*21, 25* 30:*7* 37:*13, 14* 40:*14* 86:*13* 96:*4*
**title** 11:*16*
**today** 4:*21, 25* 5:*8, 23* 6:*7, 15* 10:*7* 17:*2* 19:*11* 31:*3, 25* 54:*10* 55:*11* 59:*6* 60:*14* 61:*22* 91:*4* 97:*14*
**today's** 4:*13* 6:*18* 7:*23* 8:*6, 13* 10:*12, 16*
**told** 47:*11* 48:*9* 49:*22* 56:*17* 60:*23* 61:*16* 73:*16* 84:*4* 88:*14* 91:*5*
**tolerable** 56:*19*
**total** 74:*23*
**town** 79:*25*
**track** 17:*11* 76:*22* 77:*5, 10*
**tracked** 50:*1*
**train** 46:*11*
**trained** 27:*7, 22* 43:*23* 77:*13, 15*
**training** 27:*10, 12, 19* 28:*14* 44:*1, 6*
**transcript** 97:*16, 20*

102:7, 8
**transcription** 100:5
**transpired** 81:5
**transport** 24:3
**tried** 8:10
**Trouble** 71:18 78:22
**truck** 24:14, 18, 22
**trucks** 23:1 25:1, 16
**truck's** 24:24
**true** 17:21, 22 77:9
87:22 90:13 91:5
102:8
**truthfully** 6:7
**try** 79:23 92:12
**trying** 78:23
**twice** 96:7
**two** 8:11, 19 40:8, 14
42:9 57:5 74:25
87:6
**type** 92:22 93:4
95:5
**types** 63:13
**typically** 46:9 97:23

**< U >**
**uh-huh** 5:4
**ultimately** 87:16
**uncomfortable** 95:8
**underneath** 52:12
**understand** 5:5, 10
6:9, 11, 20, 21 13:4
19:24 22:21 27:17
34:16, 19 51:21
53:22, 24, 25 54:2
56:12 63:5 68:15
76:23 77:9 78:13
80:15 83:4, 6, 9, 18
87:12 88:7
**understanding** 39:1
46:11 89:10
**Understood** 7:18
9:15 49:9 50:23
63:16 68:13 96:14
**underwent** 27:19
**unfair** 35:1
**UNITED** 1:1 23:14,
16
**unlawful** 17:4 20:22
26:10, 18, 21, 25 27:4,
7, 11, 20, 23 28:2

30:19, 23 31:5 44:21
45:9, 12 46:13
**unnamed** 74:13
**untolerable** 84:11
**updated** 44:11, 14
**updates** 44:17
**upholding** 64:6
**urged** 64:4
**urinate** 84:4
**use** 37:17 73:10, 13,
22, 25 77:15 83:17
84:3
**uses** 74:24
**usually** 14:25

**< V >**
**valid** 24:10 25:3
89:3
**validate** 17:17
**validating** 57:1
**vehicle** 24:7 25:8
**verbal** 37:11
**verify** 59:11 92:13,
15
**verifying** 57:1
**Vested** 11:24 12:24
**videoconferencing**
101:8
**violate** 36:10, 22
**violation** 68:14
**violence** 96:21
**visible** 95:3
**visits** 20:3
**voluntarily** 60:19, 20
**vs** 1:6

**< W >**
**wage** 69:3
**wages** 85:17
**waive** 97:16, 20 98:3
**walk** 37:2
**want** 5:18 8:1
36:15 44:21 74:17
87:2 89:9 96:22
98:2
**wanted** 50:12 57:23
**wanting** 49:19
**warning** 37:8, 11
38:13 56:18 61:16,

20, 23
**watch** 80:8, 11
**watching** 80:8, 11
**water** 6:2
**way** 14:12 17:16
34:22 39:22 54:11
58:9 59:11 80:16
**ways** 14:23 92:12
**week** 20:5 30:7, 9,
14 85:2
**weeks** 97:6
**weight** 6:12
**well** 18:7 31:18
38:1 60:16 64:20
65:21 66:18 72:16
78:7 89:15
**went** 59:17, 21 78:8
**we're** 61:17
**Westshore** 2:7
**whatsoever** 17:4
21:21 28:6 36:22
96:17
**white** 41:24 42:1
**willing** 49:24 50:5
92:3
**winter** 41:8
**wish** 29:17 37:2
**withholding** 49:7
**Witness** 3:3 4:10
97:21 98:3
**Witt** 3:13 13:25
14:1 56:8 58:7
59:14, 16 60:4, 6, 11,
18, 24 61:6 65:23
66:9, 14, 18 67:3, 8,
10, 14, 17 70:25
74:13, 24 75:3, 7, 10
76:5, 7 80:25 81:2
85:12 86:1
**Witt's** 62:4 69:15
**women** 78:20
**wondering** 38:17
**word** 18:13 34:15
73:11, 13, 16, 22, 25
74:25
**words** 87:18
**work** 7:12 12:4
13:12 15:8 17:10
18:18 19:15 21:18
23:7 36:11 43:19

46:25 60:13, 24
63:25 79:24 81:4
93:1, 8, 13, 16, 19, 23
**worked** 17:17 19:15
40:21 56:22 57:25
58:1 78:5 81:19
84:21 85:9
**workers** 12:18 18:12
**working** 10:25 11:4
18:5 19:2 20:5, 8
26:2 31:3, 6 59:20
69:4 84:5 97:3, 6
**workplace** 43:22
64:1, 4 73:14, 17, 22
**works** 13:3
**workspace** 93:12
**worsteds** 81:6
**write** 21:14
**writes** 52:16
**write-up** 22:5 37:8
60:10
**writeups** 22:11
**writing** 67:25
**written** 37:8, 10
38:13 56:18 61:16,
19, 23 65:9, 12 87:16,
18 94:24
**wrong** 17:9 36:19
39:1 50:6, 13 68:19,
23
**wrongful** 40:3

**< Y >**
**y'all** 79:22
**yard** 78:18
**Yeah** 33:3
**year** 9:24 10:2, 3, 4
18:5 40:16 41:13
44:15 63:17
**years** 8:11 11:2, 5
18:1 19:24 31:4
40:13, 15

**< Z >**
**Zoom** 1:16 6:10
62:24, 25 71:11
74:11 76:12 87:9

Deposition of George Pappas

Nicholas Ford and Alonzo Hawkins v. Southern Road & Bridge LLC

## WORD LIST

**< 0 >**
**03/19/2027**  *(2)*

**< 1 >**
**1**  *(4)*
**10**  *(3)*
**100**  *(3)*
**10th**  *(1)*
**11**  *(3)*
**11th**  *(1)*
**12**  *(3)*
**12:35**  *(2)*
**13**  *(3)*
**15**  *(1)*
**17**  *(2)*
**18**  *(4)*
**19**  *(1)*
**19th**  *(1)*

**< 2 >**
**2**  *(4)*
**20**  *(4)*
**200**  *(2)*
**2012**  *(1)*
**2016**  *(2)*
**2019**  *(1)*
**2023**  *(9)*
**2024**  *(1)*
**2025**  *(4)*
**21**  *(1)*
**29**  *(1)*
**2907**  *(1)*
**2997**  *(1)*

**< 3 >**
**3**  *(3)*
**3:24-cv-00404-MCR**
  *(1)*
**30**  *(2)*
**33131**  *(1)*
**33609**  *(1)*
**34683**  *(1)*
**34691**  *(1)*

**< 4 >**
**4**  *(7)*
**4:00**  *(1)*

**400065**  *(1)*
**45**  *(1)*
**46**  *(1)*

**< 5 >**
**5**  *(3)*
**50**  *(1)*
**500**  *(1)*
**51**  *(1)*
**520**  *(1)*

**< 6 >**
**6**  *(4)*
**60**  *(1)*
**62**  *(1)*
**69**  *(2)*

**< 7 >**
**7**  *(4)*
**7:00**  *(1)*
**700**  *(1)*
**71**  *(1)*
**72**  *(1)*
**74**  *(1)*
**76**  *(1)*
**77**  *(1)*
**79**  *(1)*
**7th**  *(1)*

**< 8 >**
**8**  *(3)*
**8:00**  *(1)*
**81**  *(1)*
**87**  *(1)*

**< 9 >**
**9**  *(3)*
**9:33**  *(1)*
**90**  *(1)*
**91**  *(1)*
**95**  *(1)*

**< A >**
**a.m**  *(1)*
**abandonment**  *(2)*
**ability**  *(6)*
**able**  *(2)*
**absenteeism**  *(2)*
**acceptable**  *(3)*

**access**  *(3)*
**accommodations**  *(1)*
**accountable**  *(1)*
**accurate**  *(2)*
**ACKNOWLEDGMEN**
**T**  *(1)*
**act**  *(3)*
**action**  *(5)*
**actions**  *(2)*
**activities**  *(3)*
**activity**  *(14)*
**acts**  *(2)*
**actual**  *(2)*
**adding**  *(1)*
**additional**  *(2)*
**address**  *(4)*
**affirmed**  *(1)*
**African**  *(1)*
**agents**  *(2)*
**ago**  *(5)*
**agree**  *(1)*
**AH25**  *(2)*
**ahead**  *(1)*
**A-l-a**  *(1)*
**A-l-a-n-z-o**  *(1)*
**Alfredo**  *(1)*
**allegation**  *(1)*
**allegedly**  *(1)*
**allow**  *(2)*
**allowed**  *(2)*
**A-l-o**  *(1)*
**alongside**  *(1)*
**ALONZO**  *(21)*
**Alonzo's**  *(1)*
**Alternate**  *(1)*
**alternatives**  *(1)*
**American**  *(1)*
**amount**  *(2)*
**answer**  *(38)*
**answers**  *(7)*
**anybody**  *(9)*
**anymore**  *(1)*
**anyways**  *(1)*
**Anzivino**  *(5)*
**apart**  *(7)*
**apologize**  *(1)*
**apologized**  *(1)*
**appeal**  *(1)*
**appear**  *(1)*

**APPEARANCES**  *(1)*
**appeared**  *(1)*
**appearing**  *(2)*
**appears**  *(1)*
**applied**  *(1)*
**apply**  *(1)*
**approach**  *(1)*
**appropriate**  *(1)*
**approval**  *(1)*
**approximate**  *(1)*
**approximately**  *(1)*
**April**  *(1)*
**area**  *(1)*
**arrival**  *(1)*
**ARTHUR**  *(4)*
**asked**  *(6)*
**asking**  *(12)*
**asks**  *(1)*
**aspect**  *(2)*
**ass**  *(1)*
**asserted**  *(1)*
**assign**  *(1)*
**assigned**  *(4)*
**assignment**  *(1)*
**assigns**  *(1)*
**attached**  *(1)*
**attempt**  *(1)*
**attempting**  *(1)*
**attention**  *(6)*
**attorney**  *(12)*
**attorneys**  *(1)*
**attorney's**  *(1)*
**authorities**  *(1)*
**authority**  *(7)*
**authorized**  *(1)*
**availability**  *(1)*
**available**  *(3)*
**avenues**  *(1)*
**aware**  *(4)*

**< B >**
**baby**  *(1)*
**back**  *(5)*
**bad**  *(1)*
**BARROUKH**  *(49)*
**based**  *(5)*
**basically**  *(4)*
**basis**  *(1)*
**Bates**  *(3)*

Deposition of George Pappas                     Nicholas Ford and Alonzo Hawkins v. Southern Road & Bridge LLC

beaner  (1)
began  (3)
Behalf  (3)
behavior  (2)
behaviors  (1)
belief  (1)
believe  (38)
believed  (1)
belong  (1)
beneath  (3)
best  (3)
better  (1)
binding  (1)
bit  (2)
black  (7)
board  (2)
bottom  (8)
Boulevard  (1)
box  (1)
boxes  (1)
break  (6)
breaks  (2)
Brickell  (1)
BRIDGE  (33)
bridges  (2)
Bridge's  (3)
Brief  (3)
bring  (6)
broadly  (1)
broken  (1)
brother  (1)
brought  (6)
BROWARD  (2)
Buck  (2)
budget  (2)
budgets  (2)
bunch  (1)
bus  (1)
bypass  (1)

< C >
Cadden  (1)
call  (14)
calling  (1)
call-no  (9)
calls  (4)
cars  (2)
CASE  (1)
cause  (1)

ceased  (1)
cell  (2)
certain  (5)
CERTIFICATE  (2)
certify  (4)
chain  (2)
chance  (2)
CHANGE  (1)
changes  (2)
charges  (2)
chart  (1)
chat  (4)
checked  (3)
chewed  (1)
Christofilis  (3)
C-h-r-i-s-t-o-f-i-l-i-s
  (1)
claims  (1)
clear  (10)
clearly  (2)
client  (3)
clients  (17)
client's  (2)
clients's  (5)
close  (1)
Coates  (2)
codes  (1)
coffee  (1)
COLE  (2)
colleague  (1)
collecting  (1)
color  (1)
come  (2)
comes  (2)
command  (2)
comments  (1)
Commission  (4)
Communication  (3)
companies  (1)
company  (60)
company's  (6)
compensated  (1)
compensation  (2)
complain  (5)
complained  (4)
complaint  (21)
complaints  (32)
complete  (2)
completed  (4)

completes  (1)
completing  (2)
comptroller  (1)
computer  (1)
concluded  (1)
conduct  (12)
conducted  (5)
conference  (2)
confirm  (6)
confirmation  (2)
confirming  (4)
connected  (1)
consider  (1)
considered  (1)
consistent  (2)
consistently  (1)
contact  (4)
contacted  (2)
Continue  (3)
contribute  (1)
control  (5)
conversation  (4)
copies  (1)
copy  (3)
corner  (1)
correct  (79)
correction  (1)
corrections  (1)
correctly  (1)
cost  (1)
costs  (1)
counsel  (2)
count  (1)
country  (1)
County  (4)
couple  (5)
course  (2)
COURT  (11)
Cousin  (2)
co-workers  (1)
crew  (1)
criminal  (3)
CROSS-
EXAMINATION  (1)
current  (2)
currently  (2)
cut  (2)
cuz  (2)

< D >
DANIEL  (1)
danielb@dereksmithla
w.com  (1)
DATE  (8)
dated  (4)
day  (10)
days  (5)
day-to-day  (3)
December  (2)
decide  (1)
decision  (1)
Declaration  (3)
decline  (2)
defecate  (1)
Defendant  (5)
definite  (1)
definitely  (1)
denied  (2)
deny  (1)
department  (8)
DEPONENT  (1)
DEPOSITION  (16)
DEREK  (1)
derogatory  (1)
describe  (3)
described  (1)
Description  (1)
designation  (2)
despite  (1)
determination  (1)
determinations  (1)
determine  (1)
determined  (1)
device  (1)
devices  (1)
Dezmond  (8)
different  (7)
difficulties  (1)
DIRECT  (2)
directed  (1)
directly  (2)
disciplinary  (2)
discipline  (8)
disciplining  (1)
disclosed  (1)
discover  (2)
discrepancies  (3)
discrepancy  (2)

Deposition of George Pappas        Nicholas Ford and Alonzo Hawkins v. Southern Road & Bridge LLC

discriminated (4)
discriminating (1)
discrimination (28)
discuss (19)
discussed (10)
discussing (2)
discussion (12)
discussions (1)
dispute (2)
disrespectful (1)
dissuade (1)
distribute (1)
DISTRICT (2)
dnt (1)
document (22)
documentation (3)
documented (1)
documents (10)
doing (2)
dozens (1)
drafted (1)
Drive (9)
driver's (4)
driving (2)
drugs (1)
due (1)
DUI (1)
duly (2)
duration (2)
duties (1)
duty (2)

< E >
eat (1)
EEO (17)
EEOC (3)
effectively (1)
eight (2)
either (10)
eligible (3)
email (2)
emergency (1)
employ (2)
employed (2)
employee (73)
employees (71)
employee's (2)
employees's (2)
employment (17)

encouraged (2)
engage (1)
Enrique (1)
entail (1)
entails (1)
entered (1)
entire (1)
entity (1)
environment (1)
Errata (1)
Esequiel (12)
ESQ (2)
essential (1)
estimate (1)
ethnicity (1)
events (1)
E-verified (1)
exact (1)
exactly (6)
EXAMINATION (3)
examined (1)
example (1)
examples (1)
Excel (3)
exchange (1)
exchanged (3)
Excuse (2)
Exhibit (40)
EXHIBITS (2)
exit (1)
Expires (2)
explain (8)
explanation (1)
extend (1)
extent (1)

< F >
fact (2)
failing (1)
failure (2)
fair (11)
falsely (1)
falsification (1)
familiarity (2)
familiarize (1)
families (1)
family (2)
far (2)
feedback (2)

feel (3)
felt (1)
Fidencio (5)
Fidencio's (1)
field (4)
file (3)
filed (5)
filing (1)
fill (2)
filled (1)
final (3)
finally (1)
financially (1)
fine (2)
fired (3)
first (11)
five (4)
five-minute (1)
FLORIDA (18)
fly (1)
flying (1)
focus (1)
follow (1)
followed (1)
following (3)
follows (1)
follow-up (1)
food (1)
FORD (25)
Ford's (6)
foregoing (2)
foreman (46)
foreman/employees
  (1)
foreman's (2)
foremen (2)
forged (12)
forgery (8)
forging (3)
form (64)
formal (1)
formality (1)
forman (1)
format (1)
former (1)
forth (1)
found (1)
founded (1)
four (2)

fraudulent (1)
free (2)
frequently (3)
Friday (1)
front (2)
full (1)
further (6)

< G >
generally (1)
generate (1)
geographically (1)
GEORGE (18)
getting (1)
give (12)
given (5)
gives (1)
giving (2)
go (19)
goal (3)
goes (3)
going (18)
Good (2)
government (2)
grammatical (1)
ground (3)
GROUP (7)
guess (4)

< H >
half (1)
hallway (1)
hand (1)
handbook (23)
handbooks (1)
handle (6)
handled (1)
handles (2)
handling (4)
happened (3)
happening (5)
happens (1)
harassment (12)
Harbor (3)
hard (1)
HAWKINS (32)
Hawkins's (2)
head (1)
healthy (2)

Deposition of George Pappas · · · · · · · · · · · · · Nicholas Ford and Alonzo Hawkins v. Southern Road & Bridge LLC

hear  *(4)*
heard  *(2)*
held  *(3)*
help  *(7)*
helpful  *(1)*
HH-375658  *(2)*
hierarchy  *(2)*
hire  *(8)*
hired  *(3)*
hires  *(2)*
hiring  *(6)*
Hispanic  *(1)*
hoe  *(2)*
hold  *(1)*
Holiday  *(2)*
home  *(5)*
Hopefully  *(2)*
hotel  *(2)*
hour  *(5)*
hours  *(49)*
hr  *(48)*
HR's  *(1)*
hundred  *(1)*

< I >
identification  *(14)*
identify  *(2)*
importance  *(2)*
important  *(2)*
improperly  *(1)*
inappropriate  *(1)*
inaudible  *(1)*
include  *(2)*
included  *(1)*
includes  *(1)*
including  *(5)*
inclusive  *(1)*
incorrect  *(7)*
incorrectly  *(2)*
independently  *(1)*
INDEX  *(1)*
indicates  *(1)*
individual  *(19)*
individuals  *(19)*
individual's  *(1)*
individuals's  *(1)*
inform  *(4)*
Informal  *(2)*
informally  *(1)*

information  *(9)*
informed  *(2)*
informing  *(1)*
initial  *(2)*
input  *(2)*
inputting  *(1)*
inquiries  *(2)*
inspectors  *(1)*
Insubordination  *(1)*
insurance  *(2)*
interested  *(2)*
interesting  *(2)*
Interrogatories  *(3)*
interrogatory  *(4)*
interview  *(1)*
investigate  *(1)*
investigated  *(1)*
investigating  *(1)*
investigation  *(2)*
investigations  *(5)*
involved  *(1)*
Isaac  *(14)*
Isaac's  *(2)*
issuance  *(1)*
issue  *(16)*
issued  *(2)*
issues  *(10)*
its  *(4)*

< J >
January  *(1)*
Jeff  *(1)*
job  *(14)*
jobs  *(1)*
JONES  *(78)*
Jones's  *(6)*
judge  *(1)*
July  *(1)*
jump  *(1)*
June  *(4)*

< K >
Keam  *(7)*
K-e-a-m  *(1)*
keep  *(1)*
keeping  *(1)*
keeps  *(1)*
kept  *(2)*
Key  *(1)*

kind  *(7)*
KISSANE  *(2)*
knew  *(4)*
know  *(120)*
knowing  *(1)*
knowingly  *(1)*
knowledge  *(36)*
known  *(1)*
knows  *(1)*

< L >
Labor  *(1)*
lack  *(1)*
laid  *(1)*
language  *(1)*
Large  *(1)*
larger  *(1)*
LAW  *(1)*
lawsuit  *(3)*
lawyer  *(2)*
lay  *(1)*
leads  *(1)*
learning  *(1)*
leave  *(1)*
leaves  *(1)*
left  *(1)*
left-hand  *(2)*
letters  *(1)*
letting  *(1)*
license  *(3)*
license/I.D  *(1)*
LINE  *(1)*
list  *(2)*
listed  *(1)*
little  *(4)*
live  *(2)*
LLC  *(4)*
location  *(1)*
lodging  *(5)*
long  *(9)*
longer  *(1)*
look  *(11)*
looked  *(1)*
looking  *(4)*
looks  *(4)*
loss  *(1)*
Lucas  *(6)*
lunch  *(2)*

< M >
man  *(2)*
manage  *(2)*
manager  *(19)*
managers  *(1)*
March  *(3)*
mark  *(10)*
marked  *(15)*
marker  *(2)*
marking  *(3)*
material  *(1)*
matter  *(2)*
mean  *(10)*
Meaning  *(3)*
means  *(8)*
meet  *(18)*
meeting  *(7)*
member  *(2)*
members  *(4)*
men  *(1)*
mentioned  *(1)*
message  *(10)*
messaged  *(1)*
messages  *(13)*
met  *(1)*
Miami  *(1)*
Michele  *(5)*
midday  *(1)*
middle  *(1)*
Minimal  *(2)*
minute  *(1)*
minutes  *(4)*
misconduct  *(7)*
missing  *(2)*
mistakes  *(2)*
mm-hmm  *(1)*
moment  *(3)*
moments  *(1)*
money  *(2)*
month  *(1)*
months  *(2)*
morning  *(1)*
motel  *(1)*
move  *(2)*
Muckle  *(1)*
multiple  *(6)*

< N >
Name  *(7)*

named *(1)*
names *(9)*
Narcissus *(1)*
nature *(2)*
necessarily *(1)*
necessary *(8)*
need *(17)*
needed *(3)*
needing *(1)*
needs *(2)*
Never *(17)*
new *(1)*
NICHOLAS *(9)*
Nick *(7)*
nickname *(7)*
Nick's *(1)*
night *(2)*
nighttime *(1)*
nine *(3)*
non-black *(1)*
non-EEO *(1)*
non-foreman *(1)*
non-HR *(1)*
non-superintendent
  *(1)*
North *(1)*
NORTHERN *(1)*
Notary *(4)*
note *(1)*
noted *(1)*
notepad *(1)*
notes *(4)*
notice *(7)*
noticed *(2)*
noticing *(1)*
notified *(4)*
notifies *(1)*
notify *(5)*
November *(3)*
number *(16)*
numbers *(1)*

< O >
O-301 *(1)*
OATH *(1)*
Object *(28)*
objecting *(1)*
objection *(18)*
observed *(1)*

occasion *(1)*
occasions *(1)*
occur *(2)*
occurred *(3)*
occurring *(3)*
offense *(3)*
offer *(1)*
office *(18)*
officer *(15)*
officials *(1)*
okay *(249)*
onboarding *(7)*
once *(7)*
ones *(1)*
on-site *(3)*
operate *(1)*
operations *(1)*
option *(2)*
order *(1)*
ordering *(1)*
OSHA *(1)*
outside *(5)*
owed *(1)*
owner *(7)*
owner's *(1)*
ownership *(1)*

< P >
p.m *(3)*
Page *(7)*
pages *(3)*
paid *(8)*
Palm *(3)*
paper *(1)*
paperwork *(1)*
PAPPAS *(10)*
paragraph *(3)*
paragraphs *(1)*
participant *(1)*
parties *(2)*
Partly *(1)*
party *(1)*
pay *(2)*
paycheck *(1)*
payment *(1)*
payroll *(12)*
people *(9)*
percent *(2)*
perform *(1)*

performance *(1)*
performed *(1)*
performing *(1)*
person *(5)*
personal *(3)*
personally *(5)*
pertain *(1)*
phone *(16)*
physical *(2)*
Pinellas *(1)*
P-i-n-e-l-l-a-s *(1)*
PLACE *(2)*
placed *(1)*
Plaintiff *(4)*
Plaintiffs *(3)*
Plaintiff's *(15)*
play *(1)*
please *(24)*
PLLC *(1)*
PM *(1)*
point *(10)*
policies *(9)*
policy *(13)*
Pollo *(4)*
poor *(1)*
porta *(1)*
position *(5)*
possibility *(1)*
possible *(2)*
potential *(1)*
potentially *(1)*
potties *(1)*
practices *(1)*
prefer *(1)*
preparation *(1)*
prepare *(3)*
present *(1)*
preside *(1)*
preventing *(1)*
previously *(2)*
Printout *(1)*
prior *(7)*
problem *(2)*
problems *(1)*
procedure *(4)*
procedures *(1)*
process *(8)*
produced *(5)*
producing *(1)*

productive *(1)*
profit *(1)*
project *(31)*
projects *(5)*
proper *(1)*
properly *(3)*
proposed *(1)*
propounded *(1)*
protection *(1)*
provide *(6)*
Public *(4)*
punished *(6)*
purpose *(1)*
purposes *(2)*
put *(6)*

< Q >
question *(10)*
questions *(16)*
quick *(3)*
quicker *(1)*
quickly *(1)*
Quite *(1)*

< R >
R&B *(1)*
race *(6)*
racial *(1)*
racist *(1)*
random *(3)*
range *(1)*
rarely *(1)*
reach *(2)*
reached *(4)*
read *(17)*
reading *(2)*
ready *(2)*
reall *(1)*
really *(1)*
reason *(4)*
reasons *(2)*
recall *(17)*
receipts *(1)*
receive *(5)*
received *(1)*
recess *(3)*
recommend *(1)*
record *(12)*
records *(3)*

Deposition of George Pappas
Nicholas Ford and Alonzo Hawkins v. Southern Road & Bridge LLC

recover *(1)*
red *(1)*
**REDIRECT** *(1)*
refer *(3)*
reference *(1)*
referring *(3)*
refers *(1)*
reflects *(3)*
refresh *(1)*
regarding *(12)*
regards *(12)*
regular *(1)*
regularly *(3)*
rehire *(4)*
reject *(1)*
relation *(1)*
relationship *(2)*
relative *(2)*
relevant *(1)*
remedy *(2)*
remember *(12)*
**REMOTE** *(1)*
repair *(3)*
repairs *(3)*
rephrase *(4)*
replies *(1)*
report *(17)*
reported *(11)*
Reporter *(11)*
reporting *(6)*
reports *(5)*
represent *(8)*
representative *(4)*
represented *(1)*
request *(2)*
requested *(5)*
require *(1)*
required *(2)*
requirements *(2)*
requires *(1)*
resign *(2)*
resigned *(3)*
resolve *(2)*
resolved *(4)*
respect *(1)*
respond *(1)*
responded *(1)*
responding *(1)*
response *(9)*

responses *(1)*
responsibilities *(4)*
Responsibility *(3)*
responsible *(10)*
rest *(4)*
restate *(1)*
restroom *(2)*
result *(2)*
resulted *(1)*
results *(1)*
retain *(1)*
retaliate *(1)*
retaliation *(11)*
review *(3)*
reviewed *(4)*
reviewing *(3)*
revised *(1)*
Reyes *(5)*
right *(40)*
rights *(1)*
Roach *(2)*
**ROAD** *(35)*
role *(7)*
roles *(1)*
room *(4)*
Roughly *(3)*
Ruiz *(35)*
Ruiz's *(3)*
rule *(2)*
rules *(3)*
run *(2)*
Ryan *(18)*

< S >
safe *(1)*
safety *(1)*
saw *(2)*
saying *(4)*
says *(5)*
SBR *(1)*
scan *(1)*
scared *(1)*
schedule *(3)*
scheduling *(4)*
SCOTT *(2)*
screen *(1)*
scroll *(3)*
scrolling *(1)*
season *(1)*

second *(2)*
see *(57)*
seeing *(1)*
seek *(1)*
seen *(6)*
select *(1)*
selected *(1)*
selecting *(1)*
selects *(1)*
send *(5)*
sending *(4)*
sense *(3)*
sent *(7)*
separately *(1)*
serious *(3)*
seriousness *(1)*
set *(2)*
seven *(1)*
severe *(2)*
shake *(1)*
shape *(1)*
share *(1)*
sheet *(16)*
sheets *(46)*
shit *(2)*
show *(27)*
showed *(2)*
showing *(5)*
shut *(1)*
side *(1)*
sign *(5)*
signature *(8)*
signatures *(12)*
signed *(13)*
significantly *(1)*
signing *(2)*
similar *(2)*
similarly *(2)*
single *(2)*
sir *(1)*
site *(19)*
sites *(1)*
sitter *(1)*
sitting *(9)*
situation *(2)*
Six *(6)*
skin *(1)*
slur *(1)*
slurs *(1)*

small *(3)*
**SMITH** *(1)*
snitches *(1)*
snitching *(2)*
sole *(2)*
solve *(1)*
somebody *(6)*
soon *(1)*
sorry *(2)*
southeast *(1)*
**SOUTHERN** *(35)*
span *(1)*
speak *(21)*
speaking *(2)*
specific *(3)*
specifically *(3)*
speculate *(1)*
speculation *(1)*
spell *(1)*
spelled *(1)*
spoke *(10)*
spoken *(1)*
spreadsheet *(7)*
**SRB** *(30)*
**SRB's** *(1)*
standard *(1)*
standards *(4)*
start *(1)*
started *(2)*
**STATE** *(19)*
stated *(5)*
statement *(5)*
statements *(1)*
States *(15)*
stating *(4)*
stay *(2)*
staying *(2)*
stenographic *(1)*
stenographically *(1)*
step *(1)*
steps *(1)*
stop *(2)*
stopped *(1)*
streamlined *(1)*
strike *(9)*
striking *(1)*
strives *(1)*
structure *(1)*
stuff *(2)*

subcontractors  (2)
subjective  (1)
subjectively  (2)
subordinate  (1)
substance  (1)
substantive  (1)
sue  (1)
sufficient  (1)
suggest  (3)
suggested  (1)
Suite  (2)
sum  (2)
summer  (1)
superintendent  (51)
superintendents  (11)
superintendent's  (2)
supervise  (14)
supervising  (2)
supervision  (1)
supervisor  (8)
supply  (1)
supposed  (1)
sure  (20)
suspension  (1)
sworn  (2)
system  (7)

< T >
take  (10)
Taken  (8)
talk  (2)
talking  (8)
Tampa  (1)
Tardiness  (1)
task  (1)
tasks  (3)
taught  (1)
team  (21)
team's  (1)
technical  (1)
technology  (1)
telephone  (1)
tell  (22)
telling  (2)
ten  (3)
tenure  (1)
terminate  (9)
terminated  (23)
terminates  (1)

terminating  (9)
Termination  (22)
terminations  (2)
terms  (3)
testified  (1)
testifying  (2)
testimony  (3)
Texas  (1)
Text  (19)
texts  (1)
Thank  (2)
theirs  (1)
theoretically  (1)
thers  (1)
thing  (2)
things  (6)
think  (8)
thinks  (1)
third  (1)
thought  (1)
threat  (3)
threaten  (1)
threats  (2)
three  (5)
throw  (1)
tidbit  (1)
TIME  (84)
timeline  (1)
times  (10)
title  (1)
today  (18)
today's  (7)
told  (10)
tolerable  (1)
total  (1)
town  (1)
track  (4)
tracked  (1)
train  (1)
trained  (5)
training  (6)
transcript  (4)
transcription  (1)
transpired  (1)
transport  (1)
tried  (1)
Trouble  (2)
truck  (3)
trucks  (3)

truck's  (1)
true  (7)
truthfully  (1)
try  (2)
trying  (1)
twice  (1)
two  (8)
type  (3)
types  (1)
typically  (2)

< U >
uh-huh  (1)
ultimately  (1)
uncomfortable  (1)
underneath  (1)
understand  (31)
understanding  (3)
Understood  (7)
underwent  (1)
unfair  (1)
UNITED  (3)
unlawful  (19)
unnamed  (1)
untolerable  (1)
updated  (2)
updates  (1)
upholding  (1)
urged  (1)
urinate  (1)
use  (8)
uses  (1)
usually  (1)

< V >
valid  (3)
validate  (1)
validating  (1)
vehicle  (2)
verbal  (1)
verify  (3)
verifying  (1)
Vested  (2)
videoconferencing  (1)
violate  (1)
violation  (1)
violence  (1)
visible  (1)
visits  (1)

voluntarily  (2)
vs  (1)

< W >
wage  (1)
wages  (1)
waive  (3)
walk  (1)
want  (9)
wanted  (2)
wanting  (1)
warning  (8)
watch  (2)
watching  (2)
water  (1)
way  (8)
ways  (2)
week  (5)
weeks  (1)
weight  (1)
well  (10)
went  (3)
we're  (1)
Westshore  (1)
whatsoever  (5)
white  (2)
willing  (3)
winter  (1)
wish  (2)
withholding  (1)
Witness  (4)
Witt  (34)
Witt's  (2)
women  (1)
wondering  (1)
word  (8)
words  (1)
work  (25)
worked  (10)
workers  (2)
working  (14)
workplace  (6)
works  (1)
workspace  (1)
worsteds  (1)
write  (1)
writes  (1)
write-up  (3)
writeups  (1)

Nicholas Ford and Alonzo Hawkins v. Southern Road & Bridge LLC

**writing**  *(1)*
**written**  *(12)*
**wrong**  *(7)*
**wrongful**  *(1)*

**< Y >**
**y'all**  *(1)*
**yard**  *(1)*
**Yeah**  *(1)*
**year**  *(9)*
**years**  *(9)*

**< Z >**
**Zoom**  *(8)*