# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

NICHOLAS FORD and
ALONZO HAWKINS,

    Plaintiffs,

v.                                                  CASE NO.: 3:24-cv-00404-MCR-ZCB

SOUTHERN ROAD & BRIDGE, LLC,

    Defendant.
_____/

## DECLARATION OF RYAN WITT

I, RYAN WITT, declare as follows:

1. I have personal knowledge regarding the facts and matters stated below in this Declaration and am competent to testify regarding same.

2. I held the position of Superintendent for Southern Road & Bridge, LLC ("SRB") from February 2020 until I left SRB in October 2024.

3. As Superintendent, I was the on-site project manager. I kept the project on track making sure that that we have supplies, the project is on budget, and most importantly, the crew are working on schedule. I oversaw the onsite crew inspection to ensure the project is in conformance with plans and standards especially when field inspectors visit while we are working on the bridge. I also supervised the team working at the job site, which entails giving them clear feedback, plans, and instructions that the foreman then implements to the crew, I was in-charge of

Page 1

scheduling and enforcing SRB policy including discipline, write-ups, and suspension as approved by SRB management.

4. As Superintendent, I am familiar with and mindful of SRB's policies against retaliatory or discriminatory conduct toward any SRB employee and SRB's zero tolerance policy against any individual on the basis of any trait protected by law and any actual or attempted retaliation or threat of retaliation against an employee for reporting any violation of SRB's policies, applicable law or regulation, or for expressing concern about the implementation of such policies.

5. Consistent with SRB's goal of offering equal employment to all persons, SRB employs individuals of all races, national origins, and ethnic backgrounds, and over half of SRB's 205 employees during the time I worked there were members of minority groups.

6. As the Superintendent, I have conducted myself in a manner that is consistent with these policies and made sure SRB employees do the same. I am not aware of any unfair treatment, discrimination, or retaliation of Plaintiffs Nicholas Ford ("Mr. Ford") or Alonzo Hawkins ("Mr. Hawkins").

7. As Superintendent, I managed the team working at the job site and was there on a daily basis directly overseeing their work especially on critical phases of the project.  I made sure the team is safe and on schedule with the project.

8. As Superintendent, the Foreman reports directly to me. The Foreman did not

have employee responsibility for work assignments, scheduling, hiring, firing, demotions, promotions, and transfers of employees, and instead the Superintendent had all that authority.

9. As Superintended, I have direct knowledge of Mr. Ford's and Mr. Hawkins' employment history and the hours they actually worked on the job sites.

10. Mr. Ford and Mr. Hawkins were employees of SRB. Mr. Ford began his employment with SRB on February 26, 2023. Meanwhile, Mr. Hawkins started his employment with SRB on April 11, 2023.

11. I hired both Mr. Ford and Mr. Hawkins. I was aware they were African American at the time I hired them and their race was not a factor considered at any time by SRB in their employment with the company. SRB Foreman, Esequiel "Isaac" Ruiz ("Mr. Ruiz"), recommended to me that I hire both of them. Mr. Ford and Mr. Hawkins were friends with Mr. Ruiz's half-brother, Fidencio Reyes, and they went to school together.

12. As part of their onboarding, Mr. Ford and Mr. Hawkins were each provided a copy of the SRB Employee Handbook ("Handbook"). *See* SRB Employee Handbook attached as Exhibit A.

13. Mr. Ford and Mr. Hawkins each signed the Equal Employment Opportunity Policy Statement. *See* Mr. Ford's and Mr. Hawkins' signed Equal Employment Opportunity Policy Statement attached as Exhibit B.

14. Mr. Ford and Mr. Hawkins were both informed that the Handbook contains the policies regarding filing a complaint and the contact information they needed to file a complaint. Particularly, page 47 instructs employees that all complaints about discrimination or harassment must be reported immediately without fear of reprisal. Moreover, the Equal Employment Opportunity Statement also provides a reporting procedure for any violations of policy or incidents of harassment or discrimination. If Mr. Ford or Mr. Hawkins experienced anything that would warrant a report, they failed to follow policy despite this clear and simple instructions. *See* Exhibit B; *see also* page 47 excerpt from Handbook regarding Sexual and Other Unlawful Harassment Reporting Policy attached as Exhibit C.

15. Mr. Ford and Mr. Hawkins were employed as general laborers. Mr. Ford had a valid driver license. I authorized Mr. Ruiz to ask Mr. Ford if he was interested to become a driver. Mr. Ford agreed. Mr. Ford was then added as a driver to the SRB insurance policy.

16. Mr. Ruiz discussed with Mr. Ford that he was to be paid $22.00 per hour as laborer. Starting March 13, 2023, Mr. Ford's pay was bumped to $24.00 per hour after he accepted the offer to become driver and was added as driver.

17. There was no agreement to pay Mr. Ford $24.00 per hour from the start of his employment as general laborer. Any pay amount must be authorized by the project manager or superintendent. Neither Project Manager, George Pappas ("Mr.

Page 4

Case 3:24-cv-00404-MCR-ZCB    Document 21-6    Filed 06/05/25    Page 6 of 15

Case No. 3:24-cv-00404-MCR-ZCB

Pappas"), nor I authorized payment for $24.00 per hour to Mr. Ford. As such, there is no incorrect hourly rate or payment owed to Mr. Ford.

18. On November 6, 2023, Mr. Hawkins asked me about hours he thought were not paid for the time period of October 23 to October 29, 2023. I kept asking him to please let me know which hours are wrong and to provide details. I asked him multiple times to call me back so we could get together and go over his hours to get it corrected, if necessary. However, Mr. Hawkins never called or texted me back with his information. *See* text exchange between Mr. Witt and Mr. Hawkins attached as Exhibit D.

19. I also informed Mr. Hawkins by text to contact payroll department immediately so that corrections could be made on his time and it gets added to that week's pay cycle, if there were any errors. *See* Mr. Witt's text to Mr. Hawkins to contact Christina attached as Exhibit E.

20. Mr. Pappas also spoke with Mr. Hawkins and Mr. Ford. Mr. Pappas requested for both of them to meet with him to discuss and resolve their issues about hours not paid. However, they both declined and said they were going to retain a lawyer and leave SRB. Mr. Hawkins and Mr. Ford refused to engage or provide any documentation supporting any payroll discrepancy.

21. Following Mr. Hawkins raising his concern to me about alleged hours not paid, I immediately conducted an audit to validate that all employees' hours—not

Page 5

just Mr. Hawkins' or Mr. Ford's—were correct, accounted for, and no hours were missing. Employees on a crew generally work the same hours, unless the employee is off, out, or approved to come early. As we are working on a Department of Transportation ("DOT") project, schedules are strict because it involves road closures. The closure schedule starts from 8:00 p.m. to 5:30 a.m., Sunday through Thursday. Any minute that SRB goes over such schedule results to payment of liquidated damages, so we strictly comply with that schedule.

22. During my audit, I reviewed all pay records and time records for all employees, including Mr. Hawkins' and Mr. Ford's. I confirmed that Mr. Hawkins and Mr. Ford were paid correctly for all hours worked. I also observed Mr. Hawkins, Mr. Ford and other employees on the crew working as I worked on-site daily, so I know that the hours they actually worked are correctly reflected in the amounts they were actually paid per my audit. I also observed during my audit that Mr. Hawkins and Mr. Ford were routinely paid overtime as well.

23. In fact, Mr. Hawkins was paid a total of **213.50** hours of overtime from the period of April 11, 2023 up to and including November 9, 2023, when Mr. Hawkins' employment voluntarily terminated. *See* Mr. Hawkins' payroll records attached as Exhibit F.

24. Meanwhile, Mr. Ford was paid a total of **129.50** of overtime from the period of February 26, 2023 up to and including November 6, 2023, when Mr. Ford's

Page 6

employment voluntarily terminated. *See* Mr. Ford's payroll records attached as Exhibit G.

25. I affirm that Mr. Hawkins and Mr. Ford have the correct hours worked. I observed them working at the job site every day. Since we are on a DOT project, all of the construction crew's schedules are the same—regardless if the crew is Black, Hispanic, or Caucasian/White.

26. Mr. Hawkins never asked me for a day off to spend time with his dying mother. It would have been granted had I been informed.

27. I was aware that Mr. Hawkins and Mr. Ford were taking time off to spend time at their mother's funeral. I never advised them that they would be paid for any time spent not working.

28. I never demanded for Mr. Hawkins or Mr. Ford to immediately return to the job site while they were attending their mother's funeral.

29. Neither Mr. Hawkins nor Mr. Ford informed me that they needed help with their transportation back to the jobsite from their mother's funeral. It is SRB's policy to only pay for trips that are related to the job. However, under these circumstances, I would have made a request to SRB had I been informed that they needed transportation. SRB would have approved such a request.

30. Neither Mr. Ford nor Mr. Hawkins complained to me about not being allowed to stop for food before they head to the job site.

31. No employee ever complained to me about not being allowed to stop for food before they head to the job site.

32. I am not aware of Mr. Ruiz telling Mr. Ford, Mr. Hawkins, or any Black employees that they cannot stop for food before they head to the job site. Nor am I aware that Hispanic employees are being allowed to stop to get food before they head to the jobsite, while Black employees are not.

33. Neither Mr. Ford nor Mr. Hawkins complained to me about not being allowed a lunch break.

34. No employee ever complained to me about not being allowed a lunch break.

35. I am not aware of Mr. Ruiz denying African American employees of their lunch break. In fact, since it is protocol that someone has to be at the bridge at all times, the crew took alternating lunch breaks. I have seen the crew buy burgers and I had bought them lunch too.

36. Neither Mr. Ford nor Mr. Hawkins complained to me about not being allowed to drive the company truck. In fact, Mr. Ford was an authorized SRB driver and had been included in the SRB insurance policy as an authorized driver.

37. Mr. Hawkins was not an authorized driver of the company vehicles as he does not have a valid driver's license. In fact, I once caught Mr. Hawkins driving the company truck. He was immediately reprimanded.

38. I have not witnessed Mr. Ruiz allowing Hispanic employees to drive the

company truck despite not having any valid driver's license. It is SRB policy that an employee without a valid driver's license and a good driving record is not allowed to drive the company truck.

39. I have not witnessed nor am I aware of Mr. Ruiz or non-Black employees telling Mr. Hawkins that he cannot drive the company trucks because he is Black and the team might get pulled over.

40. Neither Mr. Ford nor Mr. Hawkins complained to me about discrimination.

41. No employee ever complained to me about discrimination.

42. Neither Mr. Ford nor Mr. Hawkins complained to me about being subjected to racial slurs.

43. No employee ever complained to me about being subjected to racial slurs.

44. Mr Hawkins and Mr. Ford have a history of friendship with some of the construction crew. I have heard the employees using racial slurs but in a joking manner, going back and forth in a brotherly banter and not in a derogatory way.

45. Notably, Mr. Hawkins and Mr. Ford are brothers. Another construction crew, Dezmond Jones, is their cousin.

46. I never made any comments to Mr. Ford or Mr. Hawkins about Black men's genitals or penis on or around September 13, 2023 or at any other time period. In fact, I was not even at the jobsite and was at a different job location during this time period.

47. I never made any comments to Mr. Ford or Mr. Hawkins about paying a "gay guy to grab your dick for $50."

48. I never showed Mr. Ford or Mr. Hawkins any pictures of naked women nor did I make a statement to them that "y'all can bang her with y'all big black cock."

49. Neither Mr. Ford nor Mr. Hawkins complained to me about not being allowed to use the restroom.

50. No employee ever complained to me about not being allowed to use the restroom, which is absolutely absurd.

51. There are porta-potties available at the yard and all employees are welcome to use it.

52. In approximately November 6, 2023, I did not tell Mr. Hawkins that he, along with the crew, did not have to report to work because he earned the day off. I told Mr. Hawkins and the crew to stand down and stay at the hotel because there were some safety concerns at the job site and I did not want an inexperienced crew to be there. Mr. Hawkins and the crew were all paid for that day.

53. Mr. Hawkins was scheduled to return to work the next day, November 7, 2023. However, Mr. Hawkins refused to go back to work. Instead, he opted to stay in the hotel. Mr. Ruiz and I tried calling him for a couple of days. But he refused to answer our calls. Crew members tried knocking on his hotel room door but he did not respond. A crew member told me that Mr. Hawkins has quit.

54. On November 9, 2023, after Mr. Hawkins has not called nor showed up to work for two (2) days, Mr. Hawkins was voluntarily terminated for "no call, no show." This was a resignation and not an SRB-initiated termination. *See* Mr. Hawkins' November 9, 2023 Termination Form attached as Exhibit H.

55. Under the Handbook, a voluntary employment termination is initiated by the employee and is deemed as a "resignation." As opposed to an employment termination initiated by SRB, which is considered as a "discharge." *See* Exhibit A, page 49 of the Handbook under "Employment Termination." Mr. Hawkins and Mr. Ford were both resignations as defined in the Handbook.

56. I contacted Mr. Hawkins multiple times along with Mr. Ruiz. However, Mr. Hawkins blocked both my phone number and Mr. Ruiz's number. Mr. Pappas tried to text Mr. Hawkins to ask if he is going to work. Mr. Hawkins never responded. Another employee drove Mr. Hawkins to the airport to leave town. Mr. Hawkins never asked me nor Mr. Ruiz permission to go on any leave and miss work. As a result, Mr. Hawkins abandoned his position and was subject to voluntary termination.

57. On November 6, 2023, Mr. Ford was also subject to voluntarily termination for job abandonment. Mr. Ford had not reported to work for five (5) work days since October 24, 2023. Mr. Ruiz and I had tried contacting Mr. Ford many times but he refused to answer his phone. Finally, on November 5, 2023, I spoke with Mr. Ford

and offered him to come back to work. However, Mr. Ford declined. *See* Mr. Ford's November 6, 2023 Termination Form attached as Exhibit I.

58. On November 6, 2023, Mr. Pappas texted and called Mr. Ford to inform him that he will be voluntarily terminated for job abandonment. Mr. Ford still refused to come back to work. Mr. Ford texted Mr. Pappas and told Mr. Pappas to contact him by text only as he was in school attending orientation. It was later found out that Ford enrolled in a 72-month career pathway program and had no plans to return to work at SRB. Like Mr. Hawkins, this was a resignation and not an SRB-initiated termination. *See* the November 6, 2023 text exchange between Mr. Ford and Mr. Pappas attached as Exhibit J.

59. As explained earlier, a voluntary employment termination is initiated by the employee and is deemed as "resignation" under the Handbook. As opposed to an employment termination initiated by SRB, which is considered as a "discharge." *See* Exhibit A, page 49 of the Handbook under "Employment Termination."

60. Notably, this is not the first time that SRB gave Mr. Ford the option to return to work.

61. On July 29, 2023, Mr. Ford was voluntarily terminated for not returning to work following a leave of absence. On the week of July 23, 2023, Mr. Ford requested for leave of absence to visit his home in Texas. Mr. Ford was supposed to report back to work on July 29, 2023. However, Mr. Ford did not show up for work in

violation of SRB policy. When I called him on July 29, 2023, he was still in Texas.

62. During the week of July 29, 2023, SRB was pressed for time on a project and needed all workers to be present. As such, SRB gave Mr. Ford an opportunity to return back to work. Mr. Ford reported back to work. *See* Mr. Ford's July 29, 2023 Termination Form attached as Exhibit K.

63. Further, around July or August 2023, Mr. Ford was found sleeping on the job. This is not only an SRB policy violation but an egregious safety issue. Mr. Ford was suspended for three (3) days. Mr. Ford reported back to work following his suspension.

64. Ultimately, I hired Mr. Ford and Mr. Hawkins cognizant of their race at the time of hire. I knew they are African American when I hired them. I would not have hired them if my intentions were to discriminate. Their race was a none-issue. Mr. Ruiz told me Mr. Ford and Mr. Hawkins were good workers. Mr. Ford and Mr. Hawkins were paid the same as the rest of the crew. Other comparators who were Caucasian/White and Hispanic had the same hours as Mr. Ford and Mr. Hawkins. SRB wanted Mr. Ford and Mr. Hawkins to stay employed with SRB. Laborers are always in high demand. SRB took the extra mile to keep calling Mr. Ford and Mr. Hawkins and repeatedly asking them to come back. However, they decided to leave SRB on their own volition. Mr. Ford and Mr. Hawkins resigned from their position. Contrary to Mr. Ford's and Mr. Hawkins' claim, SRB did not terminate them.

I declare under penalty of perjury that the foregoing Declaration is true and correct. Executed on this 3RD day of JUNE, 2025.

By: /s/ Ryan W. Witt
Ryan Witt