## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA

NICHOLAS FORD and
ALONZO HAWKINS,                                  CASE NO.: 3:24-cv-00404-MCR-ZCB

       Plaintiffs,

v.

SOUTHERN ROAD & BRIDGE, LLC,

       Defendant.

_____/

## PLAINTIFFS' RESPONSE IN OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs, NICHOLAS FORD ("Plaintiff Ford") and ALONZO HAWKINS ("Plaintiff Hawkins"), by and through their counsel and pursuant to Federal Rule of Civil Procedure 56, hereby file their Response in Opposition to Defendant's Motion for Summary Judgement [D.E. 21] ("Defendant's Motion") and in support state the following:

### INTRODUCTION

In this action, Plaintiffs seek redress for Defendant's unlawful race and color discrimination, hostile work environment, and retaliation under 42 U.S.C. §1981 ("Section 1981"), 42 U.S.C. § 2000 ("Title VII"), and the Florida Civil Rights Act of 1992, § 760.01 ("FCRA"), and further violations and retaliation under 29 U.S.C. § 203 ("FLSA"). Plaintiffs are brothers who were simultaneously employed by Defendant as laborers to perform manual labor on bridge-based construction sites. Plaintiffs worked long, grueling hours during the summer heat in Florida, only to be constantly berated with racial slurs, treated lesser-than because of their race and the color of their skin, and shorted on the number of overtime hours they earned. Plaintiffs tolerated the abuse to provide for their families, before eventually standing up for themselves and pushing back against

1

Defendant's egregious, unlawful conduct. After frequent complaints to their employer in an effort to work for a company free from discrimination and unlawful conduct, Defendant terminated Plaintiffs, claiming Plaintiffs voluntarily abandoned their positions. As described in further detail herein, the record evidence compellingly demonstrates that Defendant's purported rationale for Plaintiff's termination is rife with inconsistencies, lacks credibility, and was intended to mask Defendant's discriminatory and retaliatory intent.

Defendant's Motion seeks to obfuscate these critical issues, disregarding substantial evidence that establishes genuine material issues of fact regarding the Plaintiff's claims. Defendant has failed to provide the Court with any meaningful factual or legal evidence that would support the entry of summary judgment in its favor. For these reasons and those set forth in further detail below, Defendant's Motion must be denied.

## MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1(a)(2)

5.    Disputed. Ford was hired alongside a non-black colleague, Eloy [LNU] for the same role – Laborer – and Defendant paid Ford less than Eloy. Ford complained about the discrepancy to Esequiel Ruiz ("Ruiz") and Defendant updated this after several weeks. *See* D.E. 21-2 at 46:17-24.

9. Undisputed. However, Defendant's employee handbook also designated Ruiz and Ryan Witt ("Witt") as individuals to make complaints and reports to under the "Open Door Policy" section. *See* D.E. 21-7 at p. 46 ("Employees are encouraged to openly discuss with their supervisor any problems so appropriate action may be taken.").

14. Disputed. Hawkins' deposition testimony is being misconstrued. Hawkins' understands the cited portion of his deposition to mean he did not have any previous issues with Witt before Witt started behaving unlawfully. Prior to Witt's unlawful activities, which have been alleged

Hawkins' Complaint and Amended Complaint, Hawkins did not have any issues with Witt. *See* D.E. 27-3 at 47:23-25.

15. Disputed. Ford testified at deposition that he complained about Ruiz's and his non-black coworkers' use of the n-word to his supervisors, including Witt. *See* D.E. 21-2 at 77:8-16.

16. Disputed. Ford testified at deposition that he attempted to gain access to Defendant's human resources ("HR") via telephone call to an HR member, but could not get in contact with HR. Ford explains he first attempted to contact HR in April of 2023, and he began making complaints and reports to his supervisors after HR continued to ignore his calls. *See* D.E. 21-2 at 61:16-25 – 62:1-10.

17. Disputed. Defendant's "Open Door Policy" allowed Ford to complain to his supervisors, and Ford further testified that he could not contact Defendant's HR team. *Id.*; *See* D.E. 21-7 at p. 46.

22. Disputed. Ford testified at deposition that he complained about Ruiz's and his non-black coworkers' use of the n-word to his supervisors, including Ruiz and Witt. *See* D.E. 21-2 at 77:8-16.

26. Dispute. Hawkins has a valid driver's license. There is no documentation of Witt reprimanding Hawkins for this alleged misconduct.

28. Undisputed. However, Hawkins had HR's number, called HR, and reported unlawful activity. *See* D.E. 21-3 at 83:1-20.

37. Disputed. Hawkins called HR and reported unlawful activity. *See* D.E. 21-3 at 83:1-20.

38. Undisputed. Plaintiffs had never met George Pappas ("Pappas"), Defendant's Project Manager, in person prior to this request. Pappas made this request to meet at a construction site

late at night, and Plaintiffs were fearful that Pappas would harm them, as Defendant's employees sent Plaintiffs death threats in writing around the same time. *See* Exhibit F.

40. Disputed. Defendant failed to document any of these alleged absences, as required by its own employee handbook. Defendant's employee handbook maintains an "Attendance & Punctuality" section, explaining, "[a]ll unapproved absences will be documented in employee personnel files." *See* D.E. 21-7 at p. 13. Throughout the discovery process, Plaintiffs requested "[t]he complete personnel file of Plaintiff[s]…" *See* Exhibit H at pp. 7-8 and Exhibit I at pp.7-8. Defendant responded, "[s]ee attached." *Id*. Defendant's production failed to include a single document reflecting Plaintiffs' alleged absences, apart from Plaintiffs' final termination notices.

42. Disputed. Pappas' deposition testimony confirms that either Ruiz or Witt forged Plaintiffs and other laborers' signatures on their daily timesheets. *See* D.E. 21-4 at 56:5-25 – 57:1-21.

43. Disputed. Pappas' deposition testimony confirms only he, Ruiz, and Witt had access to Plaintiffs' timesheets. *Id*. at 52:15-23.

47. Undisputed. However, there is nothing to suggest Ford was scheduled to work for those five (5) days.

48. Disputed. Ford was paid according to the timesheet, which has since been confirmed to be fraudulent as Witt or Ruiz forged Plaintiffs' signatures. *See* D.E. 21-4 at 56:5-25 – 57:1-21.

49. Disputed. Hawkins was paid according to the timesheet, which has since been confirmed to be fraudulent as Witt or Ruiz forged Plaintiffs' signatures. *See* D.E. 21-4 at 56:5-25 – 57:1-21.

50. Disputed. Ruiz explained that Plaintiffs maintained a stellar attendance record and a high level of responsiveness and dependability. *See* D.E. 21-5 at 23:24 – 27:22.

51. Disputed. Defendant's position disregards its own interrogatory responses, production responses, and project manager's testimony that illustrate Defendant terminated Plaintiffs. *See* Exhibit A at p.4; Exhibit B at p.5; Exhibits H and I; and D.E. 21-4 at 49:21-23 and 43:10-12.

54. Disputed. Plaintiffs provide substantial information in their interrogatory responses regarding their subsequent employment. Exhibits L and M.

## LEGAL STANDARD

"Summary judgment is appropriate if the record shows no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. When deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party." *Bass v. Bd. of County Comm'rs*, 256 F.3d 1095, 1102 (11th Cir. 2001) (citing *Witter v. Delta Air Lines, Inc.*, 138 F.3d 1366, 1369 (11th Cir. 1998)).

Summary judgment is particularly unsuitable in employment cases, such as this one, where the ultimate issue to be tried is the quintessential factual question of intent. Indeed, federal courts have time and again refused to grant summary judgment in employment discrimination cases because the very question of unlawful motive is for the jury to decide. *See, e.g., Brice-Northard v. Sports Auth.*, 1998 U.S. Dist. LEXIS 20408, (S.D. Fla. 1998); *Sweat v. Miller Brewing Co.*, 708 F.2d 655, 657 (11th Cir. 1983) (holding that summary judgment is inappropriate where employer's intent is clearly disputed in discrimination cases; citing *Hayden v. First National Bank*, 595 F.2d 994, 997 (5th Cir. 1979).

In evaluating employment discrimination claims, "[c]laims of employment discrimination under § 1981 may be based on disparate treatment, hostile work environment, or retaliation and are subject to the same standards of proof and analytical framework as claims under Title VII of

the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e." *Melton v. I-10 Truck Ctr., Inc.* 2023 U.S. Dist. LEXIS 232098 at *22 (N.D. Fla. 2023). Similarly, "[b]ecause the FCRA was patterned after Title VII, claims filed under the former statute are analyzed the same way as claims filed under the latter." *Ricks v. Indyne, Inc.*, 552 F.Supp.3d 1248 at 1253 (N.D. Fla. 2021). Further, "FLSA retaliation claims are governed by the same legal analysis applicable to retaliation claims under Title VII. *Munroe v. PartsBase, Inc.*, 2008 U.S. Dist. LEXIS 97147 at *4 (S.D. 2008).[1]

## LEGAL ARGUMENT

### I.    Plaintiffs Will Prevail on their Race and Color Discrimination Claims

Under the *McDonnell Douglas* framework, a plaintiff can establish a *prima facie* case of race discrimination by showing "(1) he belongs to a racial minority; (2) he was subjected to adverse [employment] action; (3) his employer treated similarly situated employees outside his classification more favorably; and (4) he was qualified to do the job." *Pittman v. Sunland Ctr.*, 2019 U.S. Dist. LEXIS 241507 at *8 (N.D. Fla. 2019) (citing *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)).

#### A.  Plaintiffs Are Protected Class Members and Were Qualified to Do the Job

Defendant's Motion admits that Plaintiffs satisfy prongs one and four of the *prima facie* case for discrimination—that Plaintiffs are members of a protected class and were qualified to do the job. *See* D.E. 21 at p.14. As such, the first and fourth elements of Plaintiffs' *prima facie* case are satisfied.

#### B.  Defendant Subjected Plaintiffs to Adverse Actions

For employment actions to be adverse, they must be "objectively serious and tangible enough" to alter a plaintiff's "compensation, terms, conditions, or privileges of employment,

---

[1] Plaintiffs' discrimination, hostile work environment, and retaliation claims will all be analyzed under Title VII standards.

deprive[] … her of employment opportunities or adversely affect[] … her status as an employee." *Gupta v. Florida Bd. Of Regents*, 212 F.3d 571, 587 (11th Cir. 2000). Materially adverse action need not be as serious as outright termination but may also encompass "adverse actions which fall short of ultimate employment decisions," such as a written reprimand. *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1455-56 (11th Cir. 1998). The Eleventh Circuit has noted that "the cumulative weight of numerous individual incidents can be considered in determining whether the employee experienced materially adverse action." *Putman v. Sec'y, Dep't of Veterans Affs.*, 510 F. App'x 827, 831 (11th Cir. 2013).

Importantly, the Supreme Court decided in *Muldrow v. City of St. Louis* that, "what the [plaintiff] does not have to show is that the harm incurred was 'significant' or otherwise exceeded some heightened bar. 'Discriminate against' means treat worse…." *Muldrow v. City of St. Louis*, 602 U.S. 346 at 347 (2024) (citing *Bostock v. Clayton Cnty.*, 590 U.S. 644 at 657 (2020)). "Neither that phrase nor any other establishes an elevated threshold of harm." *Id*.

In this case, Defendant took numerous adverse actions against Plaintiffs' employment before ultimately terminating Plaintiffs. Defendant's sworn discovery responses emphasize that Defendant took adverse action against Plaintiffs in the form of reprimand and termination. (*See* Exhibit A at p. 4; *see* Exhibit B at p. 5; *see* D.E. 21-15[2]; *see* D.E. 21-14[3]. Additionally, Pappas' testimony supports that Defendant terminated Plaintiffs, "… I told [HR] that I terminated [Plaintiffs]," without allowing Plaintiffs to appeal the termination. *See* D.E. 21-4 at 49:21-23 and 43:10-12.

---

[2] Defendant's signed termination notice to Ford, documenting Defendant's termination of Ford. Ford did not sign this termination notice, demonstrating his refusal to cease  employment.
[3] Defendant's signed termination notice to Hawkins, documenting Defendant's involuntary termination of Hawkins. Hawkins did not sign this termination notice, demonstrating his refusal to cease employment.

Contrary to the record evidence, Defendant's Motion now contends that "Plaintiffs were not terminated from their position, but they each voluntarily quit." *See* D.E. 21 at p. 14. Defendant continues to contradict the record by stating, "[t]his is not an SRB-initiated termination." *Id*. Again, Defendant's position disregards its own discovery responses and project manager's testimony. *See* Exhibit A at p.4; Exhibit B at p.5; D.E. 21-14; D.E. 21-15; and D.E. 21-4 at 49:21-23 and 43:10-12. When reviewing Defendant's prior and present statements, Defendant's direct contradictions give rise to a genuine issue of material fact as to whether Defendant terminated Plaintiffs. In a light most favorable to the Plaintiffs, Defendant's actions must be deemed a termination of the Plaintiff's employment, thus satisfying the second prong of their *prima facie* case.

Not only did Defendants subject Plaintiffs to the ultimate adverse action, termination[4], but to repeated adverse actions throughout their employment. Defendant denied Plaintiffs the ability to operate company vehicles, eat lunch, use company restrooms on the jobsites, or sign their daily timesheets[5].[6] On one occasion, Defendant instructed Hawkins to defecate beneath a bridge. *See* D.E. 21-3 at 101:3-6 ("And when we have to go use the bathroom, [Ruiz] told us, 'to go under the bridge.'").

Defendant's failure to allow black employees to operate company vehicles, break for lunch, access port-a-potties on the jobsite, or sign daily timesheets have been confirmed by Dezmond Jones ("Jones"), an uninterested third party to these proceedings. *See* Exhibit C. Jones' declaration confirms the following:

---

[4] "This Circuit defines ultimate employment decisions as those 'such as termination, failure to hire, or demotion.'" *Strong v. Brevard Achievement Ctr., Inc.*, 2010 U.S. Dist. LEXIS 52747 at *32 (N.D. Fla. 2010) (citing *Stavropoulos v. Firestone*, 361 F.3d 610, 617 (11th Cir. 2004)).

[5] Plaintiffs' discussion of their inability to sign their daily timesheets will be discussed at length in the FLSA portion of this document.

[6] *See* D.E. 21-2 at 52:2-5; D.E. 21-3 at 67:21-25 and 68:1-3 ("When all the other black guys was here, we couldn't go to lunch. But when all the [non-black] guys came, they can go to lunch; they can take bathroom breaks; can have lunch before work or whatnot; and they didn't allow us to drive the trucks at all.").

> Mr. Ruiz told Black employees that he did not want them driving company cars…
> that they could not stop to eat lunch… that they could not use the port-a-potties on
> the jobsites. On one occasion, I saw Ruiz deny Hawkins the ability to use the
> restroom and Ruiz told Hawkins to urinate and defecate beneath one of the bridges
> we were performing work on… During my employment for SRB, I never signed a
> timesheet to confirm the number of hours I worked.

*Id*. at p. 2. Defendant repeatedly subjected Plaintiffs to adverse actions throughout their employment. Therefore, the second element of Plaintiffs' *prima facie* case is satisfied.

### C.  Plaintiffs Were Treated Less Favorably Because of Their Protected Classes

Defendant treated Plaintiffs less favorably due to their race and color. To begin, Plaintiffs were two of four black team members in a larger team of about eleven people. . Defendant's unfavorable treatment towards its black employees consisted of denying black employees the following: 1) access to operate company vehicles; 2) the ability to stop for food on the way to the worksite or take lunch; 3) access to restrooms on the jobsite; 4) reprimanding black employees for performing the same actions as non-black employees; 5) subjecting black employees to racially disparaging comments and slurs such as "*nigger*"; and 6) unlawfully terminating Plaintiffs.[7]

Importantly, Courts in the Eleventh Circuit have concurred, "[n]o other word in the English language so powerfully or instantly calls to mind our country's long and brutal struggle to overcome racism and discrimination against African Americans." *Dennard v. Hutchinson Auto. Grp. LLC*, 2025 U.S. Dist. LEXIS 54633 at 10 (M.D. Ga. 2025) (citing *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572 at 580 (D.C. Cir. 2013)).

Defendant carried out a majority of its discriminatory actions through Ruiz, employed as a foreman who directly supervised Plaintiffs[8], who used racially disparaging language towards

---

[7] *See* discussion of Defendant denying black employees access to truck, lunch breaks, and restrooms *supra* Part. I.B.

[8] Ruiz was responsible for supervising Plaintiffs' work and performance, assigned Plaintiffs' tasks, tracked Plaintiffs' hours, and disciplined Plaintiffs. D.E. 21-4 at 21:4-25, 22:8-13.

Plaintiffs in person and via text message. *See* Exhibit D (Ruiz texting a company group chat, "I swear ima get up and talk shit then they have like 4 or 5 *niggas* that stay in that room asking with a bitch… the *niggas* across hall taking laughing loud…" and Exhibit E ("this *nigga* playing [g]ay as[s] music"). Ruiz used the n-word nearly each and every day, and regularly wrote it in company-wide group chats that included Witt, employed as superintendent, who supervised Plaintiffs and Ruiz. Witt never reported Ruiz's racist language to anybody, nor did Witt take any action to combat Ruiz's frequent use of the word "*nigger*" or "*nigga*" towards Plaintiffs.

At deposition, Ford confirmed that Ruiz, along with several non-black co-workers also employed as laborers[9], used the word *nigger* in Ford's presence. *See* D.E. 21-2 at 76:25—77:1-7. Hawkins testified that the use of the "[n-word] was directly towards me and my brother." *See* D.E. 21-3 at 124:6-10. Hawkins gave an example of Defendant subjecting him to racist language when he was working alongside Ruiz, where Ruiz remarked, "[o]h, I'm sweating like a *nigger* trying to read." *Id*. at 124:15-18. Witt further made discriminatory remarks to Plaintiffs about their race and color, talking to Hawkins about a female hotel employee, saying, "y'all can bang her with y'all big black cock." *Id*. at 57:4-7.

In addition to Ruiz texting Plaintiffs the n-word, Jones confirmed the use of racist slurs by Defendant's non-black supervisors and co-workers: "SRB's non-Black employees, including but not limited to Mr. Ruiz, regularly used the word '*nigger*' at work and during work hours. The word '*nigger*' was used by these non-Black employees in the presence of Mr. Ford, Mr. Hawkins, and me. At times, the word '*nigger*' was directed towards Mr. Ford, Mr. Hawkins, and me." *See* Exhibit C.

---

[9] Plaintiffs' similarly situated non-black colleagues that racially disparaged Plaintiffs include Fidencio Rayes, Alfredo Villa, Jose Chavez, Wakeem [LNU], and Carlos Valadez. *See* D.E. 21-2 at 77:6-7. These individuals were allowed to operate company vehicles, take lunch breaks, and access restrooms on the jobsites. Importantly, none of these individuals were terminated by Defendant.

Defendant repeatedly subjected Plaintiffs to despicable, unfavorable treatment compared to its non-black employees for the duration of their employment. As such, the third and final element of Plaintiffs' *prima facie* case is satisfied. At minimum, Plaintiffs have demonstrated a genuine dispute of material fact as to these counts, and Defendant's Motion must be denied to these counts.

## II.    Plaintiffs will Prevail on their Hostile Work Environment Claims

To establish a *prima facie* case of hostile work environment, "a plaintiff must show that: (1) he belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic of the employee; (4) the harassment was 'sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment;' and (5) his employer is directly or vicariously liable for the environment." *Melton v. I-10 Truck Ctr., Inc.*, 2023 U.S. Dist. LEXIS 232098 at *37 (N.D. Fla. 2023).

### A.  Plaintiffs Were Subjected to Unwelcome Harassment Because of their Race

It is undisputed that Plaintiffs satisfy the first prong of their *prima facie* case. Next, the second and third prongs are satisfied as Defendant, by and through its non-black supervisors and employees, repeatedly subjected Plaintiffs to race-based harassment.

Defendant's harassing conduct towards Plaintiffs includes Defendant's non-black employees calling Plaintiffs "*nigger*" and "*nigga*", and telling Plaintiffs "I'm sweating like a *nigger* trying to read" and "y'all can bang her with y'all big black cocks." *See supra* Part I.C. Defendant further denied Plaintiffs access to company vehicles, lunch breaks, and restrooms because of their race. *Id.*

Therefore, Plaintiffs have satisfied the second and third prongs. Although Defendant may

assert that the testimony of Pappas, Witt, and Ruiz contradicts these allegations, the conflicting testimony creates a dispute of facts.

## B. Defendant Subjected Plaintiffs to Severe and Pervasive Harassment

To establish the "severe or pervasive" element, a plaintiff "must show that his work environment was both subjectively and objectively hostile." (citing *Harris v. Forklift Sys.*, 510 U.S. 17, 21-22 (1993)).

### i.    Subjectively Hostile

Plaintiffs can prove subjective hostility. Plaintiffs took offense to Defendant's harassment, as Hawkins explained, "[Ruiz and coworkers using the n-word] made me upset … they all laughing and thinking it's a joke and whatnot. And I don't – I didn't think it was funny." *See* D.E. 21-3 at 124: 15-25. Ford reported Ruiz's and colleagues' use of the n-word. *See* D.E. 21-2 at 77:8-16 ("Q: Did you complain about those individual's use of the N word with you? A: Yes. Q: Who did you complain to? A: [Ruiz], and [Witt]… because they are supervisors."). Plaintiffs also testified that they experienced racial hostility throughout their employment via comments from colleagues in addition to less-favorable treatment.[10] Clearly, Plaintiffs subjectively perceived their work environment as hostile.

### ii.    Objectively Hostile

In evaluating whether Plaintiffs' work environment was objectively hostile, the Court must consider four factors: "(1) frequency of the conduct; (2) severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Mendoza v. Borden, Inc.*, 195 F.3d 1238 at 1246 (11th Cir. 1999). The Court must view the evidence "cumulatively and

---

[10] *See* discussion of less-favorable treatment *supra* Part I.C.

in the totality of the circumstances." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010). Plaintiffs evaluate each factor in turn:

1. <u>Frequency of the Conduct:</u> Plaintiffs testified that Defendant's harassment included the use of racial slur such as "*nigger*," being said daily and so frequently that cannot state the exact number of times Defendant used that word. The Eleventh Circuit has considered such testimony when determining the frequency of racial harassment. *Smelter v. S. Home Care Servs.*, 904 F.3d 1276, 1285 (11th Cir. 2018). In *Jones v. UPS Ground Freight*, the Eleventh Circuit held that the plaintiff created a fact question on the pervasiveness of his harassment when he testified to seven racist incidents over a one-year period. 683 F.3d 1283, 1304 (11th Cir. 2012). Here, the high frequency of slurs being made alone satisfies the threshold. Additionally, Plaintiffs were  not allowed to drive company trucks, take lunch breaks, use company restrooms, or sign their timesheets because of their race.[11] As such, this factor must weigh in favor of the Plaintiffs.

2. <u>Severity of Conduct:</u> The Eleventh Circuit has established that "the use of the slur '*nigger*' is severe." *Cooler v. Layne Christensen Co.*, 710 Fed. Appx. 842 at *12 (11th Cir. 2017). Here, Defendant repeatedly subjected Plaintiffs to the use of the word "*nigger*," and targeted Plaintiffs with the word. *See* D.E. 21-3 at 124:6-10 ("[The n-word] was directed towards me and my brother"); *See* Exhibit C at p. 1. Thus, Plaintiffs have demonstrated Defendant's conduct was sufficiently severe.

3. <u>Physical Threat or Humiliation:</u> Defendant's employees threatened Plaintiffs with physical harm. *See* Exhibit F. Defendant's employees threatened Plaintiffs by stating, "I got you location *nigga* u at trouble[12] … I'ma sit outside his apartment *nigga* till I see u trouble and Maddie… and Alfredo [Villa] coming down here as we speak bitch." *Id*. Defendant

---

[11] *See* discussion *supra* Part. I.C.
[12] Trouble is Hawkins' nickname.

threatened the lives of Plaintiffs by stating they would go to Plaintiffs' apartment and wait for them.[13] Further, the Eleventh Circuit held that a reasonable person could find the Defendant intended for the [n-word] to humiliate Plaintiffs. *Cooler* at 848 ("Here, two of [Plaintiff]'s supervisors used the severe slur '*nigger*' in an attempt to get a reaction out of him. A reasonable person could perceive their intent was to humiliate [Plaintiff]."). This case is no different – Plaintiffs' supervisor and coworkers targeted them with the n-word. Similar to the first two factors, this factor weighs in favor of the Plaintiffs.

        4.   <u>Interference with Job Performance</u>: Defendant interfered with Plaintiffs' day-to-day job performance by 1) reducing their hours by not allowing them to clock in to drive a vehicle, 2) forcing them to urinate and defecate beneath bridges on their worksite, degrading Plaintiffs at work, and 3) denying Plaintiffs meal breaks, causing weakness and fatigue that impacted their ability to perform hours of manual labor.

The District Judge in the instant matter previously denied a summary judgment motion of a hostile work environment claim where the plaintiff alleged race-based harassment occurred in the form of "the word '*nigger*'[being] directed at [plaintiff] frequently…" and finding a perception of "a racist attitude" on the part of defendant. *Stallworth v. Okaloosa County Sch. Dist.*, 2011 U.S. Dist. LEXIS 113250 (N.D. Fla. 2011). The *Stallworth* opinion cited an Eleventh Circuit decision that found an "objectively hostile atmosphere where 'three to four times a day' a foreman and others called plaintiff explicitly derogatory terms, plaintiff was forced to interact with the abusers on a daily basis, and the derogatory names were used 'in an intimidating manner, shouting them at [plaintiff] during the course of berating him for his job performance." *Id.* (citing *Miller v. Kenworth of Dothan Inc.*, 277 F.3d 1269, 1276-77 (11th Cir. 2002)).

---

[13] *See* D.E. 21-3 at 107:16-18 ("They was threatening to come to my house and come kill me. I had to call the police.")

14

In sum, these factors will undoubtedly weigh in Plaintiffs' favor, satisfying the fourth prong of their claim.

## C. Defendant is Liable for its Hostile Work Environment

In *Faragher v. City of Boca Raton*, the Supreme Court concluded that an employer "is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Faragher v. City of Boca Raton*, , 524 U.S. 775, 807 (1998). Importantly, "[n]o affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action…." *Burlington Indus. v. Ellerth*, 524 U,S, 742 at 765 (1998).

Here, Defendant's assertion of the *Faragher-Ellerth* defense fails. Plaintiffs were harassed by and complained to Ruiz and Witt, who held supervisory authority over Plaintiffs, satisfying Defendant's vicarious liability for Ruiz and Witt's conduct.[14] Defendant's handbook even designates Ruiz and Witt as individuals to complain and report to in the "Open Door Policy" section. *See* D.E. 21-7 at p.45 ("Employees are encouraged to openly discuss with their supervisor any problems so appropriate action may be taken."). Nonetheless, Plaintiffs contacted Defendant's human resources, to no avail.[15] Importantly, Ruiz and Witt's harassment towards Plaintiffs culminated in termination.[16] Based on these facts, Defendant is not entitled to a viable *Faragher-Ellerth* defense.

---

[14] *See* discussion of Ruiz and Witt's harassment *supra* Part II.B.
[15] *See* D.E. 21-3 at 69:6-13 ("[Witt] called me and asked us about the discrimination that's going on… [Ruiz] called [Witt] about it and wanted to fight, because my brother called HR.").
[16] *See* discussion of Defendant's adverse actions *supra* Part I.B.

Ultimately, Defendant is vicariously liable through its supervisors, and liable for Plaintiffs' co-workers' conduct that was reported and never corrected.[17] Therefore, Plaintiffs have successfully established their fifth and final prong of their hostile work environment claim, and Defendant's Motion must be denied as to these claims.

### III.    Plaintiffs Will Prevail in Their Retaliation Claims

In order to establish a claim for retaliation, the Plaintiff must show (1) he participated in a statutorily protected expression; (2) he suffered a materially adverse action; and (3) there was some causal connection between the two events. *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1277 (11th Cir. 2008).[18]

### A.    Protected Activity

It is well established that "[a] complaint about an employment practice constitutes protected opposition only if the individual explicitly or implicitly communicates a belief that the practice constitutes unlawful employment discrimination." *Hamilton v. Sheridan Healthcorp Inc.*, 602 F. Appx. 485, 489 (11th Cir. 2015).

Here, Plaintiffs engaged in protected activity by complaining to numerous supervisors about race discrimination, a hostile work environment, and unpaid overtime. Plaintiffs complained they were being subjected to the n-word, in addition to being denied access to company vehicles, access to company restrooms, lunch breaks, and the ability to sign their timesheets. Plaintiff's complaints constitute protected activity, thus satisfying the first prong.

---

[17] Even under a coworker liability theory, Plaintiffs will prevail as they placed Defendant on sufficient notice of their coworkers' repeated unlawful activity, and Defendant failed to take corrective action. *See Watson v. Blue Circle Inc.*, 324 F.3d 1252, 1259 (11th Cir. 2003).

[18] This applies to § 1981, Title VII, FCRA, and FLSA retaliation.

### B.    Materially Adverse Action

As discussed at length above, Defendant took materially adverse action against Plaintiffs' employment.[19] As such, Plaintiffs have successfully established the second element of their retaliation claim.

### C.    Causal Connection

To prove causal connection, "a plaintiff must show that the relevant decisionmaker was 'aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated.'" *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1211 (11th Cir. 2013). "Generally, a plaintiff can show the two events are not wholly unrelated if the plaintiff shows that the decision maker was aware of the protected conduct at the time of the adverse employment action." *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1234 (11th Cir. 2010). Typically, "close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection." *Brungart*, 231 F.3d at 799 (11th Cir. 2000).

Here, Plaintiffs engaged in a protected activity by complaining about race discrimination, a hostile work environment, and FLSA violations during their employment. Plaintiffs ramped up their complaints against Defendant in or around November of 2023, and eventually spoke to HR. *See* D.E. 21-3 at 83:1-20.

Further, Ford complained to Pappas about Ruiz's unlawful activity and was terminated several days later. This can be confirmed by Ruiz's texts to Defendant's employees, including Hawkins, where Ruiz states, "snitching is *hoe shit* and u better than us know that *trouble* ur own brother trying to throw us under the bus…" *See* Exhibit G. Ruiz confirms that Ford reported

---

[19] *See* discussion of adverse actions *supra* Part I.B.

unlawful conduct and terminated him because deemed the report "snitching." Hawkins continued to report the discrimination and was terminated three days later. *See* D.E. 21-14 and 21-15 (Hawkins was terminated three days after Ford).

The temporal proximity between Plaintiffs' protected activity and adverse action, in conjunction with Ruiz's text messages about "snitching," establishes a causal connection and gives credence to Plaintiffs' retaliation claims. Plaintiffs complained of unlawful activity in or around November 6, 2023, and Defendant terminated Ford on November 6, 2023 and terminated Hawkins on November 9, 2023.

### D.    Defendant's Legitimate Nondiscriminatory Reason for Plaintiffs' Terminations is Pretextual

"If a plaintiff establishes a *prima facie* case of retaliation, a rebuttable presumption arises that the employer has acted unlawfully." *Matthews v. Wells Fargo*, 758 Fed. Appx. 842, 843 (11th Cir. 2019). The employer can rebut the presumption by providing a legitimate nondiscriminatory reason for its action. *Id*. "If it does so, the burden shifts back to the plaintiff to produce evidence that the employer's proffered reasons are a pretext for discrimination." *Id*.

Plaintiffs can demonstrate significant flaws in Defendant's proffered legitimate reasons for terminating Plaintiffs. Defendant claims that Plaintiffs voluntarily terminated their employment. *See* D.E. 21-14 and 21-15. This is entirely false. In early November 2023, Plaintiffs complained to Defendant about its unlawful employment practices. Plaintiffs texted Witt and Pappas about their owed overtime wages. Neither Witt nor Pappas told Plaintiffs that they were scheduled to work.

Apart from Plaintiffs' attestations that they were good workers, Ruiz testified to Plaintiffs' positive work performance:

Q: What can you tell me about Alonzo Hawkins as a person?

A: He was a good worker. He had a thrive to be great in life. He was responsible.

…

Q: [A]nd you did not have any issues with him personally or his performance; correct?

A: Yes.

Q: Could you tell me about Mr. Hawkins' attendance with regards to his work at SRB?

A: **He was there when I needed him**… **he always answered his phone. He was usually the first one to be answering the phone outside.**

…

A: [Nicholas Ford was] [t]he same way.

…

Q: And would you say that Nicholas Ford was a good worker?

A: Yes.

Q: Would you say that Mr. Ford was responsive when you texted him or reached out to him?

A: Yes.

*See* D.E. 21-5 at 23:24—27:22. Plaintiffs were never issued a warning, write-up, discipline or otherwise for any reason prior to Defendant's decision to terminate them. *Id*. On the contrary, Ruiz's testimony supports Plaintiffs' high level of dependability and responsiveness, contradicting Defendant's assertion that Plaintiffs "stopped showing up for work for multiple days." In fact, Ruiz was directly responsible for Plaintiff's attendance and explained that not only would Plaintiffs answer their phones, but they were the first to respond. *Id*. at 23:24 – 27:22. Defendant relies on the Pappas and Witt to paint the Plaintiffs' attendance in a bad light;[20] however Ruiz's testimony vindicates Plaintiffs from Defendant's false portrayal, and at minimum, creates a genuine dispute

---

[20] *See* D.E. 21 at pp. 22-23.

of material fact as to Defendant's proffered legitimate, non-discriminatory reasons for Plaintiffs'
termination.

With respect to Plaintiffs' alleged absences, Defendant policy on "Attendance &
Punctuality", explainsg, "[a]ll unapproved absences will be documented in employee personnel
files." *See* D.E. 21-7 at p. 13. During the discovery process, Plaintiffs requested "[t]he complete
personnel file of Plaintiff[s]…"[21]. and Defendant's production failed to include a single document
reflecting Plaintiffs' alleged absences. Defendant's failure to adhere to its own policies creates a
genuine dispute of material fact as to the legitimacy of its claimed reasons for Plaintiffs'
termination.

Next, Defendant's Motion references the 'same actor' argument, that the duration of
Plaintiffs' employment suggests "a strong inference exists that discrimination was not a
determining factor for the adverse action taken by the employer." *See* D.E. 21 at p. 16. (citing
*E.E.O.C. v. Florida Commercial Sec. Services, Corp.*, 2014 WL 4771887 at *16 (S.D. Fla. 2014)).
Importantly, the Court in *E.E.O.C.* goes on to consider Eleventh Circuit precedent, which explains,
"this inference is a permissible — not a mandatory — inference that a jury may make in deciding
whether intentional discrimination motivated the employer's conduct." *Id*. at 44-5 (citing *Williams
v. Vitro Servs.*, 144 F.3d 1438, 1440 (11th Cir. 1990) (reversing the order granting summary
judgment)). After considering the Eleventh Circuit's holding in *Williams*, the Court in *E.E.O.C.*
decided it "will not apply the same actor inference on summary judgment in this instant case" as
"'same actor' evidence of the sort introduced in this instance constitutes evidence that a jury may
consider in deciding the ultimate issue of intentional discrimination…'" *Id*. at 45-6 (denying

---

[21] *See* Exhibit H at pp. 7-8 and Exhibit I at pp.7-8.

summary judgment) (quoting *Williams* at 1443). We ask this Court reject Defendant's 'same-actor' argument as it is more appropriate for jury consideration.

Ultimately, Defendant's stated reasons for terminating Plaintiffs are unsubstantiated. Defendant's statements contradict their policies and employees' testimony, and the record evidence supports the Plaintiffs in establishing their termination was discriminatory and retaliatory. At minimum, Plaintiffs have created a genuine dispute of material fact.

### IV.    Plaintiffs Have Established a Convincing Mosaic of Discriminatory and Retaliatory Intent

Even if Plaintiffs had failed to establish the elements of their claims under *McDonnell-Douglas*, they would nonetheless prevail by establishing a convincing mosaic of Defendant's discriminatory and retaliatory intent. The Eleventh Circuit established that "for decades we have explained that the *McDonnell Douglas* framework 'is not the exclusive means' by which an employee can prove discrimination with circumstantial evidence." *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300 at 1310 (11th Cir. 2023).

Although the "*McDonnell Douglas* framework is one 'tool' that helps an employee prove retaliation with circumstantial evidence," *Berry*, 84 F.4th at 1310, "[w]ithout relying on the *McDonnell Douglas* framework, an employee may prove retaliation with any circumstantial evidence that creates a reasonable inference of retaliatory intent." *Id*. The Court continued, "[s]ome of our precedents refer to this evidentiary approach as the 'convincing mosaic framework.'" *Id*. at 1310-11. Thus, "[t]he legal standard – and the question for the court at summary judgment – is only whether the evidence permits a reasonable factfinder that they employer retaliated against the employee." *Id*. The same convincing mosaic standard applies for discrimination: "*McDonnell Douglas* and the 'convincing mosaic standard' are two ways to approach the same question:

whether the plaintiff has put forward enough evidence for a reasonable jury to conclude that illegal discrimination occurred." *McCreight v. AuburnBank*, 117 F.4th 1322 at 1334 (11th Cir. 2024).

Under the convincing mosaic framework, "[e]mployees are not limited in the kinds of circumstantial evidence they may present. We have identified three nonexclusive categories of circumstantial evidence that can raise a reasonable inference of unlawful conduct: evidence of suspicious timing, ambiguous statements, or other information from which unlawful intent may be inferred; evidence of systematically better treatment of similarly situated employees; or evidence that the employer's justification for its action is pretextual." *Id*. at 1311. (citing *Jenkins v. Nell*, 26 F.4th 1243, 1250 (11th Cir. 2022)).

Similar to the *McDonnel Douglas* framework, "the court must view the evidence in the light most favorable to the employee and draw all reasonable inferences in her favor" under the convincing mosaic theory. *Berry*, 84 F.4th at 1311.

A. <u>**Plaintiffs Have Created A Reasonable Inference Of Defendant's Discriminatory and Retaliatory Intent**</u>

Plaintiffs have proffered substantial material evidence, as indicated *supra*, which, if taken as true, will lead a reasonable juror to conclude that the Defendant's stated reasons for the adverse employment actions were "pretextual." Further, this includes direct and circumstantial evidence that the measures taken against Plaintiffs were motivated by discriminatory and/or retaliatory animus.

Plaintiffs provided various forms of evidence from which unlawful intent may be inferred.[22] Defendant's unjust termination of Plaintiffs was premised on false allegations, and an unjustified, premature determination surrounding their desire to continue their employment. At the

---

[22] See discussion highlighting discriminatory and retaliatory intent *supra* Parts I.B.-C., II, and III.D.

least, a reasonable jury could conclude that, "but for Plaintiffs' opposition to unlawful activity, such punitive action would not have been taken."

## V.     Plaintiffs Will Prevail on their FLSA Claims

"The FLSA requires employers to pay their employees at least one and one half times their regular wage for every hour worked in excess of forty per week." *Bailey v. Titlemax of Ga., Inc.*, 776 F.3d 797, 800 (11th Cir. 2015) (citing 29 U.S.C. § 207(a)(1)). "An unpaid-overtime claim has two elements: (1) an employee worked unpaid overtime, and (2) the employer knew or should have known of the overtime work." *Id.* at 801 (citing *Allen v. Bd. of Pub. Educ. For Bibb Cnty.*, 495 F.3d 1306, 1314-15 (11th Cir. 2007)). Here, Defendant does not dispute coverage under the FLSA or that Plaintiffs were its employees. *See* D.E. 21, at 30. Therefore, with respect to Plaintiffs' FLSA claims, the only dispute at issue is whether Defendant failed to pay Plaintiffs for overtime work which it knew, or should have known, they performed.

Notwithstanding Defendant's argument that Mr. Ford was properly paid for 129.5 hours of overtime, and Mr. Hawkins for 213.5 (*see* D.E. 21 at p. 7), the record evidence in this case establishes that the Plaintiffs' timesheets were forged by their supervisors to underreport the Plaintiffs' overtime hours—resulting in Defendant's failure to compensate them for their unreported overtime work in violation of the FLSA.

Defendant required its employees to sign a daily timesheet to confirm the number of hours worked each day[23]; however, Ford signed one timesheet during his employment[24] while Hawkins signed "three or four"—thereby calling into question the accuracy of the reported hours on the Plaintiffs' timesheets for which they were paid.[25] At deposition, Pappas was asked about these

---

[23] *See* D.E. 21-2 at 78:11-12.
[24] *See* D.E. 21-2 at 78:14-18.
[25] *See* D.E. 21-3 at 122:4-7.

timesheets and answered, "[s]ome of those signatures were not theirs." *See* D.E. 21-4 at 51:3-7.

Pappas explained that only Ruiz, Witt, and himself had access to Plaintiffs' timesheets. *Id*. at

52:15-23. Pappas was asked, "Do you understand that an individual, not [Plaintiffs], signed

[Plaintiffs] signature next to their names on at least these three timesheets?" Pappas responded,

"[y]es." *Id*. at 53:25 – 54:1-3. Pappas confirmed that other employees' signatures were also being

signed for them on the daily timesheets. *Id*. at 54:14-17. The conversation continued:

> Q: George, do you know who signed [Plaintiffs'] signatures on these timesheets?
>
> A: I believe it was [Ruiz], or [Witt].
>
> …
>
> A: The foreman or superintendent.
>
> Q: Do you understand that signing another individual's name is forgery…?
>
> A: Yes.
>
> Q: When did you discovery [Plaintiffs'] signatures were being forged on the timesheets?
>
> A: After they told me. And that's when I did a written warning to both the foreman and the superintendent that this is not tolerable and next time they would be fired, terminated.
>
> Q: And to be clear, this is the sole document that reflects how many hours my clients worked; is that correct?
>
> A: Correct.
>
> Q: And the sole individuals who were responsible for verifying, confirming and validating those hours was the foreman and the superintendent; is that correct?
>
> A: Correct.
>
> Q: When in fact, those are the only two individuals responsible for completing this form and who knowingly forged my clients' signature, either one of the foreman or the superintendent, correct?
>
> A: Correct.
>
> …

> Q: … do you know if the other individuals' names were also forged on this
> timesheet?
>
> A: Yes… I believe it looks like all of them.

*See* D.E. 21-4 at 56:5-25—57:1-21. Defendant produced timesheets that confirm Plaintiffs'
signatures were forged on approximately 100 documents. In fact, Hawkins' name is misspelled,
"Alanzo," on each forged timesheet. *See* Exhibit J[26]. The forged timesheets possess identical
penstrokes, as if one timesheet was forged, scanned, and printed as a base template that Ruiz and
Witt could unilaterally fill in and send to Pappas.

Pursuant to Pappas' testimony, Ruiz and Witt forged these timesheets, ultimately reducing
the number of hours Plaintiffs were deemed to have performed. Ruiz and Witt were incentivized
to lower the laborers' payroll costs because their performance is measured, in part, by their ability
to complete a jobsite for the lowest possible cost.

Although Defendant paid Plaintiffs at their time-and-a-half rate for <u>some</u> overtime hours
based on the submitted timesheets, it failed to pay Plaintiffs for their unreported overtime work.
As the Supreme Court held in *Andersen v. Mt. Clemens Pottery Co.*, inaccuracy of the Defendant's
time records does not foreclose the Plaintiffs from recovering their unpaid overtime wages:

> [W]here the employer's records are inaccurate or inadequate and the employee
> cannot offer convincing substitutes, a more difficult problem arises. The solution,
> however, is not to penalize the employee by denying him any recovery on the
> ground that he is unable to prove the precise extent of uncompensated work. … In
> such a situation we hold that an employee has carried out his burden if he proves
> that he has in fact performed work for which he was improperly compensated and
> if he produces sufficient evidence to show the amount and extent of that work as a
> matter of just and reasonable inference. The burden then shifts to the employer to
> come forward with evidence of the precise amount of work performed or with
> evidence to negative the reasonableness of the inference to be drawn from the
> employee's evidence.

---

[26] This identifies several timesheets that reflect the forgery, however Plaintiffs can provide all 143 pages of
timesheets produced if this Court wishes.

328 U.S. 680, 687-88 (1946).

Here, in light of Defendant's inaccurate timekeeping records, the testimony provided by the Plaintiffs and their supervisors is sufficient to bear their burden of proving they performed overtime work for which they were not compensated. *See id.*, at 686 (reversing the Sixth Circuit Court of Appeals' determination that FLSA plaintiffs must "show by evidence rather than conjecture the extent of overtime worked," and holding the Court "imposed upon the employees an improper standard of proof, a standard that has the practical effect of impairing many of the benefits of the FLSA."); *see also Allen*, 495 F.3d at 1315-18 (reversing the entry of summary judgment, and holding that "it is possible that Plaintiffs' burden at trial may ultimately be met with evidence other than precise, written documentation."). Indeed, "[a]lthough a FLSA plaintiff bears the burden of proving that he or she worked overtime without compensation, 'the remedial nature of this statute and the great public policy which it embodies … militate against making that burden an impossible hurdle for the employee.'" *Allen*, 495 F.3d at 1315 (quoting *Andersen*, 328 U.S. at 687).

Ford worked approximately ten  hours of overtime per week,[27] and Hawkins worked approximately twenty  hours of overtime per week[28]. Defendant employed Ford for approximately nine months, or 36 weeks, and he worked approximately 360 hours of overtime. Defendant employed Hawkins for approximately seven months, or 28 weeks, and he worked approximately 560 hours of overtime. Compared to Defendant's payroll records, Ford is owed about **230.5**[29] hours of overtime wages, and Mr. Hawkins is owed about **346.5**[30] hours of overtime wages. Plaintiffs further demonstrate the inaccuracy of the timesheets as they do not indicate Plaintiffs worked when

---

[27] *See* D.E. 21-2 at 38:5-7.
[28] *See* D.E. 21-3 at 41:10-12.
[29] 360 hours of owed overtime minus the 129.50 hours Defendant paid Mr. Ford during his employment.
[30] 560 hours of owed overtime minus the 213.50 hours Defendant paid Mr. Hawkins during his employment.

the sun was down, yet photo evidence proves they worked before sunrise and after sunset. *See* Exhibit K.[31]

Despite the inaccuracy of the Defendant's time records and Plaintiffs' evidence of working beyond their reported hours, Defendant fails to proffer additional evidence of the precise amount of work performed by Plaintiffs or evidence to negate the reasonableness of the inferences drawn from Plaintiffs' evidence that they worked beyond their reported hours. Moreover, the Court must conclude that Defendant possessed knowledge of Plaintiffs' unpaid overtime wages given that their supervisors "squelched truthful timekeeping" by forging their timesheets to underreport the Plaintiffs' working hours. *See Allen*, 495 F.3d at 1319 (holding that knowledge may be imputed to the employer when its supervisors or management "encourage[] artificially low reporting"); *Brennan v. Gen. Motors Acceptance Corp.*, 482 F.2d 825, 828 (5th Cir. 1973) ("The company cannot disclaim knowledge when certain segments of its management squelched truthful responses."); *Bailey*, 776 F.3d at 801 (11th Cir. 2015). Therefore, Plaintiffs have satisfied their burden of establishing that: (i) Defendant's timekeeping records are, at minimum, inaccurate; (ii) Plaintiffs performed overtime work for which they were not paid; and (iii) Defendant knew, or should have known, of the unpaid overtime work performed by the Plaintiffs. Based on the confirmed forgery of Plaintiffs' timesheets, no reasonable juror would be able to conclude that Defendant accurately calculated Plaintiffs' owed wages or adequately paid them for the time that

---

[31] The video additionally shows Defendant did not maintain safe employment practices as Plaintiffs were not secured while performing work on the bridge, yet another violation.

they worked. This evidence creates a material, factual dispute that must be decided by the jury, thus warranting a denial of Defendant's Motion as to this claim.[32] [33]

## <u>CONCLUSION</u>

For the reasons set forth above, Plaintiffs respectfully request that the Court deny the Defendant's Motion for Summary Judgement.

Dated:  Miami, Florida          **DEREK SMITH LAW GROUP, PLLC**
        July 17, 2025          *Counsel for Plaintiffs*


        */s/ Daniel J. Barroukh*
        Daniel J. Barroukh, Esq.
        Florida Bar No.: 1049271
        Derek Smith Law Group, PLLC
        520 Brickell Key Drive, Suite O-301
        Miami, FL 33131
        Tel: (305) 946-1884
        Fax: (305) 503-6741
        Danielb@dereksmithlaw.com

---

[32]Defendant prematurely requested Plaintiffs' punitive damages be stricken. *See* D.E. 21 at p.34. It is well established in the Northern District that where "a genuine dispute of material facts exists… summary judgment is not appropriate on the issue of compensatory and punitive damages." *Flanning v. Baker*, 2016 U.S. Dist. LEXIS 121010 at 21 (N.D. Fla. 2016).

[33] Defendant arbitrarily inserts a brief discussion of Plaintiffs' mitigation efforts at the tail-end of its motion. Again, this conversation is appropriate for a jury upon consideration of damages at trial.

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)

Pursuant to Local Rule of Civil Procedure 7.1(F), I hereby certify that the foregoing Plaintiffs' Response in Opposition to Defendant's Motion for Summary Judgment contains no more than 8,000 words, inclusive of headings, footnotes, and quotations, but exclusive of case style, signature block, the Certificate of Service, and this Certificate of Compliance.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing document is being served on July 17, 2025, on all counsel of record on the service list below via the Court's CM/ECF system.

*/s/ Daniel J. Barroukh*
Daniel J. Barroukh, Esq.

## SERVICE LIST

**COLE, SCOTT & KISSANE, P.A.**
500 N. Westshore Boulevard, Suite 700
Tampa, FL 33609
Telephone: (813) 560-2814
Facsimile: (813) 286-2900

Brian D. Rubenstein, Esq.
Brian.rubenstein@csklegal.com
Florida Bar No.: 16997
Arthur L. Jones III, Esq.
Arthur.jones.iii@csklegal.com
Florida Bar No.: 1008304

*Attorneys for Defendant*